IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Joanne Augst-Johnson, Nancy Reeves, Debra Shaw, Jan Tyler, Cheryl Giustiniano, Laurie Blackburn, Erna Tarantino, and Elizabeth Reinke<br><br>On behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>Morgan Stanley & Co. Incorporated f/k/a Morgan Stanley DW Inc.,<br><br>        Defendant. | Case No. 1:06-cv-01142 (RWR)<br><br>CLASS ACTION<br><br>JURY TRIAL DEMAND |

## DECLARATION OF CYRUS MEHRI

Pursuant to Title 28 U.S.C. Section 1746, I, Cyrus Mehri, hereby declare and state, as follows:

1.  I am over the age of eighteen years. I have personal knowledge of the facts set forth herein, and am competent to testify thereto.

2.  I am a founding partner at Mehri & Skalet, PLLC ("M&S"), and co-lead counsel (along with Steven M. Sprenger of Sprenger + Lang, PLLC) for the plaintiffs in the above-referenced action.

**HISTORY OF THE CASE**

3.      In April of 2004, the National Council of Women's Organizations ("NCWO") and the law firm of Mehri & Skalet launched the Women on Wall Street Project to investigate claims of gender discrimination in the financial services industry. The NCWO had heard from women at many of these companies that they had experienced gender discrimination in their employment and asked my firm to initiate an investigation into these gender discrimination claims. We agreed to undertake the investigation because of the important public policy issues involved in reforming an industry where women have historically been denied equal opportunity.

4.      In January 2005, my office first received a call from Joanne Augst-Johnson regarding a potential sex discrimination claim against Morgan Stanley & Co. Incorporated ("Morgan Stanley"). Ms. Augst-Johnson had already filed a discrimination charge with the U.S. Equal Employment Opportunity Commission ("EEOC") and had been issued a right-to-sue letter. Ms. Augst-Johnson believed that she and other female Financial Advisors were afforded fewer business opportunities than comparable male Financial Advisors and that she and other female employees experienced gender discrimination in numerous aspects of their employment including career advancement, distribution of accounts, work assignments, compensation, and other terms and conditions of employment.

5.      My office began an investigation into Ms. Augst-Johnson's claims, and a few months later asked Steven M. Sprenger and Mara R. Thompson of Sprenger + Lang, PLLC to join as co-counsel in the investigation because of their extensive experience in

sex discrimination class action litigation and settlements, including *Kosen v. American Express Financial Advisers, Inc.*, Civ. No. 1:02CV00082 (HHK) (D.D.C.) (settlement of $31 million on behalf of female financial advisors). Chris Moody and Whitney Warner of Moody & Warner, P.C., who had been investigating claims on behalf of Nancy Reeves, Debra K. Shaw, and Jan Tyler against Morgan Stanley, joined our legal team by May 2005. Together these three firms constitute proposed "Class Counsel."

6. In March 2005, we entered into a tolling agreement with Morgan Stanley tolling claims for female Financial Advisors as of December 27, 2004. The tolling agreement was entered into in order to facilitate potential settlement negotiations. We scheduled an initial settlement negotiation meeting with Morgan Stanley's outside counsel, Mark Dichter, of Morgan Lewis & Bockius LLP, on April 15, 2005 in New York.

**SETTLEMENT NEGOTIATIONS**

7. In preparing for our first settlement meeting, my co-counsel and I worked with Ms. Augst-Johnson to identify the claims in the case and to develop a written statement of the issues we believed should be resolved by a settlement on behalf of a nationwide class. Attorneys Mara Thompson, Sandi Farrell, and I all met with Ms. Augst-Johnson in person prior to the initial settlement meeting.

8. Prior to the initial settlement meeting on April 15, 2005, Plaintiffs' counsel identified three key programmatic issues to be addressed in a potential settlement: account distribution, promotions, and internal grievance procedures.

9. During the first several months of the negotiations, the Company was only willing to discuss far more limited programmatic relief than the relief we sought.

Progress toward a comprehensive settlement that included broad programmatic relief and classwide monetary relief was slow to develop and hard fought. By the end of 2005, the parties had begun to discuss the comprehensive and far-reaching programmatic relief envisioned by Class Counsel. In 2006, we continued those discussions and also began to address obtaining relevant computerized data and resolving the monetary relief claims.

10. As settlement negotiations went on, we continued our investigation of sex discrimination claims of financial advisors against the Company. In 2005 and 2006, Class Counsel conducted in-depth interviews with over two hundred (200) potential class members.

11. During these interviews, several women expressed interest in participating in the case in a more substantial way. Ultimately, seven additional women became Named Plaintiffs: Nancy Reeves, Deborah Shaw, Jan Tyler, Cheryl Giustiniano, Laurie Blackburn, Erna Tarantino, and Elizabeth Reinke. All eight Named Plaintiffs appeared to have typical claims and to be suitable to serve as class representatives. In addition, they represent a cross-section of the country, coming from the states of Minnesota, Colorado, Washington, Virginia, Nevada, and Illinois. All eight have executed declarations in support of the settlement.

12. With over 200 witnesses, representing female employees in over 35 states, this was an extremely comprehensive investigation. Without disclosing the names of the witnesses, we provided the fruits of our investigation to the Defendant in various presentations, including an in-depth power point presentation. As a result of this, the Company agreed to expand the scope of the settlement talks. Based on the results of the continuing investigation, additional issues such as distributions and transfers of accounts,

Page 4

work assignments, compensation, career advancement opportunities, termination, and other terms and conditions of employment became part of the focus of the negotiations.

13.     We engaged in settlement negotiations with the Defendant during most of 2005 and all of 2006, including numerous, lengthy in-person meetings in Philadelphia, New York, and Washington, DC, and several telephone conferences.  The negotiations were conducted at arm's length, and faced several potential impasses.  Beginning in June 2006, negotiations were conducted under the auspices of Hunter Hughes, Esq., who was jointly selected by the parties to serve in that capacity because of his reputation as one of the premier mediators for large employment discrimination class actions.  The material terms of the settlement were subject to intense negotiation, and the parties called upon Mr. Hughes frequently to assist in resolving highly contested points.  Class Counsel kept the Named Plaintiffs informed of the progress of negotiations by telephone, and , at various stages, had them review and provide input regarding the programmatic relief, the memorandum of understanding, and the settlement agreement.  On February 22, 2007, counsel for the parties signed a Memorandum of Understanding, signaling the first step towards resolution.  On April 23, 2007, counsel for the parties finalized a written settlement agreement resolving all claims in the case, subject to court approval.  The settlement was crafted by highly experienced counsel on both sides.  The development of the programmatic relief was a collaborative effort to achieve common ground.

14.     During settlement negotiations, Class Counsel sought, and Morgan Stanley produced to Class Counsel, voluminous data and other information concerning Morgan Stanley's workforce and work practices relevant to the claims asserted and damages we sought.  If the parties had chosen to engage in divisive litigation rather than

devoting their energies to problem solving through thoughtful negotiations, this type of candid and fruitful exchange may not have been possible. This exchange was, in many ways, equivalent to class discovery, and enabled Class Counsel to assess their litigation position. To that end, Class Counsel retained an expert to conduct statistical analyses of the data. The expert worked with Class Counsel to review the data, ensure it was complete, request supplemental data, and analyze the data. The expert also conducted studies similar to those that she would have conducted in preparation for trial of this matter. Class Counsel also retained a second expert to assist in analyzing industry practices and to provide input on crafting injunctive relief. He believes that outstanding relief has been achieved here.

15. Based on our expert's analyses of the data received from Morgan Stanley, as well as representations from the Company, Class Counsel believe that there are approximately 2700 class members.

**BENEFITS OF THE SETTLEMENT FOR THE CLASS**

16. In the judgment of Class Counsel, the terms of this settlement are enormously beneficial to the proposed class and easily meet the legal standard of "fair, reasonable, and adequate" for approving a class settlement. The class relief in the settlement directly addresses the concerns raised by the Named Plaintiffs in two key respects: First, the Settlement Agreement provides for meaningful programmatic relief that will greatly enhance business opportunities for women financial advisors at Morgan Stanley, making distribution of business opportunities more objective, by instituting innovative new programs and putting in place reporting, monitoring, and accountability measures. Second, the Settlement creates substantial monetary relief for a nationwide

class. Because plaintiffs' counsel completed an extensive investigation and engaged in frequent and intensive settlement negotiations, we identified relevant legal issues and understood the strengths and weaknesses of our case. Based on this experience, we believe that this settlement creates an outstanding result without the long delays and risks of protracted litigation.

17.  Perhaps the most significant and long-lasting benefit that class members who are current employees will reap from the settlement is the programmatic relief, which was fashioned in an extraordinarily collaborative way by the parties, and will be augmented with the recommendations of two industrial psychologists.

18.  Both the Settlement Agreement and the Plaintiffs' Memorandum of Points and Authorities in Support of the Motion for Preliminary Approval set forth the specific details of this relief, which should expand opportunities for female Financial Advisors to be successful at Morgan Stanley. Class Counsel anticipates that this relief will also set a valuable example for gender equity at other financial services companies.

19.  Some highlights of the programmatic relief include: (1) the account distribution system, which will be modified to ensure that business opportunities are distributed on the basis of criteria that reflect merit and current performance. This system will remove discretion from branch managers in distributing accounts and will decrease the value of historical performance; (2) an independent Diversity Monitor will be appointed to ensure that the new account distribution system is being implemented and to monitor the way in which Human Resources responds to inquiries and complaints; and (3) the Company will develop and implement a comprehensive management assessment

and development program to provide candidates a path to assessment and selection as branch managers.

20. In addition to these specific policy changes, the Company will appoint two noted outside Industrial Psychologists, Irwin Goldstein and Kathleen K. Lundquist, who will propose innovative, meaningful, novel, state of the art ideas for programs that will: attract and retain women to Morgan Stanley; increase participation of women in partnerships and in distribution of retiring broker accounts; and provide training, development, and mentoring for female Financial Advisors and Financial Advisor Trainees. Professor Goldstein is senior vice chancellor for academic affairs for the University System of Maryland. He previously served for 12 years as professor and dean of the School of Behavioral and Social Sciences at the University of Maryland, College Park. As an organizational psychologist, Professor Goldstein works with organizations on resolving issues related to employment discrimination and has participated in many class action settlements. Dr. Lundquist is the President of Applied Psychological Techniques, Inc. She has over 20 years of experience in the field of industrial/organizational psychology, with particular interest in the areas of employment discrimination and the design of HR processes. She has frequently been appointed as a settlement expert in class action settlements. Both Dr. Goldstein and Dr. Lundquist just completed a five-year term as joint experts in the race discrimination case *Ingram v. The Coca-Cola Company*. Their work has been instrumental in making The Coca-Cola Company one of the top companies in the nation on the issue of diversity and equal opportunity.

21. The benefits provided in the programmatic relief aspects of the Settlement, which extend beyond direct relief to the class, enhance the fairness of the settlement.

22. In addition to the far-reaching programmatic relief, the settlement also provides an outstanding monetary benefit to the class. The Settlement Fund will consist of an initial payment by Morgan Stanley of Forty-Six million dollars ($46,000,000). Accrued interest to the initial payment is expected to add at least one million dollars to the Settlement Fund. The Company will make a financial contribution to the Settlement Fund to cover the employer's share of payroll taxes in an amount to be determined by the Special Master. The Settlement Fund is likely to approach $50 million in total. Indeed, to Class Counsel's knowledge, this is one of the larger funds created in a gender discrimination case. Each class member who completes a Claim Form and Release will have an opportunity to receive a monetary payment, without being required to prove her case in court. This is an enormous benefit that compares favorably with other settlements that effectively called on class members to participate in mini-trials in order to recover a monetary award. If the case were litigated, it is likely that many class members would be unable to successfully claim any relief at all.

23. The allocation of awards to class members out of the Settlement Fund will be based on a formula that includes two equally weighted components – an Earnings Regression component and a Claim Form component. The Earnings Regression component will be developed by Plaintiffs' labor economist and statistician and will account for the claimant's length of tenure at Morgan Stanley and the disparity between the claimant's earnings during the liability period and those of high-performing male

peers. The Claim Form component will be based on a formula that takes into consideration the individual's evidence of sex discrimination, evidence of compensatory damages, the general release of claims asserted in administrative charges, and, where applicable, contributions to the litigation. Based on these two components, the Special Master will recommend a plan of allocation and the amounts of individual awards.

24. The Special Master agreed to by the parties and submitted to the Court for approval is Thomas ("Tommy") Warren. Mr. Warren has over 30 years of experience in class action and civil rights law and 15 years of experience in settlement administration. He is particularly well-versed in employment discrimination settlements and has served in a Special Master capacity in prior settlements. Class Counsel is confident that Mr. Warren will fulfill his duties as Special Master with distinction.

25. Mr. Warren is President and owner of Settlement Services, Inc., ("SSI"), a business entity that specialized in class action settlement administration. Settlement Services Inc. will serve as the Claims Administrator for this case, by agreement of the parties. SSI has extensive experience in settlement administration and the parties are confident that SSI will satisfy their responsibilities in the most effective and professional manner.

26. In addition to the Settlement Fund, Morgan Stanley is expected to spend at least $7.5 million over the term of the Settlement to implement the provisions of the programmatic relief. The projected benefit of the programmatic relief to class members in terms of expected additional earnings for female Financial Advisors as a result of the programmatic relief achieved here is at least $16 million over the five-year settlement term. The overall value of the settlement is expected to exceed $70 million – an excellent

result for the class. This amount understates the true value of the settlement because the value of the reforms encompassed in the programmatic relief cannot be quantified monetarily.

27. Indeed, it is entirely possible that, even if the plaintiffs had litigated for years, the class had been certified, and the plaintiffs had survived an almost inevitable appellate challenge to certification, prevailed in a trial on the merits, and won a likely appeal, the class would not have achieved anywhere near what is provided in this settlement. Of course, there is also the substantial risk of achieving no relief for the class.

28. Finally, the settlement benefits must be evaluated in light of the substantial due process protections provided to members of the class. The mandatory claims released by class members are limited to relief related to sex discrimination at Morgan Stanley during the class period. While the Named Plaintiffs are expected to execute a general release of all claims against Morgan Stanley, they, as well as all other class members, have the opportunity to opt out and preserve their claims if they so desire. The Named Plaintiffs have the additional option of signing a Class Member release, allowing them to opt out with respect to their non-gender claims. The benefits of the settlement terms, compared with the scope of the release, are fair and reasonable.

**RECOMMENDATIONS FOR SETTLEMENT**

29. I carefully considered whether to recommend that the class accept the settlement, based on the following: my knowledge of the strengths and weaknesses of the factual case we had developed through informal discovery; my knowledge of the strengths and weaknesses of the class' position on class certification and its claims on the merits under prevailing law applicable in this jurisdiction; my knowledge and experience

of the serious risks of litigating employment discrimination class actions; and the inevitable years of delay in obtaining a recovery, if any, at trial.

30. Based on this knowledge and experience, I determined that even if the class action proceeded to trial, and was successful, it would be difficult to obtain better programmatic relief, and it would be unlikely that the class would obtain a better monetary recovery. I believed that agreeing to such an excellent settlement, which would provide best-case scenario relief far quicker than litigation, was undoubtedly in the best interests of the class. My co-counsel are all in strong agreement with this assessment.

**BASIS FOR CERTIFYING CLASS COUNSEL AND THE CLASS REPRESENTATIVES**

**Qualifications of Class Counsel**

31. The firms and lawyers that brought this case, litigated it, and successfully negotiated an outstanding settlement, are extremely well qualified to serve as class counsel. While Steve Sprenger and I served as co-lead counsel, all the attorneys involved worked together to bring about this result. Each of the lawyers brings different strengths to the team – class action expertise, knowledge about the civil rights statutes and other substantive legal issues involving sex discrimination claims, settlement experience, and overall legal talent. All of these lawyers have taken their obligations to further the interests of the class very seriously from the beginning of the case. We have regularly communicated with the Named Plaintiffs and other class members throughout the investigation and settlement negotiation process. Our team has invested all the financial, legal and other resources necessary to prosecute and successfully resolve this case.

Individually and collectively, we all meet or exceed the standards set by Rule 23 to determine class counsel's adequacy.

32.  Mehri & Skalet, PLLC, specializes in representing plaintiffs in class actions, particularly employment discrimination class actions.  During the past 20 or so years, I have represented plaintiffs in dozens of class actions in a variety of fields, including consumer fraud, antitrust and securities.  Most significantly, over the last fifteen years, I have had the privilege and opportunity to represent protected classes in a series of employment discrimination and other civil rights class actions.  Prior to private practice, I clerked for the Honorable John T. Nixon, Chief Judge of the Middle District of Tennessee and graduated from Cornell Law School.  I am assisted by skilled lawyers in my firm who have helped obtain an excellent result for the class in this case.

33.  I have served as counsel in a number of employment discrimination multi-plaintiff or class actions.  I have also been involved in investigating, litigating, and in some cases, settling more than 20 potential discrimination class actions.  During the last decade, there are few lawyers in the country who have devoted more time and energy than I have to employment discrimination class actions on behalf of employees at Fortune 500 Companies.

34.  Along with my colleagues at that time, I was recognized by the Court for my work as class counsel in the landmark class action settlement of race discrimination claims against Texaco:

> This case involved extraordinary skill and effort on the part of plaintiffs' counsel, particularly in view of the relentless effort, vigor and skill employed by Texaco's experienced and able counsel in pursuing a defensive strategy that maximized burden and left no litigation tactic unexplored.  The risk of litigation was substantial, to say the least.  Cases

such as this rarely produced significant recoveries and are fraught with problems of proof, being largely based on statistical data. ...

* * *

And the ingenuity of counsel (and their respective clients) in framing an imaginative settlement, that may well have important ameliorative impact not only at Texaco but in the corporate context as a whole, likewise merit consideration.

*Roberts v. Texaco Inc.*, 979 F. Supp. 185, 197-98 (S.D.N.Y. 1997).

35. My colleagues and I received similar commentary on our skills in representing a class in the noted settlement of race discrimination claims against The Coca-Cola Company, where Judge Story observed: "As a judge, there's no greater pleasure than the opportunity to be involved in litigation with quality, professional class counsel..." *Ingram v. The Coca-Cola Company*, No. 1-98-CV-3679 (RWS) (N.D. Ga.), Transcript of Fairness Hearing, May 29, 2001, at 220. More recently, in *Robinson v. Ford Motor Co.*, No: 1:04-CV-00844 (S.D. Ohio 2005), Judge Spiegel stated: "The Court notes that the results obtained in this matter by [class counsel] are far reaching and notable."

36. Steven A. Skalet is a co-founder of our firm and is a graduate of the University of Pennsylvania Law School. Mr. Skalet has over 35 years of experience as a litigator and transactional lawyer and has served as lead counsel in numerous national and state wide class actions. Mr. Skalet worked extensively on drafting documents and negotiating issues pertaining to the Settlement Agreement and preliminary approval as the settlement came to fruition.

37. Sandi Farrell, an associate at my firm, is a graduate of Yale Law School. Ms. Farrell participated in almost all of the settlement negotiation sessions and assisted in drafting the briefs related to settlement approval. She also completed much of the factual

investigation in the case and interacted extensively with the clients. She had a significant civil rights legal background prior to joining the firm in 2005.

38. Lisa Bornstein joined the firm in 2003 after graduating from Columbia Law School, clerking for the Honorable Stanley Marcus of the U.S. Court of Appeals for the 11th Circuit, and working at the United States Department of Justice. Ms. Bornstein helped draft the Complaint and prepare the preliminary approval papers.

39. Sprenger + Lang, PLLC is a nationally known firm specializing in civil rights cases and class actions. The qualifications of the attorneys at that firm are addressed in the Declaration of Steven Sprenger, also submitted herewith.

40. Moody & Warner, P.C. is a law firm that specializes in precedent-setting and socially significant civil litigation around the western United States from its base in New Mexico. Christopher Moody is an honors graduate from Duke University School of Law and has litigated employment discrimination cases for over 20 years. Whitney Warner is a high honors graduate of the University of New Mexico School of Law and has been practicing for over 8 years. Mr. Moody and Ms. Warner have litigated a number of multiple-plaintiff employment discrimination and collective actions and are highly experienced in employment discrimination litigation, including sex discrimination cases. They participated extensively in the investigation of the case and provided strategic guidance and assistance with settlement negotiations, specifically crafting programmatic relief, case strategy, and client communications.

**Adequacy of Class Counsel**

41. The record in this case reflects that putative class, fully discharged their duties to the class. Our work in the litigation is documented above, and the declarations

of all eight Named Plaintiffs are submitted separately to demonstrate both the typicality of their claims and their participation in the investigation and negotiations, and their support of the settlement.

42.     I have no doubt that Preliminary Approval of this settlement is in the best interests of the class, and that any continuing questions any class members have about the settlement terms or benefits should be handled through the normal notice, objection and opt-out, and Fairness Hearing process.  Because of the significant benefit this settlement provides to the Class, I respectfully request that the Court begin this approval process as soon as possible.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24th day of April, 2007 in Washington, D.C.

                                        /s/Cyrus Mehri
                                        Cyrus Mehri