UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Joanne Augst-Johnson, Nancy Reeves, Debra Shaw, Jan Tyler, Cheryl Giustiniano, Laurie Blackburn, Erna Tarantino, and Elizabeth Reinke, | ) ) ) ) | Case No. 1:06-cv-01142 (RWR) |
| On behalf of themselves and all others similarly situated, | ) ) ) | CLASS ACTION |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Morgan Stanley & Co. Incorporated, formerly known as Morgan Stanley DW Inc., | ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF JOINT
MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION
SETTLEMENT AND CLASS COUNSEL'S MOTION FOR AWARD
OF ATTORNEYS' FEES AND EXPENSES**

# TABLE OF CONTENTS

I.   INTRODUCTION................................................................................................... 1

II.  HISTORY OF THE CASE .................................................................................... 1

III. SUMMARY OF THE SETTLEMENT TERMS ................................................... 4

    A. General Terms ............................................................................................... 4

    B. Programmatic Relief ..................................................................................... 5

    C. Monetary Relief for Named Plaintiffs and Class Members ........................... 8

IV. THE COURT SHOULD APPROVE THE PROPOSED SETTLEMENT CLASS ................... 9

    A. The Proposed Settlement Class Satisfies Rule 23(a) ................................... 10

        1. The Proposed Class is so Numerous that Joinder of All Members is Impracticable. ............... 10

        2. Questions of Law and Fact Are Common to the Class. ........................... 11

        3. The Named Plaintiffs' Claims Are Typical of the Class Claims. .............. 12

        4. Adequacy of Representation is Satisfied. .............................................. 12

    B. The Proposed Settlement Class Satisfies Rule 23(b) ................................... 13

V.  THE COURT SHOULD GRANT PRELIMINARY APPROVAL OF THE
    SETTLEMENT BECAUSE IT IS FAIR, ADEQUATE AND REASONABLE ................... 15

    A. The Settlement Provides Adequate Relief to the Class ................................ 17

    B. The Settlement is Fair in its Provisions Concerning Notice to Class Members and
       Allocation of Benefits Amongst Named Plaintiffs and Class Members........................ 19

        1. The Proposed Form of Notice is Adequate........................................... 19

        2. Monetary Benefits of the Settlement Will Be Fairly Distributed Among Named Plaintiffs
           and Class Members........................................................................... 20

    C. The Requested Fee Award is Fair, Reasonable and Adequate ...................... 21

        1. The Initial Requested Percentage Allocation is Consistent with All Applicable  Precedent. ..... 21

        2. The Series of Future Annual Allocations are Fully Justified by the Anticipated Fees and
           Costs to Enforce and Monitor the Settlement....................................... 24

VI. THE COURT SHOULD ENTER ADMINISTRATIVE ORDER NO. 1 ............................. 25

CONCLUSION ........................................................................................................ 26

Plaintiffs Joanne Augst-Johnson, Nancy Reeves, Debra Shaw, Jan Tyler, Cheryl Giustiniano, Laurie Blackburn, Erna Tarantino, and Elizabeth Reinke (the "Named Plaintiffs" or "Class Representatives"), on behalf of the putative settlement class, respectfully request that this Court grant the parties' Joint Motion for Preliminary Approval of their Class Action Settlement Agreement, which will provide class members with substantial programmatic and monetary relief. Under all applicable standards, the proposed settlement is fair, adequate, and reasonable. It is the product of extensive bargaining by both sides over more than two years, and it reflects a milestone achievement in this field that is expected to have an impact not just at Morgan Stanley but throughout a financial services industry that has been troubled by historic gender inequity.

## I.    INTRODUCTION

The Plaintiffs have obtained through arduous negotiations an outstanding result for the Settlement Class that will considerably expand opportunities for women Financial Advisors and Registered Financial Advisor Trainees at Morgan Stanley. The Plaintiffs have alleged in their Amended Complaint that Morgan Stanley has discriminated against them as a class on the basis of sex in various aspects of their employment described below. The parties have agreed that the settlement will constitute a full and complete adjudication of the rights of Named Plaintiffs and Class Members as set forth in the Settlement Agreement. The settlement is exceedingly fair, adequate, and reasonable, and therefore warrants the Court's approval.

## II.    HISTORY OF THE CASE

The financial brokerage industry has long struggled with gender equity for female brokers. In April of 2004, the National Council of Women's Organizations and the law firm of Mehri & Skalet, PLLC launched the Women on Wall Street Project to investigate claims of gender discrimination in the financial services industry. (Declaration of Cyrus Mehri (hereinafter "Mehri Decl."), ¶ 3).

1

This case began in early 2005, after Joanne Augst-Johnson contacted Mehri & Skalet regarding her experiences at Morgan Stanley.   Soon thereafter, Mehri & Skalet enlisted the assistance of Sprenger + Lang, PLLC, which successfully prosecuted a similar gender discrimination case against American Express Financial Advisors, Inc.  (Mehri Decl., ¶¶ 4-5; Declaration of Steven M. Sprenger, (hereinafter "Sprenger Decl."), ¶¶ 4, 8, 12).  At the same time, a third firm, Moody & Warner, P.C., had been investigating the claims of Nancy Reeves, Debra Shaw and Jan Tyler.  Eventually the three firms joined forces, and over more than two years, they collectively conducted interviews of more than 200 women employed in Morgan Stanley's retail brokerage business. (Mehri Decl., ¶¶ 5, 10; Sprenger Decl., ¶ 10).   These women worked in over 35 states, including all regions of the country.   (Mehri Decl., ¶ 12).   In the course of the investigation, other courageous women stepped forward to join in the prosecution of these claims: Cheryl Giustiniano, Laurie Blackburn, Erna Tarantino and Elizabeth Reinke.  Each of them came forward to help bring about change at Morgan Stanley and to create change in an industry that has been reluctant to afford equal opportunities to female brokers.

The claims in this case, set forth in detail in the Amended Complaint, allege that Morgan Stanley discriminated against women Financial Advisors and Registered Financial Advisor Trainees with respect to distributions and transfers of accounts, work assignments, compensation, career advancement opportunities, termination, and other terms and conditions of employment.

For more than two years, the parties have engaged in exhaustive and continuous negotiations that included the exchange of information similar to discovery that would have occurred during formal class discovery prior to a class certification motion and trial before this Court.  (Mehri Decl., ¶¶ 13-14; Sprenger Decl., ¶ 10).  An examination of the information exchanged, including analyses conducted by recognized statistical experts of company-wide computer data concerning account distributions and compensation for women versus men during the potential liability period, enabled

2

the parties to fully assess their respective litigation positions.  Morgan Stanley representatives also provided detailed information on company practices.  The Named Plaintiffs provided valuable insights and contributions, particularly with respect to the topics addressed in the programmatic relief.  Extensive, rigorous, arms-length negotiation sessions, including over 15 in-person negotiations held in New York, Philadelphia and Washington, DC, and numerous telephone conferences, accompanied the parties' exchange of information. (Mehri Decl., ¶ 13).  In light of the complexities of the issues and the intensity of the negotiations, the parties concluded that it would be useful for an outside mediator to facilitate the negotiations.  Midway through the process, the parties engaged Hunter H. Hughes, Esq. of Rogers & Hardin, LLP, a skilled mediator and nationally recognized leading authority in the field of employment class action dispute resolution.  (*Id.*; Sprenger Decl., ¶ 10).  Mr. Hughes brought his invaluable skills to help the parties overcome numerous challenges to reaching an agreement.

To their credit, the parties devoted their energies to problem-solving with thoughtful negotiations rather than distracting and divisive litigation. (Mehri Decl., ¶ 14).  The achievement of this settlement occurred far earlier due to the proactive approach of Plaintiffs and company management rather than contentious and protracted litigation that could go on for years, or even decades, as occurred in one celebrated case in this District, *Hartman v. Duffey*, Civ. No. 77-2019, which took 27 years to resolve.

These intensive mediation efforts culminated in a Settlement Agreement ("Settlement") on April 23, 2007.  The parties now seek approval of this Settlement, including class certification and the issuance of class notice, pursuant to Rule 23(e).[1]

---

[1]    The Court is also being asked to enter proposed Administrative Order No. 1 (attached to the Settlement Agreement as Exhibit D), which establishes the mechanism through which the Settlement Fund will be disbursed, consistent with applicable provisions of the Internal Revenue Code and the Settlement.

III.    **SUMMARY OF THE SETTLEMENT TERMS**

If approved, the Settlement will provide exceptional, wide-ranging injunctive relief. These injunctive relief measures, summarized below, address employment issues that would have been litigated in this case. While triggered by claims of gender discrimination, many of these measures will also benefit all Financial Advisors and Registered Financial Advisor Trainees by promoting fairness, consistency and objectivity in Morgan Stanley's employment practices. In addition, the Settlement provides outstanding monetary relief for Class Members. The overall value of the Settlement is in excess of $70 million. Moreover, the Settlement is a milestone achievement because it will set a standard for other companies in the financial services industry in their efforts to achieve equal opportunity and gender equity in the workplace.

A.    **General Terms**

The Settlement Class includes all Named Plaintiffs in the action and all women who were employed by Morgan Stanley as Financial Advisors or Registered Financial Advisor Trainees at any time between August 5, 2003, and the date of preliminary approval of the Settlement (Settlement Agreement § III.D.1). All Class Members who receive a monetary award under the Settlement will expressly release all sex discrimination claims that arise out of the allegations giving rise to this lawsuit (*Id.*, § V.A). Class Members may opt out of the monetary portion of the Settlement by filing an opt-out statement with the Court within the prescribed period (*Id.*, § IV.C.5).

The term for the programmatic provisions of the Settlement is five (5) years (*Id.*, § III.B).[2] During the five-year term, Morgan Stanley will regularly report to Class Counsel about Morgan Stanley's compliance with Settlement obligations through a Diversity Monitor hired pursuant to the Settlement Agreement (*Id.*, § VII.F.1 and § IX.C). The company will institute a state-of-the-art monitoring program developed with input from jointly appointed expert Industrial Psychologists

(*Id.*, § VII.F.2 and § IX.B). If Morgan Stanley fails to carry out any of its obligations, Class Counsel may bring an enforcement action following attempted voluntary resolution of the dispute. Any such enforcement action would be brought before an arbitration panel and subject to binding arbitration and Court oversight (*Id.*, § X).

From both a programmatic relief and monetary relief perspective, the Settlement compares favorably with the Consent Decree approved by Judge Kennedy in *Kosen, et al. v. American Express Financial Advisors Inc.*, the most analogous case in this District. (Sprenger Decl., ¶ 12).

**B.    Programmatic Relief.**

The programmatic relief agreed to in the Settlement consists of changes in company policies and practices that plaintiffs alleged were the source of the sex discrimination that they and other women experienced. The Settlement provides that Morgan Stanley shall, among other things:

1.    Revise the calculations used to allocate accounts and other business opportunities, known as "Power Rankings," to ensure equitable and fair account distribution without regard to gender. The methodology for calculating a Financial Advisor's Power Ranking will be disclosed to each Financial Advisor, with an explanation of each factor and how each factor is weighted (Settlement Agreement, § VII.C.1-2);

2.    Implement account distribution policies to ensure equitable distribution of the accounts of departing Financial Advisors, retiring Financial Advisors, departing Financial Advisor partners, and leads, call-ins and walk-ins. The new policies will be disseminated via e-mail by senior management to all field employees and will be posted on Morgan Stanley's intranet site. Morgan Stanley will also train all managers on the account distribution policies (*Id.*, § VII.C.3.a)

3.    Computer-automate the account distribution process (*Id.*, § VII.C.3.d);

4.    Require that the accounts held by (a) a retiring Financial Advisor, (b) a departing partner in a Financial Advisor partnership, or (c) a manager transferred to a non-producing manager position will be distributed through the Power Ranking account distribution process described above unless a Joint Production Agreement has been in effect for twenty-four (24) months or longer (*Id.*, § VII.C.4-5);

---

2    The settlement term may be extended only as provided in the Settlement Agreement or by order of the Court if warranted under applicable law.

5.   Implement a "Financial Advisor of the Day" Program to disseminate leads, call-ins and walk-ins in each branch office equitably and without regard to gender (*Id.*, § VII.C.6);

6.   Implement a Branch Management Mobility project which includes posting all branch management positions on Morgan Stanley's Internal Job Bank for a minimum of 5 business days. The positions to be posted include: Branch Manager; FA in Charge; Sales Manager; and Assistant Branch Manager (*Id.*, § VII.B);

7.   Develop and implement a comprehensive management assessment and development program to provide candidates a path to assessment and selection as branch managers *(Id.);*

8.   Provide all management-level field personnel with diversity training no less than every other year. Branch Manager compensation will also have a diversity component designed to measure and reward efforts at recruiting, training, and retaining women Financial Advisors *(Id.);*

9.   Appoint two noted outside Industrial Psychologists who will be a resource to develop innovative, meaningful, novel, state-of-the-art ideas for programs to:

 a.   Develop workplace initiatives designed to attract and retain women to Morgan Stanley and to enhance their success;

 b.   Develop programs and make recommendations to increase participation of women in the distribution of retiring Financial Advisors' accounts;

 c.   Develop programs and make recommendations to increase participation of women in Financial Advisor partnerships;

 d.   Develop policies and practices regarding training, development and mentoring that will enhance opportunities for women Financial Advisors and Financial Advisor Trainees;

 e.   Review the operation of the revised Power Ranking calculations and account distribution process and provide the Diversity Monitor with findings of any deviations from the account distribution policy.

(*Id.*, § VII.F.2)

10.   Appoint a Diversity Monitor whose tasks will be to:

 a.   Review account distribution data, exception reports and complaints, and inform Morgan Stanley and Lead Class Counsel of any potential non-compliance found;

b.    Review monthly reports regarding complaints from women Financial Advisors and Financial Advisor Trainees alleging gender discrimination or inequality and the resolution of such complaints through Morgan Stanley's CARE program or otherwise;

c.    Monitor bi-annual training of management on EEO policies and policies against discrimination and retaliation and ensure implementation of the training agreed to;

d.    Review Human Resources' investigations and resolutions of inquiries and complaints from Financial Advisors;

e.    Provide reports to Class Counsel at least twice per year regarding all items monitored, including the analysis of account distributions;

f.    Maintain records for the five-year term of the settlement.

g.    Review Human Resources training on best practices for complaint investigation and resolution, including training regarding compliance with state, federal, and local EEO laws; Morgan Stanley's anti-discrimination and harassment policies; and compliance with the proposed settlement agreement;

h.    Collect and maintain data regarding (a) compensation of Financial Advisors, (b) account distribution, (c) partnerships between active Financial Advisors or an active Financial Advisor and a retiring Financial Advisor, (d) any other data agreed upon by the parties; and

i.    Meet with Class Counsel at least once per year regarding compliance with the policies and procedures set forth in the Settlement Agreement.

(*Id.*, § VII.F.1)

Class Counsel will monitor Morgan Stanley's compliance with its commitments, based on reports and information that the Diversity Monitor is required to provide to Class Counsel on a semi-annual basis (*Id.*, § IX.A). Further, a monitoring system developed by the jointly appointed Industrial Psychologists will ensure that the far reaching policies are carried out as intended (*Id.*, § IX.B).

The parties estimate that, in addition to the monetary relief, Morgan Stanley will spend approximately $7.5 million on the programmatic relief measures required by the Settlement

Agreement described above.  Furthermore, the parties estimate that, as a result of the actions to be taken by Morgan Stanley pursuant to the Settlement, the earnings of women Financial Advisors and Registered Financial Advisor Trainees will increase by at least $16 million over the five-year term of the Settlement (Mehri Decl. ¶ 26).

### C.    Monetary Relief for Named Plaintiffs and Class Members.

The Fund will be established by Morgan Stanley's initial electronic transfer of $46 million within 10 days after preliminary approval into an account to be established in the name of MS-GWMG Financial Advisor Sex Discrimination Settlement Fund (Settlement Agreement, § VIII.A). The initial principal is expected to generate over $1 million in interest prior to Class Member distributions (*Id.*, ¶ 22).  Morgan Stanley will also pay the employer's share of payroll taxes due on Class Member distributions.  (Settlement Agreement, § VIII.F.2).  Ultimately, the Settlement Fund, inclusive of interest and the employer's share of payroll taxes, is likely to approach $50 million. Together with the estimated monetary value of the programmatic relief, the overall value of the Settlement is in excess of $70 million (Mehri Decl., ¶¶ 22, 26).  The Settlement Fund will be used to pay the claims of Class Members (including the Named Plaintiffs); attorneys' fees and litigation expenses; and costs to administer the claims process and to monitor and enforce the Settlement (*Id.*, § VIII.A).

The allocation of awards from the Claims Portion to Class Members, including the Named Plaintiffs, shall be based on an allocation formula that includes an Earnings Regression component and a Claim Form Survey component, each of which shall be weighted equally in calculating a Class Member's monetary award (*Id.*, § VIII.D.1-2).  The Earnings Regression component, which will be developed by Plaintiffs' labor economist and statistician, will consist of a mathematical calculation that accounts for both the claimant's length of tenure at Morgan Stanley and the disparity between the claimant's earnings during the liability period and those of male peers (*Id.*, §

VIII.D.1). The Claim Form Survey component, which will be administered by a Special Master, will be based on a formula that takes into consideration individual evidence of sex discrimination, individual evidence of compensatory damages, individual contributions to the litigation, and the release of claims asserted in administrative charges that exceed the scope of the Class claims (*Id.*, § VIII.D.2). No awards will be paid prior to final approval of the Settlement. (*Id.,* § VIII.D.3.d). The Special Master will recommend a plan of allocation based on the Earnings Regression calculations and consideration of the Claim Forms and information provided by Class Counsel, and will submit final awards to the Court for approval (*Id.*, § VIII.D.3.a-c).

## IV.    THE COURT SHOULD APPROVE THE PROPOSED SETTLEMENT CLASS

The Court should grant preliminary approval, and ultimately final approval, to the proposed Settlement under the standards developed pursuant to Rule 23 of the Federal Rules of Civil Procedure.[3] Rule 23 applies to the settlement of any case raising class allegations, even prior to class certification. *See* 3B *Moore's Federal Practice* §23.80[2-1]. Approval of a class action settlement generally involves a four step procedure: (1) preliminary approval, (2) notice to class members, (3) a fairness hearing, and (4) final approval. *See* Fed. R. Civ. P. 23(e).

In considering whether to grant a motion for preliminary approval of a proposed settlement agreement, the Court utilizes a "threshold inquiry" standard intended merely to reveal conspicuous defects. Unless the Court's initial examination "discloses[s] grounds to doubt its fairness or other obvious deficiencies," the Court should order that notice of a formal fairness hearing be given to Class Members under Rule 23(e). *Manual for Complex Litigation (Third)* Section 30.41 (1995).

The proposed Settlement defines the Class as:

---

[3]    In the event that the Settlement is not given final approval, defendant reserves all defenses to class certification.

> All women who were employed as Financial Advisors or Registered
> Financial Advisor Trainees in the Global Wealth Management Group of
> Morgan Stanley & Co. Incorporated or its predecessor(s) at any time between
> August 5, 2003 and the date of preliminary approval.

This Settlement Class readily satisfies the requirements of Rule 23(a) and at least one of the alternatives of Rule 23(b).  Because the proposed class is appropriate for certification under the standards of Fed. R. Civ. P. 23 and the proposed settlement is fair, adequate, and reasonable, the Court should approve the Settlement.

### A.    The Proposed Settlement Class Satisfies Rule 23(a).

Under Rule 23(a) of the Federal Rules of Civil Procedure, a class may be certified when "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  The proposed settlement class meets each of these requirements.

### 1.    The Proposed Class is so Numerous that Joinder of All Members Is Impracticable.

Courts generally agree that classes with 40 or more members satisfy the numerosity requirement. *See Frazier v. Consolidated Rail Corp.*, 851 F.2d 1447, 1456 n.10 (D.C. Cir. 1988); *5 Moore's Federal Practice* § 23.22[3][a] (Matthew Bender 3d ed. 1998).  Based upon all the computerized employment and payroll data provided by the Company and reviewed in arriving at the proposed Settlement, the parties agree that the proposed Class consists of over two thousand seven hundred (2,700) women Financial Advisors and Registered Financial Advisor Trainees. (Mehri Decl., ¶ 15).  Therefore, the proposed Settlement Class clearly meets the numerosity requirement.

## 2.    Questions of Law and Fact Are Common to the Class.

Commonality requires that the claims in a case raise issues that involve questions of law or fact common to the class, but does not require that every issue of law or fact be identical with respect to each class member. *See, e.g., Taylor v. D.C. Water & Sewer Auth.*, 2007 U.S. Dist. LEXIS 17737 at **7-8 (D.D.C. Mar. 13, 2007). Generally, the commonality requirement is satisfied where there is at least one issue which, if resolved, affects all or a significant number of class members. *See, e.g., Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 239 F.R.D. 9, 25-26 (D.D.C. 2006). For this reason, the commonality requirement is "easily met." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 259 (D.D.C. 2002).

The programmatic relief portions of the proposed Settlement here demonstrate that the claims of all members of the Class raise numerous common issues. Morgan Stanley maintains its employment practices and policies in much the same way at each of its branch offices. All of the Class Members, both current and former Morgan Stanley employees, were subjected to the same employment policies and practices during their tenure as Financial Advisors or Registered Financial Advisor Trainees with Morgan Stanley.

The similarity of these employment policies and practices presents a number of factual and legal issues common to members of the Class, some of which are set forth in the Amended Complaint at paragraph 22. The commonality requirement is thus easily satisfied in this case. *See, e.g., McReynolds v. Sodexho Marriott Servs.*, 208 F.R.D. 428, 441-44 (D.D.C. 2002) (finding commonality where tens of thousands of employment decisions made throughout country were linked by defendant's company-wide policy of not having any consistent promotion policy, guidelines, or requirements); *Wells v. General Elec. Co.*, 78 F.R.D. 433, 438 (E.D. Pa. 1978) ("[A] nationwide class action may be appropriately maintained where defendant has or maintains a policy which is uniformly applied to all employees within the class.").

### 3.    The Named Plaintiffs' Claims Are Typical of the Class Claims.

The Rule 23(a) typicality requirement is met if "each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Pigford v. Glickman*, 182 F.R.D. 341, 349 (D.D.C. 1998) (internal citation omitted); *see also Chang v. United States*, 217 F.R.D. 262, 272 (D.D.C. 2003) ("typicality focuses on the similarity of the legal and remedial theories behind the claims of named representatives and those of the putative class").   Courts have liberally construed the typicality requirement. *See In re Vitamins Antitrust Litig.*, 209 F.R.D. at 260.   Here, all Class Members' claims arise from Morgan Stanley's employment policies and practices.

The eight Named Plaintiffs are or were employed by Morgan Stanley between August 5, 2003, and the date of preliminary approval.   Seven of the Named Plaintiffs held the title of Financial Adviser; one Named Plaintiff held the title of Registered Financial Adviser Trainee.   Each Named Plaintiff alleges that she suffered discrimination with respect to Morgan Stanley's employment practices affecting compensation and career advancement – the same forms of sex discrimination claimed on behalf of members of the proposed Class.   (Augst-Johnson Decl., ¶ 4; Reeves Decl., ¶ 4; Shaw Decl., ¶ 4; Giustiniano Decl., ¶ 4; Blackburn Decl., ¶ 4; Tarantino Decl., ¶ 4; Reinke Decl., ¶ 3).   Each Named Plaintiff would use the same legal theories to prove her claims.   Accordingly, the typicality requirement is satisfied.

### 4.    Adequacy of Representation Is Satisfied.

The adequacy requirement is intended to expose incompetent or ineffective class counsel or to uncover any potential conflicts of interest between class representatives and the remaining class members. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 625-27 (1997).   Lead Class Counsel are competent and experienced employment class-action litigators who have achieved several significant employment discrimination settlements and have vigorously represented the interests of

the members of the Class in this matter. Class Counsel thus meet the adequacy requirement of Rule 23. (Mehri Decl., ¶¶ 31-42; Sprenger Decl., ¶¶ 3-9).

Further, the interests of the Named Plaintiffs do not conflict with the interests of the other Class Members. The representative Named Plaintiffs have claims similar to the members of the proposed Settlement Class and do not face unique overriding defenses. The Named Plaintiffs have aided Class Counsel in prosecuting the case and have fairly and adequately represented the interests of the Class in this case thus far and are expected to continue to do so if the Class is approved.

### B.     The Proposed Settlement Class Satisfies Rule 23(b).

In addition to satisfying all four Rule 23(a) requirements, the proposed Settlement Class also must satisfy the provisions of at least one of the three subsections of Rule 23(b). Fed. R. Civ. P. 23(b). The proposed Class meets this requirement, and should be certified under both Rule 23(b)(2) and (b)(3). Approval of a class under both subsections is consistent with Fed. R. Civ. P. 23(c)(4), which permits cases to be maintained as a class action with respect to particular issues, and has been approved by the D.C. Circuit. *See Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997) (permitting district court to adopt a "hybrid" approach, certifying a (b)(2) class as to the claims for declaratory or injunctive relief, and a (b)(3) class as to the claims for monetary relief, effectively granting (b)(3) protections including the right to opt out to class members at the monetary relief stage"); *see also Thomas v. Powell*, 247 F.3d 260, 265 & n.2 (D.C. Cir. 2001) (noting that district court did not enter findings necessary to establish a (b)(2)/(b)(3) hybrid class, while accepting premise that classes could, if properly supported, be certified under both clauses); *Robinson v. Metro-North Commuter Railroad Co.*, 267 F.3d 147, 164-167 (2d Cir. 2001) (discussing (b)(2)/(b)(3) certification with approval); *Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 898 (7th Cir. 1999) (discussing (b)(2)/(b)(3) classes with approval); 7A C. Wright, A. Miller, & E. Cooper, *Federal Practice & Procedure* § 1775.

13

Rule 23(b)(2) requires that the defendant has acted on grounds generally applicable to the Class, making final injunctive relief appropriate with respect to the Class as a whole. Here, Morgan Stanley's account distribution policies and other employment practices affecting compensation, as well as its policies and practices for selecting sales management, applied to all members of the proposed Class. The programmatic relief agreed to in the Settlement Agreement will benefit all members of the Class who currently work for Morgan Stanley as well as women Financial Advisors and Registered Financial Advisor Trainees who will work there in the future. Class Counsel believes that this relief is as valuable as the monetary relief agreed to in the Settlement. Thus, with respect to the programmatic relief, certification under Rule 23(b)(2) is appropriate.

The Class should also be approved pursuant to Rule 23(b)(3). It is appropriate to approve the Class under Rule 23(b)(3) insofar as Class Members seek and have collectively obtained monetary relief because common issues would predominate over purely individualized issues in the litigation over damages. The parties have agreed to an allocation formula using statistical regressions and a Claim Form designed to target distributions to those Class Members most harmed. Accordingly, some Class Members may believe that they are entitled to damages beyond those that may be afforded to them under this Settlement. By certifying the Class under Rule 23(b)(3), the Court would afford such Class Members the opportunity to opt out of the monetary portion of the Settlement without releasing any of their claims. Class Members' rights to exercise control over the damages aspects of their claims will thus be protected. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).[4]

---

[4]    Rule 23(b)(3) also requires that, to be approved, "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." The Supreme Court,

V.    **THE COURT SHOULD GRANT PRELIMINARY APPROVAL OF THE SETTLEMENT BECAUSE IT IS FAIR, ADEQUATE AND REASONABLE**

While Rule 23 does not specify the standards by which a district court should evaluate a proposed settlement for purposes of approval, courts have overwhelmingly accepted the standard that the settlement agreement must be "fair, reasonable and adequate" with respect to final approval. *See, e.g., United States v. District of Columbia*, 933 F. Supp. 42, 47 (D.D.C. 1996); *Osher v. SCA Realty, Inc.,* 945 F. Supp. 298, 304 (D.D.C. 1996); *In re National Student Marketing Litigation*, 68 F.R.D. 151, 155 (D.D.C. 1974). Thus, at the preliminary approval stage, the Court should determine whether it is reasonable to believe that the agreement may be fair, reasonable and adequate, while deferring a final determination until notice is effected and comments and objections may be considered.

A district court is not bound to adopt any fixed set of criteria to determine whether this standard is met, but must avail itself of any considerations that will, under the facts and circumstances of the case, most effectively measure the fairness, adequacy and reasonableness of a settlement. *See, e.g., Thomas v. Albright*, 139 F.3d 227, 231 (D.C. Cir. 1998); *Pigford*, 185 F.R.D. at 98 & n.13. Two over-arching judicial principles provide guidance. First, the courts favor compromise of complex litigation to obviate the uncertainties of the outcome and to avoid wasteful litigation and expense. *See, e.g., Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C. Cir. 1993) (noting the "interest in encouraging settlements, particularly in class actions, which are often complex, drawn out proceedings demanding a large share of finite judicial resources"); *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 103 (D.D.C. 2004) ("'principle of preference' favoring and encouraging settlements" limits judicial discretion); *Osher*, 945 F. Supp. at 304 (the general preference of courts for "resolution of disputes through voluntary compromise" is especially strong

---

however, has held that this superiority requirement is irrelevant in the context of a settlement class. *See Amchem*, 521 U.S. at 620.

in the context of class actions "given the litigation expenses and judicial resources required in many such suits") (internal citations omitted); *Hammon v. Barry*, 752 F. Supp. 1087, 1100 (D.D.C. 1990) ("particularly in class action suits, there is an overriding public interest in favor of settlement"); *Luevano v. Campbell*, 93 F.R.D. 68, 85 (D.D.C. 1981) (the "strong public policy in favor of the settlement of claims . . . is particularly important in the resolution of cases brought under Title VII of the Civil Rights Act of 1964, because of the 'strong preference' of Congress for 'encouraging voluntary settlement of employment discrimination claims'") (internal citations omitted).

Second, the purpose of requiring court approval of the settlement of a class action is to ensure that the interests of the nonparty class members are protected. *See Blackman v. District of Columbia*, 454 F. Supp. 2d 1, 7-8 (D.D.C. 2006) ("in deciding whether to approve a proposed settlement, the Court must protect the interests of those unnamed class members whose rights may be affected by the settlement of the action"); *Osher,* 945 F. Supp. at 304 (the Court has "the duty of protecting absentee class members, which it executes by 'assuring that the settlement represents adequate compensation for the release of the class claims'").

In evaluating a settlement under these principles, a court also should leave considerable discretion to the litigants and their counsel. *United States v. District of Columbia*, 933 F. Supp. at 46-47 ("the function of the reviewing court is not to substitute its judgment for that of the parties to the decree, but to assure itself that the terms of the decree are fair and adequate and are not unlawful, unreasonable, or against public policy"); *Hammon*, 752 F. Supp. at 1093 ("a court deciding whether to approve a class action should not substitute its judgment for that of the proponents of the settlement"); *Manual for Complex Litigation, Second*, § 30.42 at 225 (1986). This is particularly true where, as here, counsel on both sides are experienced class action litigators. *See, e.g.*, *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 U.S. Dist. LEXIS 12344 at **19-20 ("opinion of … experienced and informed counsel should be afforded substantial consideration by a

court in evaluating the reasonableness of a proposed settlement"); *Osher,* 945 F. Supp. at 304 (recommendations of experienced class counsel should be seriously considered by the court in evaluating a proposed class settlement).  The proposed Settlement here has been crafted by experienced class action attorneys on both sides.  (*See*  Mehri Decl., ¶ 13; Sprenger Decl. ¶¶ 3-9).

Given the application of these factors to this case, the proposed settlement is fair, adequate and reasonable to class members in three crucial respects.  First, it provides adequate relief from the defendant to the Class.  Second, it provides a fair means for allocating the benefits amongst Named Plaintiffs and other Class Members.  Finally, it provides reasonable compensation to Class Counsel. Each of these factors will be discussed in greater detail below.

### A.    The Settlement Provides Adequate Relief to the Class.

In assessing the fairness, adequacy and reasonableness of a settlement, "by far the most important factor is a comparison of the terms of the compromise or settlement with the likely recovery the plaintiffs would realize if the case went to trial."  *See Blackman v. Dist. of Columbia*, 454 F. Supp. 2d at 13 ("the most important metric of the fairness, reasonableness, and adequacy of a class settlement is how the relief secured by the settlement compares to what the parties could have obtained at trial"); *Pigford,* 185 F.R.D. at 91; *see also Thomas v. Albright,* 139 F.3d at 231 (courts' primary task is to evaluate the terms of the settlement in relation to the strength of the plaintiffs' case).  In this case, the Settlement provides significant programmatic and monetary relief to Class Members, far better than would likely have been possible in litigation.  Indeed, the relief obtain here surpassed the relief obtained by plaintiffs in *Kosen v. American Express Financial Advisors, Inc.* (Sprenger Decl., ¶ 12).

As discussed above, the programmatic relief is comprehensive, with provisions that address every significant issue raised by the Named Plaintiffs in the Amended Complaint: compensation, account assignments, mentoring programs, management job selection procedures, EEO

17

investigative techniques and corporate accountability, monitoring and compliance, and enhanced programs and initiatives to promote opportunities for women Financial Advisors and Registered Financial Advisor Trainees.  Systemic changes like these go far beyond the relief that is typically awarded by courts after trials in employment discrimination class cases.  Class Counsel expects that the changes in Morgan Stanley's employment practices contemplated in this Settlement will set an example for employers throughout the industry.  (Mehri Decl., ¶ 18).  Likewise, the Settlement Fund is among the highest ever negotiated in the settlement of a gender discrimination class action.  (Sprenger Decl., ¶ 11).  It will adequately compensate members of the Class for claimed losses.

The outstanding programmatic and monetary relief obtained for the Class makes approval of the Settlement appropriate, particularly when measured against the likely outcome if this case were litigated.  The Named Plaintiffs and Class Members, as well as defendant, faced substantial risks in this case in addition to the risks, expenses and delay normally associated with employment discrimination class actions.[5]  First, the substantive law regarding the time period for which Named Plaintiffs and the Class can recover for disparities in compensation is in dispute, and both sides have strong legal arguments in their favor, making the case risky for both the Named Plaintiffs and the defendant.  Second, the proposed Class encompasses approximately 2,700 Financial Advisors and Registered Financial Advisor Trainees who have worked throughout the country at numerous locations.  Both sides faced significant risks in trying to prove or contest a pattern of discrimination and the existence of centralized control over the relevant personnel practices necessary to certify a nationwide class and successfully establish class liability.  Third, the Plaintiffs intended to seek recovery of both economic and compensatory damages on behalf of all Class Members should

---

[5]    Both sides recognize that, regardless of the outcome, litigation would be protracted and expensive, especially if the litigation proceeded through a full-scale liability trial and a large number of individual damages hearings.  *See Petrovic v. AMOCO Oil, Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999) (holding that the anticipated length and complexity of further litigation is an important factor to consider in determining whether to approve a settlement).

litigation have commenced, and defendant intended to seek to limit the potential scope of recovery.

For all of these reasons, the Settlement is fair, adequate and reasonable in the quantum of relief it provides to Class Members.

**B.      The Settlement Is Fair in its Provisions Concerning Notice to Class Members and Allocation of Benefits Amongst Named Plaintiffs and Class Members.**

To be fair, a settlement must provide adequate notice to class members so that each class member can make an informed choice about whether to opt out, object, and/or file a timely claim form and have an opportunity to receive a monetary award.  A fair settlement should allocate the benefits of the settlement fairly among all class members, including named plaintiffs.     The proposed award process is designed to achieve these objectives.

**1.      The Proposed Form of Notice is Adequate.**

Under Fed. R. Civ. P. 23(e), the Court is required to give class members notice and an opportunity to comment on, or object to, a proposed settlement of a class action.  The form and method of notice must be adequate to inform the class members of the terms of the settlement.

The parties' proposed form of Notice, to be mailed to each Class Member and attached to the Settlement Agreement as Exhibit C, is adequate.  The Notice provides a detailed summary of the terms of the Settlement, including the proposed procedures for distribution of awards**.**  It also provides the requisite information to Class Members about how and by when to file objections, and the procedures for opting out and filing Claim Forms.

The proposed plan for delivery of the Notice to Class Members satisfies the requirements of Rule 23, given the information available to the parties.  The mailed Notice will be sent to the last known address for each member of the Class.  If a Notice is returned as undeliverable, additional efforts will be made by the Claims Administrator to reach the Class Member.  (Settlement Agreement § IV.C.3).  Furthermore, Class Counsel will provide information about the Settlement on  two  websites:   www.findjustice.com/cases/rights-discrimination/morgan-stanley/   and

www.morganstanleygendercase.com.  Class Counsel believe that the proposed Settlement will receive significant media attention and, as a result, Class Members will be more likely to search the Internet for more information.

      **2.**      **Monetary Benefits of the Settlement Will Be Fairly Distributed Among Named Plaintiffs and Class Members.**

With respect to monetary relief, the Settlement provides for the allocation of a portion of the Settlement Fund to Class Members who timely submit Claim Forms.  Monies will be allocated to Class Members based on an Earnings Regression model and information provided on a Claim Form and by Class Counsel.  Class Members, including Named Plaintiffs, are entitled to consideration of their contributions to the prosecution of the litigation.  In addition, Named Plaintiffs are entitled to consideration of their release of individual claims beyond the scope of the class-wide claims of sex discrimination if they decide to release such claims.  After reviewing the Claim Form submissions, the Special Master will recommend and submit an allocation plan and monetary awards to the Court for approval.  No awards will be paid until Court approval is obtained.

The Court may exercise its authority to review the recommended awards to insure that the interests of Class Members are fully protected pursuant to Fed. R. Civ. P. 23(d).  An allocation plan that is subject to court scrutiny is fair and reasonable even though the precise details of the formula are not spelled out in the settlement itself.  *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 170 (2d Cir. 1987) (where court assessed overall fairness of settlement prior to adoption of distribution scheme, and where defendant's obligations under settlement agreement are not an issue, distribution scheme need not be finalized prior to final approval of class settlement); *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 224 (5th Cir. 1981) (sustaining district court's approval of settlement notice even though amount each class member could expect to receive are not yet determined); *Nellis v. Shugrue*, 165 B.R. 115, 124 (S.D.N.Y. 1994) ("there is no requirement that a court must know or estimate the potential recovery for each class member"); *In*

20

*re Drexel Burnham Lambert Group, Inc.*, 130 B.R. 910, 925 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285 (2d Cir. 1992) (settlement satisfactory even though "amounts to be distributed . . . will be subject to further allocation procedures"); *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 165 n. 22 (S.D. Ohio 1992); *Manual for Complex Litigation (Third),* § 30.212 n.58.

>    C.     **The Requested Fee Award is Fair, Reasonable and Adequate.**

Finally, the allocation of the Settlement Fund between members of the Class and Class Counsel is fair, adequate, and reasonable.   Class Counsel requests an initial allocation of the common fund to cover past and future fees and expenses associated with the administrative process, class investigation, litigation, settlement negotiation, settlement approval, and the claims process, and a series of annual allocations to cover future fees and expenses associated with monitoring and enforcing the Settlement over its five-year term.

>    1.     **The Initial Requested Percentage Allocation is Consistent with All Applicable Precedent.**

In the D.C. Circuit, fee awards in common fund cases are evaluated based on the "percentage-of-the-fund method." *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993); *see also In re Newbridge Networks Sec. Litig.*, 1998 U.S. Dist. LEXIS 23238 (D.D.C. Oct 23, 1998) (applying method to arrive at award of 30% plus expenses); *In re Ampicillin Antitrust Litig.*, 526 F. Supp. 494 (D.D.C.) 1981) (applying method to arrive at award of 45%, including expenses). According to *Swedish Hospital* and subsequent cases interpreting it, awards for attorneys' fees alone typically range from 20% to 30% of a fund, *id.* at 1272; *Fresh Kist Produce, LLC v. Choi Corp.*, 362 F. Supp. 2d 118 (D.D.C. 2005); *In re Newbridge Networks Sec. Litig.*, 1998 U.S. Dist. LEXIS 23238.   However, courts in this jurisdiction have approved awards as high as 45%.   *See In re Ampicillin Antitrust Litig.* 526 F. Supp. at 499.   As discussed below, attorneys' fees awards in this District in employment discrimination class actions tend to be in the 30-37.5% range due to the special challenges in these types of cases and the difficulty of precisely valuing programmatic relief.

Although the D.C. Circuit has not developed a formal list of factors to be considered when approving fee awards in common fund cases such as this one, this Court has found the following factors, among others, to be useful: (1) the size of the fund created and the number of persons benefited; (2) the skill and efficiency of the attorneys involved; (3) the complexity of the litigation; 4) the risk of nonpayment; and (5) awards in similar cases. *In re Baan Co. Secs. Litig.*, 288 F. Supp. 2d 14, 17 (D.D.C. 2003). These factors strongly support the reasonableness of Class Counsel's requested fee and expense award.

First, Class Counsel's request for an initial fee and expense allocation of twenty-six percent (26%) of the Settlement Fund to cover all past and future fees and costs, excluding future fees and costs associated with monitoring and enforcing the Settlement, is fair and reasonable when compared to awards in similar cases. It is well within the generally accepted 20-30% range. Moreover, the requested percentage is far below the percentage fee awarded in the most comparable case in the District, *Kosen v. American Express Financial Advisors, Inc.* (Sprenger Decl., ¶ 12 & Ex. A). In *Kosen*, Judge Kennedy approved a fee award of 35% in connection with a $31 million dollar pre-litigation settlement of similar claims of sex discrimination by women financial advisors. (*Id.*, Ex. A, at pp. 12-18, 25-28). In finding the 35% fee reasonable, Judge Kennedy observed that higher percentage fee awards have been approved in two other similar employment discrimination class actions in the District: *McLaurin v. National Railroad Passenger Corp.* and *Thornton v. National Railroad Passenger Corp.* In both of those cases Judge Sullivan approved percentage fee awards of 37.5%. (*Id.* at p. 17). And in July of last year, Judge Huvelle awarded fees of $21,596,274 and costs of $2,535,947, representing 30.1% of the $80 million class settlement, in *McReynolds v. Sodexho Marriott Servs., Inc.*, Case No. 1:01-cv-00510 (ESH). *See* Minute Order entered July 27, 2006.

Second, Class Counsel faced substantial risks when it undertook its representation of the Named Plaintiffs. The commencement of work, rather than the point when a lawsuit is filed or a settlement is reached, is the appropriate time to assess risk. *See In re Synthroid Marketing Litigation*, 264 F.3d 712, 718-19 (7th Cir. 2001) ("The best time to determine this rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness . . .)"); *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 583 (3d Cir. 1984) (appropriate time for determining risk is "to be measured at the point when the attorney's time was committed to the case.") The nationwide nature of the proposed Class and the nature of the damages sought would place a tremendous amount of Class Counsel's time and expenses at risk. Substantial risks existed that: the Court would not certify a class; that if a class were certified, it would be substantially more circumscribed than Plaintiffs proposed; and that if a class were certified, the damages would be far less than the Plaintiffs sought.

Third, the claims asserted in this case raise a number of novel and complex legal issues under Title VII. One such issue is whether the company is liable under Title VII for the actions of its financial advisor employees who chose to form private partnerships for purposes of serving their clients, including their personal decisions regarding the composition of those partnerships and the allocation of income generated by those partnerships. The Settlement establishes an innovative mechanism to address this and a number of other difficult issues.

Fourth, Class Counsel prosecuted this litigation skillfully and efficiently. Drawing on their breadth of previous experience in employment discrimination class litigation, Class Counsel was able to persuade the company to negotiate a resolution from the start rather than engage in protracted and expensive litigation. In the course of their negotiations, Class Counsel obtained necessary documents and electronic data from the company without formal discovery requests, depositions and motions to compel. Class Counsel engaged experts to analyze the data the same

way they would have in contested litigation, except without the need for generating time-consuming and expensive expert reports. In sum, Class Counsel achieved an outstanding result in light of the numerous risks in just over two years – a result that may otherwise have taken five, ten or even more years to achieve.

Fifth, the Settlement will provide benefits to several thousand women. Approximately 2,700 class members will be eligible for monetary benefits. Moreover, the programmatic relief will provide substantial benefits to hundreds, if not thousands, of future women Financial Advisors and Registered Financial Advisor Trainees. Such sweeping programmatic relief similar to that negotiated here was not involved in *Swedish Hospital* or *Newbridge Networks* where comparable or greater attorneys' fee awards were approved than what Class Counsel seeks here. Negotiating and drafting the provisions concerning injunctive relief consumed substantial hours of attorney time and effort. These programmatic changes are arguably more important in addressing the problems raised by Class Members and in helping to create a work environment that provides equal opportunity to all than are monetary awards. If the value of this kind of relief was not factored into attorneys' fee awards, attorneys would have little incentive to negotiate such provisions in employment discrimination class actions. Thus, in order to facilitate the goals of Title VII, the legal system should incentivize negotiation of injunctive provisions in settlements such as this one. If the value of the programmatic relief is included in computing the total monetary value of the common fund, the settlement is worth over $70 million and, thus, the fee request is less than 20%.

### 2.    The Series of Future Annual Allocations are Fully Justified by the Anticipated Fees and Costs to Enforce and Monitor the Settlement.

Class Counsel requests approval for five additional annual allocations for fees and expenses that will likely be incurred during the term of the Settlement Agreement. Each requested allocation is $300,000, plus accrued interest, to be payable on each anniversary of the Settlement Agreement's final approval for the next five years. These future allocations are amply justified, and indeed

conservative, based on the work and expenses that will likely be devoted and incurred to: (1) facilitate distribution of the monetary relief to Class Members; (2) monitor Morgan Stanley's compliance with all aspects of the Settlement Agreement through Morgan Stanley's multi-faceted regular reporting to Class Counsel and semi-annual meetings with Class Counsel; and (3) consult with Morgan Stanley to assure proper development and implementation of the computerized record-keeping and injunctive requirements of the Settlement Agreement. The requested future fee and cost allocations of $300,000 per year represent roughly 500-600 hours of partner level time at market billing rates. Class Counsel believes that an estimate of 500-600 hours per year to monitor and enforce the Settlement is a conservative estimate.

For all these reasons, the requested fee and expense award here is fair, reasonable and consistent with applicable precedent.

## VI.    THE COURT SHOULD ENTER ADMINISTRATIVE ORDER NO. 1

The terms of the Settlement provide that Morgan Stanley will transfer $46 million into the Settlement Fund within ten days following preliminary approval and prior to the hearing on final approval. In order to ensure that the fund can be created and administered, the parties therefore also ask the Court to enter proposed Administrative Order No. 1. It provides fair and reasonable terms for the establishment and investment of the fund, and is consistent with the Settlement Agreement and practices in other class action settlements in this District.

**CONCLUSION**

For all the foregoing reasons, the Plaintiffs request that the Court issue the parties' jointly proposed form of Order granting preliminary approval of the proposed Settlement Agreement, including but not limited to, preliminarily certifying the proposed Settlement Class and appointing the Named Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel, approving the method and form of Notice, establishing deadlines with respect to the final approval process, enjoining certain Class Member actions, and appointing Thomas Warren as Special Master. They also request the Court to enter the parties' jointly proposed Administrative Order No. 1 to enable the creation of the legal entity to receive the settlement monies from defendant shortly after preliminary approval and to invest those funds for its beneficiaries.

Dated: April 24, 2007

Respectfully submitted,

/s/ Steven M. Sprenger
Steven M. Sprenger (DC No. 418736)
SPRENGER & LANG, PLLC
1400 Eye Street, N.W.
Suite 500
Washington, DC 20005
(202) 265-8010

Mara R. Thompson (*Pro Hac Vice*)
SPRENGER & LANG, PLLC
310 Fourth Avenue S.
Suite 600
Minneapolis, MN 55415
(612) 871-8910

Cyrus Mehri (DC No. 420970)
Steven A. Skalet (DC No. 359804)
Lisa M. Bornstein (DC No. 485933)
Sandi Farrell (DC No. 491677)
MEHRI & SKALET, PLLC
1250 Connecticut Ave. NW
Suite 300
Washington, DC  20036
(202) 822-5100

Christopher M. Moody (*Pro Hac Vice*)
Whitney Warner (*Pro Hac Vice*)
MOODY & WARNER, P.C.
4169 Montgomery Blvd. NE
Albuquerque, NM 87109
(505) 944-0033

*Attorneys for Plaintiffs and the Class*