# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| Joanne Augst-Johnson, Nancy Reeves, Debra Shaw, Jan Tyler, Cheryl Giustiniano, Laurie Blackburn, Erna Tarantino, and Elizabeth Reinke,  ) ) ) ) | |
| ) | Case No. 1:06-cv-01142 (RWR) |
| On behalf of themselves and all others similarly situated, ) ) ) | CLASS ACTION |
| Plaintiffs, ) ) ) | |
| v. ) ) | |
| Morgan Stanley & Co. Incorporated, formerly known as Morgan Stanley DW Inc., ) ) ) | |
| Defendant. ) | |

---

## DECLARATION OF CYRUS MEHRI
## IN SUPPORT OF JOINT MOTION FOR
## FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Pursuant to Title 28 U.S.C. Section 1746, I, Cyrus Mehri, hereby declare and state, as follows:

1.  I am over the age of eighteen years. I have personal knowledge of the facts set forth herein, and am competent to testify thereto.

2.  I am a founding partner at Mehri & Skalet, PLLC ("M&S"), and co-lead counsel (along with Steven M. Sprenger of Sprenger + Lang, PLLC) for the plaintiffs in the above-referenced action.

### HISTORY OF THE CASE AND SETTLEMENT NEGOTIATIONS

3.  In 2004, the National Council of Women's Organizations ("NCWO") asked Mehri & Skalet to coordinate aspects of the Women on Wall Street Project – an

Page 1

investigation of gender discrimination at several financial services companies. The NCWO had heard from women at many of these companies that they had experienced gender discrimination in their employment and asked my firm to initiate an investigation into these gender discrimination claims. We agreed to undertake to the investigation because of the important public policy issues involved when women are systematically denied business opportunities afforded to their male counterparts in an industry so central to our financial system. The NCWO is a nonpartisan, nonprofit coalition of 220 member organizations that address issues of concern to women, including family and work, economic equity, education, affirmative action, older women, corporate accountability, women and technology, reproductive freedom, women's health, younger women, and global progress for women's equality. Attached hereto as Exhibit A is a letter from the NCWO, expressing their wholehearted support of the Settlement reached in this case.

4.  In January 2005, my office first received a call from Joanne Augst-Johnson regarding a potential sex discrimination claim against Morgan Stanley & Co. Incorporated ("Morgan Stanley"). Ms. Augst-Johnson had already filed a discrimination charge with the U.S. Equal Employment Opportunity Commission ("EEOC") and had been issued a right-to-sue letter. Ms. Augst-Johnson believed that she and other female Financial Advisors were afforded fewer business opportunities than comparable male Financial Advisors and that she and other female employees experienced gender discrimination in numerous aspects of their employment including career advancement, distribution of accounts, work assignments, compensation, and other terms and conditions of employment.

5.  My office began an investigation into Ms. Augst-Johnson's claims, and a few months later asked Steven M. Sprenger and Mara R. Thompson of Sprenger + Lang, PLLC to join

as co-counsel in the investigation because of their extensive experience in sex discrimination class action litigation and settlements, including *Kosen v. American Express Financial Advisers, Inc.,* Civ. No. 1:02CV00082 (HHK) (D.D.C.) (settlement of $31 million on behalf of female financial advisors). Chris Moody and Whitney Warner of Moody & Warner, P.C., who had been investigating claims on behalf of Nancy Reeves, Debra K. Shaw, and Jan Tyler against Morgan Stanley, joined our legal team by May 2005. Together these three firms constitute "Class Counsel."

6.  In March 2005, we entered into a tolling agreement with Morgan Stanley tolling claims for female Financial Advisors as of December 27, 2004. The tolling agreement was entered into in order to facilitate potential settlement negotiations. We scheduled an initial settlement negotiation meeting with Morgan Stanley's outside counsel, Mark Dichter, of Morgan Lewis & Bockius LLP, on April 15, 2005 in New York.

7.  In preparing for our first settlement meeting, my co-counsel and I worked with Ms. Augst-Johnson to identify the claims in the case and to develop a written statement of the issues we believed should be resolved by a settlement on behalf of a nationwide class. Attorneys Mara Thompson, Sandi Farrell, and I all met with Ms. Augst-Johnson in person prior to the initial settlement meeting.

8.  Prior to the initial settlement meeting on April 15, 2005, Plaintiffs' counsel identified three key programmatic issues to be addressed in a potential settlement: account distribution, promotions, and internal grievance procedures.

9.  During the first several months of the negotiations, the Company was only willing to discuss far more limited programmatic relief than the relief we sought. Progress toward a comprehensive settlement that included broad programmatic relief and classwide monetary relief

was slow to develop and hard fought. By the end of 2005, the parties had begun to discuss the comprehensive and far-reaching programmatic relief envisioned by Class Counsel. In 2006, we continued those discussions and also discussed obtaining relevant computerized data and resolving the monetary relief claims.

10. As settlement negotiations went on, we continued our investigation of sex discrimination claims of financial advisors against the Company. In 2005 and 2006, Class Counsel conducted in-depth interviews with over two hundred (200) potential class members.

11. During these interviews, several women expressed interest in participating in the case in a more substantial way. Ultimately, the four original women were joined by four additional women and the Named Plaintiffs are: Joanne Augst-Johnson, Nancy Reeves, Deborah Shaw, Jan Tyler, Cheryl Giustiniano, Laurie Blackburn, Erna Tarantino, and Elizabeth Reinke. All eight Named Plaintiffs appeared to have typical claims and to be suitable to serve as class representatives. In addition, they represent a cross-section of the country: they are from the states of Minnesota, Colorado, Washington, Virginia, Nevada, and Illinois. All eight executed declarations in support of the Settlement that were filed on April 24, 2007 with Plaintiffs' Motion for Preliminary Approval of Class Action Settlement.

12. With over 200 witness interviews, this was an extremely comprehensive investigation. Without disclosing the names of the witnesses, we provided the fruits of our investigation to the Defendant in various presentations. As a result of this, the Company agreed to expand the scope of the settlement talks. Based on the results of the continuing investigation, additional issues such as distributions and transfers of accounts, work assignments, compensation, career advancement opportunities, termination, and other terms and conditions of employment became part of the focus of the negotiations.

13. During settlement negotiations, Class Counsel sought, and Morgan Stanley produced to Class Counsel, voluminous data and other information concerning Morgan Stanley's workforce and work practices relevant to the claims asserted and damages we sought. If the parties had chosen to litigate, this type of candid and fruitful exchange may not have been possible. This exchange was, in many ways, equivalent to and even went beyond class discovery, and enabled Class Counsel to assess their litigation position. To that end, Class Counsel retained Dr. Janice Madden, a professor at the University of Pennsylvania and a principal in the consulting firm, Econsult Corp., to conduct statistical analyses of the data. Dr. Madden worked with Class Counsel to review the data, ensure it was complete, request supplemental data, and analyze the data. She also conducted studies similar to those that she would have conducted in preparation for trial of this matter. Class Counsel also retained a second expert to assist in analyzing industry practices and to provide input on crafting injunctive relief. He believes that outstanding relief has been achieved here.

14. During Class Counsel's investigation, many women Financial Advisors reported to Class Counsel that managers at Morgan Stanley made decisions directing accounts to themselves. For this reason, Class Counsel decided to exclude managers, assistant managers, and other employees with managerial titles or responsibilities from their investigation in order to avoid any potential conflicts between the claims of potential Class Members.

15. We engaged in settlement negotiations with the Defendant during most of 2005 and all of 2006, including numerous, lengthy in-person meetings in Philadelphia, New York, and Washington, DC, and many telephone conferences. The negotiations were conducted at arm's length, and faced several potential impasses. Beginning in June 2006, negotiations were conducted under the auspices of mediator Hunter Hughes, Esq., who was jointly selected by the

parties to serve in that capacity because of his reputation as one of the premier mediators for large employment discrimination class actions. The material terms of the settlement were subject to intense negotiation, and the parties called upon Mr. Hughes frequently to assist in resolving highly contested points. Class Counsel kept the Named Plaintiffs informed of the progress of negotiations by telephone, and had them review and provide input regarding the programmatic relief, the memorandum of understanding, and the settlement agreement at various stages. On February 22, 2007, counsel for the parties signed a Memorandum of Understanding, signaling the first step towards resolution. On April 23, 2007, counsel for the parties finalized a written settlement agreement resolving all claims in the case, subject to court approval.

16. On April 24, 2007, counsel for the parties filed a Joint Motion for Preliminary Approval of Class Action Settlement Agreement. A preliminary approval hearing was held on July 5, 2007, during which the Court suggested certain revisions to the Settlement Agreement and the Notice to Class Members. Counsel for the parties made the changes suggested by the Court and filed revised versions of the Settlement Agreement and Notice on July 11, and July 16, 2007.

## BENEFITS OF THE SETTLEMENT FOR THE CLASS

17. Both the Settlement Agreement and the Plaintiffs' Memorandum of Points and Authorities in Support of the Motion for Preliminary Approval set forth the specific details of this relief, which should expand opportunities for female Financial Advisors to be successful at Morgan Stanley. Class Counsel anticipates that this relief will also set a valuable example for gender equity at other financial services companies.

18. In the judgment of Class Counsel, the terms of this settlement are enormously beneficial to the class and easily meet the legal standard of "fair, reasonable, and adequate" for

approving a class settlement. The class relief in the settlement directly addresses the concerns raised by the initial claimants in two key respects: First, the Settlement Agreement provides for meaningful programmatic relief that will greatly enhance business opportunities for women financial advisors at Morgan Stanley, making distribution of business opportunities more objective, by instituting innovative new programs and putting in place reporting, monitoring, and accountability measures. Second, the Settlement creates substantial monetary relief for a nationwide class. Because plaintiffs' counsel completed an extensive investigation and engaged in frequent and intensive settlement negotiations, we identified relevant legal issues and understood the strengths and weaknesses of our case. Based on this experience, we believe that this settlement creates an outstanding result without the long delays and risks of protracted litigation.

19. Perhaps the most significant and long-lasting benefit that class members who are current employees will reap from the settlement is the programmatic relief, which was fashioned in an extraordinarily collaborative way by the parties, and will be augmented with the recommendations of two jointly appointed Industrial Psychologists.

20. Some highlights of the programmatic relief include: (1) the account distribution system, which will be modified to ensure that business opportunities are distributed on the basis of criteria that reflect merit and current performance. This system will limit discretion of branch managers in distributing accounts and will decrease reliance on historical performance; (2) an independent Diversity Monitor will be appointed to ensure that the new account distribution system is being implemented and to monitor the way in which Human Resources responds to inquiries and complaints; and (3) the Company will develop and implement a comprehensive management assessment and development program to provide candidates a path to assessment and selection as branch managers.

21. In addition to these specific policy changes, the Company will appoint two noted outside Industrial Psychologists, Dr. Irwin Goldstein and Dr. Kathleen K. Lundquist, who will propose innovative, meaningful, novel, state of the art ideas for programs that will: attract and retain women to Morgan Stanley; increase participation of women in partnerships and in distribution of retiring broker accounts; and provide training, development, and mentoring for female Financial Advisors and Financial Advisor Trainees. Professor Goldstein is senior vice chancellor for academic affairs for the University System of Maryland. He previously served for 12 years as professor and dean of the School of Behavioral and Social Sciences at the University of Maryland, College Park. As an organizational psychologist, Professor Goldstein works with organizations on resolving issues related to employment discrimination. Dr. Lundquist is the President of Applied Psychological Techniques, Inc. She has over 20 years of experience in the field of industrial/organizational psychology, with particular interest in the areas of employment discrimination and the design of HR processes. She has frequently been appointed as a settlement expert in class action settlements. Both Dr. Goldstein and Dr. Lundquist just completed a five-year term as joint experts in the race discrimination case *Ingram v. The Coca-Cola Company,* which has been instrumental in making The Coca-Cola Company one of the top companies in the nation on the issue of diversity and equal opportunity.

22. The Joint Experts have already conducted substantial groundwork so they can proceed expeditiously upon final approval of the Settlement. They have made three on-site visits at Morgan Stanley to meet with executives who function in such areas as training, diversity, and hiring. They have started working on project plans and await the Court's final approval to begin their work in earnest.

23. On September 26 and 27, 2007, counsel for the parties and Named Plaintiff

Laurie Blackburn interviewed candidates for the Diversity Monitor that will be appointed pursuant to the Settlement. The Diversity Monitor will monitor Morgan Stanley's efforts to carry out the terms of the Settlement Agreement and provide reports to Lead Class Counsel and counsel for Morgan Stanley regarding the items monitored. The parties expect to finalize the selection of the Diversity Monitor shortly.

24.   The benefits provided in the programmatic relief aspects of the Settlement, which extend beyond direct relief to the class, enhance the fairness of the settlement.

25.   In addition to the far-reaching programmatic relief, the settlement also provides an outstanding monetary benefit to the class. The Settlement Fund will consist of an initial payment by Morgan Stanley of Forty-Six million dollars ($46,000,000), accrued interest to the initial payment that is expected to add at least one million dollars, and the Company's additional financial contribution to cover the employer's share of payroll taxes on payments made to Class Members. Indeed, to Class Counsel's knowledge, this is one of the largest funds created in a gender discrimination case. Each class member who completes a Claim Form and Release will have an opportunity to receive a monetary payment, without being required to prove in court that she experienced any actual injury. This is an enormous benefit that compares favorably with other settlements, particularly in this industry, where class members have been required to prosecute and succeed at individual mini-trials in order to recover a monetary award. If this case were handled in a similar fashion, it is likely that many of the claimants could not successfully prosecute such a mini-trial – as has happened to numerous claimants in similar settlement arrangements in this industry. This would result in large numbers of claimants receiving nothing, a situation that will not occur here.

26.   The allocation of awards to class members out of the Settlement Fund will be

based on a formula that includes two equally weighted components – an Earnings Regression component and a Claim Form component. The Earnings Regression component will be developed by Plaintiffs' labor economist and statistician and will account for the claimant's length of tenure at Morgan Stanley and the disparity between the claimant's earnings during the liability period and those of high-performing male peers. The Claim Form component will be based on a formula that takes into consideration the individual's evidence of sex discrimination, evidence of compensatory damages, the general release of claims asserted in administrative charges, and, where applicable, contributions to the litigation. Based on these two components, the Special Master will recommend a plan of allocation and the amounts of individual awards.

27. The Earnings Regression component will provide a Class Member an opportunity to receive an award if her annual earnings in any year during the liability period fall below an annual earnings curve which is set at two standard deviations above the mean earnings curve for male Financial Advisors. Two standard deviations above the mean earnings curve for male Financial Advisors is approximately the highest-earning 5% of male Financial Advisors. Based on Class Counsel's review of Morgan Stanley's employment and payroll data, very few Class Members will have earned enough money to be excluded from an award under the Earnings Regression component.

28. The Plaintiffs' labor economist and statistician, Dr. Janice Madden, a principal in the consulting firm, Econsult Corp., is ready to proceed with the Earnings Regression analysis upon final approval of the Settlement.

29. The Special Master agreed to by the parties and submitted to the Court for approval is Thomas ("Tommy") Warren. Mr. Warren has over 30 years of experience in class action and civil rights law and 15 years of experience in settlement administration. He is particularly well-

versed in employment discrimination settlements. Class Counsel are confident that Mr. Warren will fulfill his duties as Special Master with distinction. Mr. Warren is ready to proceed with determining a recommended plan of allocation of the Settlement Fund upon final approval of the Settlement.

30.     The Claims Administrator chosen by the parties is Settlement Services Incorporated ("SSI"). SSI has extensive experience in settlement administration and the parties are confident that SSI will satisfy their responsibilities in the most effective and professional manner. SSI is ready to proceed with the processing of Claim Forms and administering the Settlement upon final approval of the Settlement.

31.     In addition to the Settlement Fund, Morgan Stanley is expected to spend at least $7.5 million over the term of the Settlement to implement the provisions of the programmatic relief. The projected benefit of the programmatic relief to class members in terms of expected additional earnings for female Financial Advisors as a result of the programmatic relief achieved here is at least $16 million over the five-year settlement term. The overall value of the settlement is expected to exceed $70 million – an excellent result for the class. This amount understates the true value of the settlement because the value of the reforms encompassed in the programmatic relief cannot be quantified monetarily.

32.     Indeed, it is entirely possible that, even if the plaintiffs had litigated for years, the class had been certified, and the plaintiffs had survived an almost inevitable appellate challenge to certification, prevailed in a trial on the merits, and won a likely appeal, the class would not have achieved anywhere near what is provided in this settlement. Of course, there is also the substantial risk of achieving no relief for the class.

33.     Stewart J. Schwab, Dean of Cornell Law School, analyzed the success rates of

employment discrimination cases in federal court, using official data from the Administrative Office of the United States Courts and his report on this analysis is attached hereto as Exhibit B. Dean Schwab found that plaintiffs have a more difficult time in employment discrimination cases than in virtually any other category of cases. Among other things, Dean Schwab found that 61 percent of employment discrimination cases are decided on pretrial motions in the defendant's favor. (Exhibit B, at 1). Employment discrimination plaintiffs win only 28.1 percent of trials, compared 44.0 percent for plaintiffs overall. (*Id.*, at 1-2). The median employment discrimination award after trial is $68,000. (*Id.*, at 4). Even when employment discrimination plaintiffs win at trial, the judgment is more likely to be reversed on appeal (42 percent of the time) than in almost any other category of cases and trial judgments for defendants are much less likely to be reversed than any other nonprisoner category of case. (*Id.*, at 2). Considering the likelihood of losing a dispositive pretrial motion, the low win rate at trial, the high likelihood that a plaintiff's trial win will be appealed by the defendant, the high rate of reversal of plaintiffs' trial wins, and a generally low median award for employment discrimination plaintiffs, Professor Schwab projects that the value of a typical individual discrimination case is between $6,536 and $9,648. (*Id.* at 5).

34.     These figures on the difficulty in litigating individual employment cases provide a sobering context for the exceptional result achieved here. As of October 1, 2007, 907 Class Members have filed timely Claim Forms. After deducting attorneys' fees and the costs for settlement administration, the Settlement Fund will have approximately $32 million to distribute to Class Members who submit timely and valid Claim Forms. Class Counsel believe that this Settlement is a far better result than proceeding with litigation. Moreover, these claimants will receive their recovery with relative ease, avoiding years of delay and risk of

Page 12

litigation.

35.     Finally, the settlement benefits must be evaluated in light of the substantial due process protections provided to members of the class. The mandatory claims released by class members are limited to relief related to sex discrimination at Morgan Stanley during the class period. While the Named Plaintiffs are expected to execute a general release of all claims against Morgan Stanley, they, as well as all other class members, have the opportunity to opt out and preserve their claims if they so desire. The Named Plaintiffs have the additional option of signing a Class Member release, allowing them to opt out with respect to their non-gender claims. The benefits of the settlement terms, compared with the scope of the release, are entirely reasonable.

## CLASS COUNSEL'S CONTACTS WITH CLASS MEMBERS

36.     In addition to the Notice program approved by the Court and administered by the Claims Administrator, Settlement Services, Inc., Class Counsel created and maintained a website, www.morganstanleygendercase.com, which contained detailed information related to the proposed settlement. This website was activated on July 5, 2007. On the website, a visitor can view and/or download the Amended Complaint; the Joint Motion for Preliminary Approval of Class Action Settlement; Plaintiffs' Memorandum in Support of Preliminary Approval; the Second Revised Settlement Agreement; the Notice of Class Action, Proposed Settlement Agreement & Settlement Hearing; the Claim Form; the Named Plaintiff Release; and the Class Member Release.

37.     Class Counsel also posted information related to the Settlement and/or links to the www.morganstanleygendercase.com website on their individual firm websites, www.findjustice.com (Mehri & Skalet, PLLC); www.sprengerlang.com (Sprenger + Lang,

Page 13

PLLC); and www.nmlaborlaw.com (Moody & Warner, P.C.).

38.     Class Counsel was available to answer questions from Named Plaintiffs and Class Members on any aspect of the Settlement. Class Members who called the 800-number listed on the Claim Form were connected directly with an attorney or paralegal at Mehri & Skalet, PLLC assigned to answer questions and provide assistance. Class Members also could and did call Sprenger + Lang, PLLC, and Moody & Warner, P.C., and speak to an attorney or paralegal for more information or assistance with her Claim Form. Any Named Plaintiff or Class Member who requested assistance in filling out her Claim Form was provided it. Class Counsel answered questions from or provided assistance to dozens of Class Members.

39.     On September 14, 17 and 18, 2007, Class Counsel searched for updated addresses for the 33 addresses SSI did not find new addresses for using LEXIS-NEXIS' SmartLinx tool. Where phone numbers were located, Class Counsel made efforts to call these Class Members or relatives of the Class Members and obtain updated addresses. Class Counsel provided updated addresses for 13 Class Members to SSI on September 17 and 18, 2007.

40.     On September 14, 2007, SSI informed Class Counsel that it resent the Notice Package to 316 Class Members whose original package had been returned as undeliverable via priority mail, with a bright yellow insert instructing Class Members to contact Class Counsel if they anticipated any difficulty meeting the deadlines specified in the Notice. Class Counsel has received approximately 25 calls from these Class Members and has instructed each of them to include a letter or note with her submission of a claim form or opt-out request indicating that she received her notice too late to submit her claim form or opt-out request by the deadline. No Class Member on the list of the 316 who were remailed the Notice with the bright yellow insert indicated to Class Counsel that she wished to object to the Settlement.

## CLASS MEMBERS' RESPONSE TO THE SETTLEMENT

41.     The response of the Class Members to this Settlement has been overwhelmingly positive. Many of the Class Members who spoke with paralegals and attorneys at my firm and at Sprenger + Lang have thanked us for prosecuting this case and bringing about such a comprehensive resolution. For example, a Class Member told Class Counsel that she believes the revised Power Rankings described in the Settlement will help women Financial Advisors.

42.     As of October 1, 2007, 907 Class Members have filed claims. SSI has received 18 Claim Forms postmarked after the September 24, 2007 deadline and 28 Claim Forms with illegible postmarks. Class Counsel will ask the Special Master to consider these late Claim Forms.

43.     Lead Class Counsel has received only 29 requests to opt out of the Settlement. This number is only one percent of the total Class. Some of the opt-outs received by Lead Class Counsel do not include all of the information required by the Notice to the Class and/or were received after the deadline for opt-outs. Morgan Stanley has communicated to Lead Class Counsel that it opposes the validity of late or deficient opt-outs, with one exception. Morgan Stanley does not object to the Court allowing a late opt-out from a Class Member who signs an affidavit or a declaration pursuant to 28 U.S.C § 1746 testifying that she did not receive the mailed notice before the September 10, 2007 deadline. Lead Class Counsel do not oppose this position.

44.     A true and correct copy of each opt-out request received on or before September 10, 2007 is attached hereto as Exhibit C.

45.     A true and correct copy of each opt-out request that was received after

September 10, 2007 is attached hereto as Exhibit D.

46. Lead Class Counsel has received only two objections to this Settlement from Class Members Jennifer Cropper, and Janice Grant. True and correct copies of each objection are attached hereto as Exhibits E, and F. Lead Class Counsel also received a purported objection from Mary Harris Evans, who is not a member of this Class. A true and correct copy of this document is attached hereto as Exhibit G.

47. The objection of Janice Grant includes certain information about other class settlements that Class Counsel is in a position to know is incorrect or inaccurate. She describes a settlement value reportedly in excess of $200 million in *Cremin v. Merrill Lynch*. Class Counsel's understanding is that this settlement is not public and therefore Ms. Grant has no way of knowing the true monetary value of that settlement. Nor do we believe that her assertion could be accurate in light of the fact that under the *Cremin* settlement, each class member had to arbitrate her claim with a great uncertainty of success. The *Cremin* case focused on overt discrimination and sexual harassment claims. The settlement in that case included a series of arbitrations in which many women received no money. Many have had to wait several years, some as long as a decade, to complete their arbitrations.

48. Ms. Grant reports that a prior case against Morgan Stanley resulted in a $54 million settlement. Part of that settlement provided $12 million to the charging party for her termination claim. In addition, the class members in that case worked on the institutional side of Morgan Stanley and the class members' average earnings, according to Morgan Stanley's counsel, were many times higher than in this case.

49. I carefully considered whether to recommend that the class accept the settlement, based on the following: my knowledge of the strengths and weaknesses of the factual case we had

developed through informal discovery; my knowledge of the strengths and weaknesses of the class' position on class certification and its claims on the merits under prevailing law applicable in this jurisdiction; my knowledge and experience of the serious risks of litigating employment discrimination class actions; and the inevitable years of delay in obtaining a recovery, if any, at trial.

50.     Based on this knowledge and experience, I determined that even if the class were certified and proceeded to trial, and was successful, it would be nearly impossible to obtain better programmatic relief, and it would be unlikely that the class would obtain a better monetary recovery. I believed that agreeing to such an excellent settlement, which would provide best-case scenario relief far more quickly and certainly than litigation, was undoubtedly in the best interests of the class. My co-counsel are all in strong agreement with this assessment.


I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of October, 2007 in Washington, D.C.

_____
Cyrus Mehri