# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Joanne Augst-Johnson, Nancy Reeves, Debra Shaw, Jan Tyler, Cheryl Giustiniano, Laurie Blackburn, Erna Tarantino, and Elizabeth Reinke<br><br>On behalf of themselves and all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>Morgan Stanley & Co. Incorporated f/k/a Morgan Stanley DW Inc.,<br><br>　　　　　　　Defendant. | Case No. 1:06-cv-01142<br>　　　(RWR)<br><br><br>CLASS ACTION |

## DECLARATION OF CYRUS MEHRI IN SUPPORT OF CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES

Pursuant to Title 28 U.S.C. Section 1746, I, Cyrus Mehri, hereby declare and state, as follows:

1.  I am over the age of eighteen years. I have personal knowledge of the facts set forth herein, and am competent to testify thereto.

2.  I am a founding partner at Mehri & Skalet, PLLC ("M&S"), and co-lead counsel (along with Steven M. Sprenger of Sprenger & Lang, PLLC) for the plaintiffs in the above-referenced action.

### HISTORY OF THE LITIGATION

3.  The background describing the inception of this case is set forth in my Declaration in Support of Joint Motion for Final Approval of Class Action Settlement

Page 1

filed on October 1, 2007. (Hereinafter "Mehri Final Approval Decl.") *See* Mehri Final Approval Decl. ¶¶ 3-6.

### INVESTIGATION

4.    From January 2005, when counsel was first contacted by Ms. Augst-Johnson, to April 2007, when a Settlement Agreement was signed, Class Counsel conducted an extensive investigation of the claims raised by Ms. Augst-Johnson and the other named Plaintiffs, Nancy Reeves, Debra Shaw, Jan Tyler, Cheryl Giustiniano, Laurie Blackburn, Erna Tarantino and Elizabeth Reinke.

5.    While the investigation was ongoing, Class Counsel commenced settlement negotiations with counsel for Morgan Stanley. These settlement negotiations were intense, on-going, and hard-fought.

6.    Class Counsel's investigation lasted for over two years and included an extensive review of documents prior to achieving a settlement. Class Counsel hired a well-respected expert and worked closely with the expert to evaluate statistical and economic data. Class Counsel conducted hundreds of interviews with witnesses, and developed an understanding of the complex practices and norms of the financial services industry.

7.    In addition, Class Counsel created a unique database to retain and update information on an ongoing basis, prepared memoranda on various factual and legal topics, drafted declarations of class representatives, negotiated the Settlement Agreement, worked with the claims administrator on sending notice to the class, fielded hundreds of phone calls from class members regarding participating in the settlement, held regular

conference calls with co-counsel, frequent conference calls with opposing counsel, and had extensive contacts with named plaintiffs.

8. During settlement negotiations, the parties engaged in broad, informal class discovery. This exchange was, in many ways, equivalent to class discovery, and enabled Class Counsel to assess their litigation position. Morgan Stanley produced voluminous data and other information concerning Morgan Stanley's workforce and work practices relevant to the claims we asserted and damages we sought. Settlement discussions were meaningfully informed through the production and disclosure of historical electronic payroll data, employment policy documents and witness interview summaries.

9. In addition to the exchange of factual information, the parties shared their respective statistical analyses of the payroll data and legal arguments with respect to class certification and liability. Based on the array of documents and information exchanged, plaintiffs would have been in a position to file their motion for class certification with targeted formal discovery if settlement negotiations had been unsuccessful.

10. Class Counsel retained Dr. Janice Madden, of the University of Pennsylvania, to conduct statistical analyses of the data. She worked with Class Counsel to review the data, ensure it was complete, request supplemental data, and analyze the data. She also conducted studies similar to those that she would have conducted in preparation for trial of this matter. Class Counsel also retained a second expert to assist in analyzing industry practices and to provide input on crafting injunctive relief. He believes that outstanding relief has been achieved here.

## SETTLEMENT NEGOTIATIONS

11.     We engaged in settlement negotiations with the Defendant during most of 2005 and all of 2006, including numerous, lengthy in-person meetings in Philadelphia, New York, and Washington, DC, and numerous telephone conferences. The negotiations were conducted at arm's length, and faced several potential impasses.

12.     During the first several months of the negotiations, the Company was only willing to discuss far more limited programmatic relief than the relief we sought. Progress toward a comprehensive settlement that included broad programmatic relief and class-wide monetary relief was slow to develop and hard fought.

13.     As settlement negotiations went on, we continued our investigation of sex discrimination claims of financial advisors against the Company. In 2005 and 2006, Class Counsel conducted in-depth interviews with over two hundred (200) potential class members.

14.     Without disclosing the names of the witnesses, we provided the fruits of our investigation to the Defendant in various presentations, including a comprehensive Power Point presentation.

15.     As a result of these presentations, the Company agreed to expand the scope of the settlement talks. Based on the results of the continuing investigation, additional issues such as distributions and transfers of accounts, work assignments, compensation, career advancement opportunities, termination, and other terms and conditions of employment became part of the focus of the negotiations.

16.     By the end of 2005, the parties had begun to discuss the comprehensive and far-reaching programmatic relief envisioned by Class Counsel. In 2006, we continued

those discussions and also began to address obtaining relevant computerized data and resolving the monetary relief claims.

17. Beginning in June 2006, negotiations were conducted under the auspices of Hunter Hughes, Esq. Mr. Hughes was jointly selected by the parties because of his reputation as one of the premier mediators for large employment discrimination class actions. The material terms of the settlement were subject to intense negotiation, and the parties called upon Mr. Hughes frequently to assist in resolving highly contested points.

18. As a result of these extensive negotiations, Class Counsel and Defendants agreed on the creation of a Settlement Fund. The size of the fund was negotiated in an amount sufficient to include all attorneys' fees and costs awarded by the Court, including those in connection with securing court approval of the Settlement, as well as those involving the claims process and monitoring of the Settlement Agreement

19. On February 22, 2007, counsel for the parties signed a Memorandum of Understanding, signaling the first step towards resolution. On April 23, 2007, counsel for the parties finalized a written settlement agreement resolving all claims in the case, subject to court approval.

20. Class Counsel kept the Named Plaintiffs informed of the progress of negotiations by telephone, and had them review and provide input regarding the programmatic relief, the memorandum of understanding, and the settlement agreement at various stages.

21. Class Counsel continued working with the Defendant to revise the Settlement Agreement. In the course of these negotiations, Class Counsel spent considerable time working with the claims administrator in drafting documents, including

notice and claim forms, reviewing opt out and objection requests, reviewing claim forms, answering phone calls from class members, and providing general administrative support for such a large class.

## RISKS AND CHALLENGES OF CLASS ACTION LITIGATION

22. Class Counsel took this case on a contingency basis, involving a risk of attorney time and firm expenses. Class Counsel has received no compensation for its extensive work in this case so far.

23. The litigation was both factually and legally complex, requiring the identification of policies and practices that contributed to the alleged discrimination and developing evidence that these policies were administered in a discriminatory manner on a nationwide basis in offices across the country.

24. Civil rights cases, including employment discrimination cases, are particularly difficult to prosecute. As the report of Stewart Schwab, Dean of Cornell Law School points out, 60% of employment plaintiffs lose at summary judgment, and of the 40% that make it to trial, only 28% are victorious. Further, 42% of those trial victories that result in appellate decisions are reversed. The report of Dean Schwab is attached as an Exhibit to my Affidavit in Support of Joint Motion For Final Approval of Class Action Settlement. These figures result in an overall win rate of less than 10%. The obstacles facing civil rights counsel are daunting.

25. Many law firms are reluctant or unwilling to undertake major Title VII cases, due to the substantial expenses involved in such cases as well as the genuine risk of nonpayment. Civil rights class actions generally are riskier and harder to prosecute than other class action cases. Class Counsel faced significant risks in prosecuting this

case -- the challenges of quantifying and presenting proof, as well as the difficulties posed by the evolving legal standards in this area of the law.

26.     Despite the fact that this was a challenging and risky case that few attorneys would agree to undertake on a contingency basis, Class Counsel in this case secured outstanding results for the Class, and in far less time than if the matter had been tried.

## RESPONSE TO THE SETTLEMENT

27.     The response of the Class Members to this Settlement has been overwhelmingly positive. *See* Mehri Final Approval Decl. ¶¶41-43.

28.     Only three objections to the settlement were received. *See* Mehri Final Approval Decl. ¶47. None of these objections included any objection to the fees requested by Class Counsel. One objector, Ms. Grant, recognizes the work of counsel. "I do not doubt that Class Counsel expended significant time and effort in this matter. I also do not dispute that Class Counsel are entitled to be paid or have any basis to challenge the amount of their request." Objection of Janice Grant at 3. Attached as an Exhibit to my Affidavit in Support of Joint Motion For Final Approval Class Action Settlement.

29.     In addition to the fact that no class member objects to the fee request in this case, Defendant does not contest the award requested by Class Counsel. Nor has there been an objection by any of the 50 Attorneys General who received the CAFA notice.

## SKILLED AND EXPERIENCED COUNSEL

30.     The firms and lawyers that brought this case, litigated it, and successfully negotiated an outstanding settlement, are highly experienced, extremely skilled attorneys

who are well qualified to serve as Class Counsel. While Steve Sprenger and I served as co-lead counsel, all the attorneys involved worked together to bring about this result. Each of the lawyers brings different strengths to the team – class action expertise, knowledge about the civil rights statutes and other substantive legal issues involving sex discrimination claims, settlement experience, and overall legal talent. All of these lawyers have taken their obligations to further the interests of the class very seriously from the beginning of the case. We have regularly communicated with the Named Plaintiffs and other class members throughout the investigation and settlement negotiation process. We also have the expertise to work with both the statistical and non-statistical experts to advance this case. Our team has invested all the financial, legal and other resources necessary to prosecute and successfully resolve this case.

31.  Mehri & Skalet, PLLC, specializes in representing plaintiffs in class actions, particularly employment discrimination class actions. During the past 20 or so years, I have represented plaintiffs in dozens of class actions in a variety of fields, including consumer fraud, antitrust and securities. Most significantly, over the last fifteen years, I have had the privilege and opportunity to represent protected classes in a series of employment discrimination and other civil rights class actions. For example, last month we obtained class certification in a case regarding historic racial barriers in the life insurance marketplace. *Norflet v. John Hancock Life Insurance Company*, 3:04CV1099 (JBA) (D.Conn. September 6, 2007) (J. Arteton). Prior to private practice, I clerked for the Honorable John T. Nixon, Chief Judge of the Middle District of Tennessee and graduated from Cornell Law School in 1988. I am assisted by skilled lawyers in my firm who have helped obtain an excellent result for the class in this case.

32. I have served as counsel in a number of employment discrimination multi-plaintiff or class actions. I have also been involved in investigating, litigating, and in some cases, settling more than 20 potential discrimination class actions. During the last decade, there are few lawyers in the country who have devoted more time and energy than I have to employment discrimination class actions on behalf of employees.

33. Along with my colleagues at that time, I was recognized by the Special Master for my work as Class Counsel in the landmark class action settlement of race discrimination claims against Texaco:

> This case involved extraordinary skill and effort on the part of plaintiffs' counsel, particularly in view of the relentless effort, vigor and skill employed by Texaco's experienced and able counsel in pursuing a defensive strategy that maximized burden and left no litigation tactic unexplored. The risk of litigation was substantial, to say the least. Cases such as this have rarely produced significant recoveries and are fraught with problems of proof, being largely based on statistical data.
>
> * * *
>
> And the ingenuity of counsel (and their respective clients) in framing an imaginative settlement, that may well have important ameliorative impact not only at Texaco but in the corporate context as a whole, likewise merit consideration.

*Roberts v. Texaco Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997).

34. My colleagues and I received similar praise for our skill in representing a class in the settlement of race discrimination claims against The Coca-Cola Company, where Judge Story observed: "As a judge, there's no greater pleasure than the opportunity to be involved in litigation with quality, professional Class Counsel..." *Ingram v. The Coca-Cola Company*, No. 1-98-CV-3679 (RWS) (N.D. Ga.), Transcript of Fairness Hearing, May 29, 2001, at 220. In *Robinson v. Ford Motor Co.*, Judge Spiegel noted "the qualifications and skill of the attorneys in this case is impressive." *Robinson v. Ford*

*Motor Co.*, 2005 U.S. Dist. LEXIS 12071 *6 (D. Ohio 2005). He went on to point out that "the results obtained in this matter are far-reaching and notable... Valuable monetary relief has been obtained in addition to this valuable and extensive injunctive relief." *Id.* *7.

35.  Steven A. Skalet is a co-founder of our firm and is a graduate of the University of Pennsylvania Law School. Mr. Skalet has over 35 years of experience as a litigator and transactional lawyer and has served as lead counsel in numerous national and state wide class actions. Mr. Skalet worked extensively on drafting documents and negotiating issues pertaining to the Settlement Agreement and preliminary approval as the settlement came to fruition.

36.  Lisa Bornstein joined the firm in 2003 after graduating from Columbia Law School, clerking for the Honorable Stanley Marcus of the U.S. Court of Appeals for the 11th Circuit, and working at the United States Department of Justice. Ms. Bornstein communicated with the class representatives, fielded calls from class members, drafted the motion for attorneys' fees, and participated in the drafting of the preliminary approval papers.

37.  Anna M. Pohl joined the firm in 2004 after graduating from the New England School of Law and working at NOW Legal Defense and Education Fund (now Legal Momentum). Ms. Pohl participated in the investigation of this case and drafted the final approval papers.

38.  Sprenger & Lang, PLLC is a nationally known firm specializing in civil rights cases and class actions.

39.    Steve Sprenger graduated with high distinction from the University of Iowa College of Law in 1988, and was a member of the Iowa Law Review and Iowa Moot Court Board. Following graduation from law school, Mr. Sprenger was employed as an associate attorney by Arent Fox Kintner Plotkin & Kahn in Washington, D.C. from 1988 until 1992, and by Shook Hardy & Bacon in Kansas City, Missouri from 1992 until 1993. Thereafter, Mr. Sprenger founded his own private practice in Kansas City, Missouri focusing on the representation of employees in individual and class employment litigation in federal court. In 2000, he joined Sprenger & Lang, PLLC, and is currently a member in the firm's Washington office. Mr. Sprenger was recently recognized by *Lawdragon Magazine* (Jan./Feb. 2007) as being one of "500 Leading Plaintiffs' Lawyers In America."

40.    Mr. Sprenger currently serves or has previously served as lead Class Counsel or co-lead Class Counsel for certified plaintiff classes in *Carlson, et al. v. C.H. Robinson Worldwide, Inc.*, No. 02-3780 (D. Minn.) (Ericksen, J.) (gender discrimination); *Nauman, et al. v. Abbott Laboratories and Hospira, Inc.*, No. 04C7199 (N.D. Ill.) (Gettleman, J.); *Turner v. Torotel, Inc.*, No. 96-0646-CV-W-5 (W.D. Mo.) (Laughrey, J.) (race discrimination), and *Eickhoff v. City of Kansas City, Kansas*, No. 98-2372-KHV (D. Kan.) (Vratil, J.) ("reverse" discrimination). In addition, he has previously served as Class Counsel for the certified plaintiff class in *Kosen v. American Express Financial Advisors, Inc.*, No. 1:02CV00082 (HHK) (D.D.C.) (Kennedy, J.) (gender discrimination).

41.    All of the above-referenced discrimination class actions were brought under Title VII, and resulted in successful recoveries of monetary and programmatic

relief for class members as reflected in a court-approved consent decree. In the most recently resolved Title VII class action, Judge Ericksen observed that "[c]lass counsel achieved substantial monetary relief and substantial programmatic relief" and "demonstrated considerable skill and determination throughout [the] litigation." *Carlson v. C.H. Robinson Worldwide, Inc.*, 2006 U.S. Dist. LEXIS 67108, *14 (D. Minn. Sept. 18, 2006).

42. Mr. Sprenger has previously served as trial counsel in more than ten trials, including as lead trial counsel in five jury trials. In three of those jury trials, he represented plaintiffs bringing claims under Title VII: *Baty v. Willamette Industries, Inc.*, No. 96-2181-JWL (D. Kan.) (Lungstrum, J.) (sexual harassment and retaliation verdict for plaintiff); *Dhyne v. Meiner's Thriftway, Inc.*, No. 96-1298-CV-W-2 (W.D. Mo.) (Gaitan, J.) (sexual harassment verdict for plaintiff), and *Townsend v. Lumbermens Mutual Casualty Co.*, No. 98-2356-JWL/CM (D. Kan.) (Lungstrum, J.; Murghia, J.) (verdict for defendant on race discrimination claims reversed by Tenth Circuit and remanded). Most recently, he served as trial counsel for plaintiffs in *Hill v. Republic of Iraq and Saddam Hussein*, No. 99-3346 (D.D.C.) (Jackson, J.) (judgments for plaintiffs entered by court under Foreign Sovereign Immunities Act after *ex parte* evidentiary hearing and written submissions).

43. Mara R. Thompson is a partner in Sprenger & Lang's Minneapolis office. Ms. Thompson is a 1988 graduate, with honors, from the University of Minnesota law school. She was employed as an associate attorney by Harstad & Rainbow in Minneapolis, MN from 1988 until 1991, and by Gray Plant Mooty from the merger of the Harstad firm into Gray Plant in 1991 until 1994. She joined Sprenger & Lang in 1994.

Prior to joining Sprenger & Lang in 1994, Ms. Thompson primarily defended employment discrimination cases. Since joining Sprenger & Lang, Ms. Thompson has spent nearly all of her time prosecuting class action employment discrimination cases.

44. Ms. Thompson currently serves or has served as Class Counsel for certified plaintiff classes in *Carlson, et al. v. C.H. Robinson Worldwide, Inc.*, No. 02-3780 (D. Minn.) (Ericksen, J.) (gender discrimination); *Kosen v. American Express Financial Advisors, Inc.*, No. 02CV00082 (HHK) (D.D.C.) (Kennedy, J.) (gender discrimination), *Beckmann v. CBS, Inc.*, No. 3-96-1172 (D. Minn.) (Frank, J.) (gender discrimination), *Thornton v. Amtrak*, No. 98CV0890 (D.D.C.) (Sullivan, J.) (race discrimination), *McLaurin v. Amtrak*, No. 98CV2019 (D.D.C.) (Sullivan, J.) (race discrimination), *Franklin v. First Union*, No. 3:99-CV-344 (E. D. Va.) (Williams, J.) (ERISA), *Lucich v. New York Life*, No. 01-Civ-1747 (S.D.N.Y.) (Greisa, J.) (ERISA), *Gentry v. Nightrider/IKON*, No. 3:96-CV-1121 (N.D. Tex.) (Fish, J.) (race and national origin discrimination), *Aburime v. Northwest Airlines, Inc.*, No. 3-89-402 (D. Minn.) (Alsop, J.) (race discrimination), and *Rogers v. FMC Corp.*, No. 00-cv-5045 (N.D. Ill.) (Gottschall, J.) (race discrimination).

45. Moody & Warner, P.C. is a law firm that specializes in precedent-setting and socially significant civil litigation in the western United States from its base in New Mexico. Christopher Moody is an honors graduate from Duke University School of Law and has litigated employment discrimination cases for over 20 years. Whitney Warner is a high honors graduate of the University of New Mexico School of Law and has been practicing for over 8 years. Mr. Moody and Ms. Warner have litigated a number of multiple-plaintiff employment discrimination and collective actions and are highly

experienced in employment discrimination litigation, including sex discrimination cases. They participated extensively in the investigation of the case and provided strategic guidance and assistance with settlement negotiations, specifically crafting programmatic relief, case strategy, and client communications.

## TIME AND EXPENSES

46. Class Counsel has spent close to three years investigating this case, two years negotiating and advancing a successful settlement, and fielding telephone calls in response to the Notice and Claim Form. Class Counsel also prepared all papers for notice and final approval.

47. Mehri & Skalet's lodestar and expenses through September 30, 2007 are $1,163,921 and $42,597.73, respectively. (See Summary Reports Attached hereto as Exhibits A and B). Sprenger & Lang's lodestar and expenses through September 30, 2007 are $1,525,605 and $72,534.62, respectively. Moody & Warner's lodestar and expenses through September 30, 2007 are $582,320 and $15,715, respectively. (See the Declaration of Steven Sprenger (Exhibit 2) and the Declaration of Christopher Moody, (Exhibit 3)).

48. Combined with the other two firms, our combined lodestar through September 30, 2007 is $3,271,846 and the combined expenses are $130,846. Total hours by Class Counsel through September 30, 2007 in this case are 8,511.

49. We estimate that Mehri & Skalet will have additional expenses of $40,000, while Sprenger & Lang will have additional expenses of $25,000. This makes the total actual and estimated expenses $195,846.

50. For work related to the Final Fairness Hearing, the claims process, working with experts on the earnings analysis, communications with class members and the final selection of Diversity Monitor the firms estimate that they will expend the following lodestar amounts, $250,000 for Sprenger & Lang, $250,000 for Mehri & Skalet and $40,000 for Moody & Warner. Subtracting the $195,846 in expenses from the overall fee request of $11,960,000 makes the portion of the fee request $11,764,154. Combining the $3,271,846 lodestar with the $540,000 discussed in this paragraph makes the expected lodestar $3,811,846. Comparing this lodestar amount with the fee request results in a multiplier of 3.08, well within the range routinely awarded by federal courts nationwide.

## FUTURE ATTORNEYS' FEES & EXPENSES FOR ONGOING OBLIGATIONS RELATED TO IMPLEMENTATION AND MONITORING OF THE CONSENT DECREE

51. I anticipate that Mehri & Skalet will devote over $750,000 in fees and expenses performing substantive legal work monitoring the implementation and enforcement/compliance with the settlement. I anticipate that this work will include:

(1) Serving as representatives for thousands of clients and class members throughout the term of the Decree, and in this capacity to advise clients/class members, recommend and negotiate resolution with Morgan Stanley, evaluate candidates for the Diversity Monitor position, work with the Special Master and Claims Administrator to get all determinations made and payments sent, work with the statistical expert in determining the Earnings Regression Analysis;

(2) Monitoring Morgan Stanley's compliance with all aspects of the Decree through Morgan Stanley's multi-faceted regular reporting to Class Counsel and semi-annual meetings with Class Counsel, make semi-annual reports to the Court about Morgan Stanley's compliance, and prosecute enforcement actions before the Court in the event any deficiencies in Morgan Stanley's performance are not cured by its agreement through a negotiation and mediation process; and

(3) Consulting with Morgan Stanley to assure proper development and implementation of the computerized record keeping and injunctive requirements of the Decree.

## SUBSTANTIAL IMPACT OF THIS CASE

52. It is my belief that the impact of the programmatic relief in this case will be substantial. A copy of a press release when we filed the Complaint and largely completed the programmatic negotiations is attached to this declaration as Exhibit C. In that press release, mediator Hunter Hughes explained that the reforms being developed in the settlement are "meaningful, novel and far-reaching."

53. Class Counsel believe the impact of this settlement will reverberate throughout the industry. The sweeping injunctive relief agreed to in this case has the potential to create reforms that will influence the entire financial services industry.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of October, 2007 in Washington, D.C.

                                              s/Cyrus Mehri
                                              Cyrus Mehri