# Exhibit 4



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHELLEY KOSEN, *et al.*,           )
                                   )
            Plaintiffs,            )
                                   )
      v.                           )     Civil Action No. 1:02CV00082 (HHK)
                                   )
AMERICAN EXPRESS FINANCIAL         )         CLASS ACTION
ADVISORS, INC. ("AEFA"), IDS       )
FINANCIAL SERVICES, INC.,          )
AMERICAN EXPRESS FINANCIAL         )
CORPORATION and AMERICAN           )
EXPRESS COMPANY,                   )
                                   )
            Defendants.            )

## ORDER APPROVING CONSENT DECREE

Having considered the filings and oral presentations of the parties concerning the

proposed settlement of the dispute between the named plaintiffs and defendants with respect to

AEFA's employment actions and practices and having conducted a fairness hearing at which

persons with comments were invited to give their opinions about the settlement, the Court makes

the following:

## FINDINGS OF FACT

**BACKGROUND**

      1.     American Express Financial Advisors, Inc. is a Delaware corporation with its

principal place of business in Minneapolis, Minnesota. The other defendants are the corporate

parent and various affiliates of American Express Financial Advisors, Inc. The claims of the

plaintiffs are directed against the policies and actions of American Express Financial Advisors,

Inc., and the defendants are therefore collectively referred to herein as "AEFA."

      2.     The named plaintiffs are seventeen women. Fifteen of them are current or former

financial advisors affiliated with AEFA and therefore members of the Damages Class as defined

1

in paragraph 3 below. Two of the plaintiffs were rejected for positions as financial advisors with AEFA and are thus members of the Injunctive Class as defined in paragraph 3 below.

3.    The Consent Decree that the parties have negotiated provides for the creation of two settlement classes, defined as follows:

As to Injunctive Relief Alone:  All women who applied to work for or otherwise become affiliated with and were rejected by American Express Financial Advisors, Inc. for positions as Financial Advisors at any time between December 8, 1998 and March 20, 2002 ("Injunctive Class").

As to Damage and Injunctive Relief:  All women employed by or otherwise affiliated with American Express Financial Advisors, Inc. as Financial Advisors at any time between December 8, 1998 and March 20, 2002 ("Damages Class")

4.    Four of the women who became named plaintiffs filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") against AEFA on October 4, 1999. Subsequently, the remaining 13 named plaintiffs filed charges of discrimination.

5.    In 2000, before the EEOC had issued any right-to-sue letters and hence before any complaint had been filed, the parties agreed to attempt to negotiate a settlement of the dispute. They then spent a number of months negotiating the information to be exchanged, exchanging information, and agreeing upon a mediator for the negotiations. They selected Linda Singer of ADR Associates, a mediator experienced in the facilitation of negotiations in complex litigation.

6.    This settlement was reached after more than six months of complex, arms-length negotiations facilitated by Ms. Singer. The mediations were attended by lawyers for Plaintiffs, including lawyers from Sprenger & Lang, PLLC and Miller-O'Brien, PLLP ("Class Counsel"), as well as AEFA's internal counsel and outside counsel from the firms of Dorsey & Whitney and Jones, Day, Reavis and Pogue. Counsel also conferred frequently by telephone to resolve disputes.

7.    The Decree contains significant monetary and injunctive relief.  The Decree addresses every significant issue plaintiffs raised in their Complaint:  hiring, lead and account assignments, mentoring programs, interview and job selection procedures, pay, EEO investigative techniques and corporate accountability, harassment, termination, and diversity training.

8.    During the course of the mediation, the parties reviewed and analyzed virtually all aspects of AEFA's personnel practices including, but not limited to: hiring; lead and account assignments; compensation; mentoring; training; promotions; retention; and termination.

9.    In connection with the mediation sessions, Class Counsel and counsel for AEFA analyzed, with the assistance of an expert statistician, extensive computer-readable employment data produced by AEFA.  This data included information concerning advancement, compensation, retention and termination.  Class Counsel also assembled voluminous anecdotal information from Plaintiffs and Class Members, while counsel for AEFA obtained information from its client.

10.    In December 2001, the parties reached an agreement in principle to resolve the dispute.  On January 17, 2002, the plaintiffs filed their Complaint.  On January 18, 2002, the parties filed a Consent Decree, two proposed orders with numerous exhibits, a motion for preliminary approval of the settlement, and supporting papers.

11.    On March 20, 2002, the Court entered both of the orders proposed by the parties: (a) an Order Preliminarily Approving Consent Decree and Directing Notice to Class Members ("Preliminary Approval Order"), and (b) Administrative Order No. 1.  The Preliminary Approval Order, provided for, among other things, notice of the proposed settlement to be given to members of the proposed Classes.  The Court approved a three-pronged plan for providing

3

notice to class members, involving the mailing of notice to members of the Damages Class, the

publication of notice in two publications, and the creation of a website that provided information

about the settlement and gave Class members and others the ability to download settlement

documents. In the Preliminary Approval Order, the Court also approved the forms of notice

attached as Exhibits D and E to the Consent Decree ("Mailed Notice" and "Published Notice"

respectively) as meeting the requirements of Fed. R. Civ. P. 23 to inform class members of the

terms of the settlement and of the steps class members needed to take to file claims and to object

to or exclude themselves from the settlement.

12.    A second order, Administrative Order No. 1, appointed two of Class Counsel –

Lawrence P. Schaefer and Maurice W. O'Brien – as administrators ("Administrators") of the

settlement fund to be created under the terms of the Consent Decree.

I.    PROVISION OF NOTICE TO CLASS MEMBERS

13.    Pursuant to the Preliminary Approval Order, AEFA provided Class Counsel with

the names, social security numbers, last-known addresses and other information concerning all

of the 4,111 members of the Damages Class recorded in AEFA's computer-readable records.

The Administrators meanwhile engaged Rust Consulting, Inc. to assist it in the performance of

their duties as Administrators, including with respect to mailed notice.

14.    On March 29, 2002, Rust mailed by first class mail the Mailed Notice and the

claim form attached as Exhibit C to the Consent Decree ("Claim Form") to all 4,111 members of

the Damages Class recorded in AEFA's computer-readable data. (The Mailed Notice and the

Claim Form together are referred to as the "Notice Package.") Through May 30, 2002, only 106

of the Notice Packages had been returned as undeliverable, and Rust had been able to use other

4

resources to identify more current addresses for 67 of those class members, leaving only 39

Damages Class members for whom Rust does not appear to have accurate addresses yet.

15.    In addition, the Published Notice was published, in accordance with the Schedule

attached as Exhibit 1 to the Preliminary Approval order, twice apiece in *The Wall Street Journal*

and in *Investment News*, two publications widely read by participants in the investment advice

industry.

16.    Finally, Class Counsel prepared a website from which members of the settlement

classes and other interested parties could find out about the settlement and download any of the

settlement documents.

17.    These actions by Class Counsel, including the Administrators, to inform members

of the settlement classes of the settlement conform with the obligations of Class Counsel and the

Administrators under the Preliminary Approval Order and are sufficient to inform class members

of the settlement to the extent reasonably practicable.

## II.    THE SETTLEMENT CLASSES

### A.    The Rule 23 Classes

18.    Each of the Classes has too many members who are too widely scattered around

the country for joinder to be practicable.

19.    The claims of the members of each of the proposed Classes raise numerous

common factual and legal issues, some of which are identified in paragraph 53 of the Complaint.

20.    The claims of the 15 plaintiffs who are members of the Damages Class are typical

of the claims of other members of the Damages Class, in that they arise from the same practices

that give rise to the claims of the other members of the class.  Similarly, the claims of the other

two plaintiffs are typical of the claims of the other members of the Injunctive Class, in that they arise from the same practices that give rise to the claims of the other members of the class.

21.    The plaintiffs are adequate representatives of the Classes of which they are members.  They have together engaged experienced and adequate Class Counsel.  They also do not have any interests in conflict with those of the unnamed members of their respective Classes.

22.    AEFA adopted policies and practices in evaluating applicants for positions as financial advisors that have been generally applicable to such applicants.  All members of the Injunctive Class were rejected for employment or affiliation with AEFA.  The only remedy provided in the Consent Decree for members of the Injunctive Class (except for the two named plaintiffs for whom information is available) is injunctive.  The Decree does not restrict any member of this class (except the two named plaintiffs) from pursuing claims for damages in the future.

23.    AEFA adopted personnel policies and practices with respect to lead and account assignments, pay, promotions, mentoring, training, investigation of complaints, diversity training and terminations that have been generally applicable to financial advisors.  During its term, the Consent Decree will alter each of these policies and practices.  The scope of the negotiated injunctive relief indicates that this relief predominates in importance over monetary relief for the members of the Damages Class.

24.    Common issues concerning the nature of these personnel policies and practices and their impact on female employees would exceed in importance solely individual issues in litigating the claims of Damages Class members, especially in the litigation of liability issues.  Each Class Member's damages claim, however, also would be influenced by purely individual

facts.  For example, compensation among class members has varied substantially, and some

class members have sought promotions to managerial positions while others have not.

25.    As of May 30, 2002, 340, or over 8%, had already submitted Claim Forms.  Only

22 of the 4,111 Damages Class members, or about 0.5%, tried to exclude themselves from the

settlement.

**B.    The Opt-In Collective Actions**

26.    All fifteen of the plaintiffs who are or were financial advisors assert claims under

the Equal Pay Act ("EPA") that they have been paid less than similarly situated males.  Other

female financial advisors are similarly situated to the plaintiffs:  they all filled the same

positions, the types of compensation available to financial advisors were the same for all of

them, and the policies and practices that determined compensation were the same for all of them.

27    Seven of the fifteen plaintiffs who are or were financial advisors assert claims of

"gender plus age" discrimination in violation of the Age Discrimination in Employment Act

("ADEA").  Other female financial advisors who are or were at least forty years of age when

working as a financial advisor are similarly situated to the seven plaintiffs:  they all filled the

same positions and they were subject to the same personnel policies and practices.

28.    The Mailed Notice informs members of the Damages Class of their opportunity to

opt in to the EPA and ADEA actions, and the Claim Form gives them an opportunity to do so.

29.    Through May 30, 2002, all Damages Class members who filed claim forms had

opted into the EPA collective action, and all Damages Class members over 40 years old who

filed claim forms had opted into the ADEA collective action.

7

III.    EVALUATION OF THE SETTLEMENT

A.    <u>The Relief Provided by AEFA to the Class</u>

1.    <u>The Settlement is the Result of Arms Length Negotiations</u>

30.    This settlement was reached after almost a year of complex, arms-length negotiations facilitated by Ms. Singer.  Numerous lawyers attended and conducted these negotiations.  The mediation sessions included ten in-person meetings and numerous telephone conferences.

2.    <u>The Terms of the Settlement in Relation to the Strength of Plaintiffs' Case and the Risks of Litigation Support Approval of the Settlement.</u>

31.    The injunctive relief provided by the settlement is comprehensive.  The provisions address every significant issue raised by the plaintiffs in the Complaint:  hiring, lead and account assignments, mentoring programs, interview and job selection procedures, pay, EEO investigative techniques and corporate accountability, termination, and diversity training.  Systemic changes like these go beyond the relief that typically is awarded by courts after trials in employment discrimination class cases and probably could have been obtained only through negotiations. .

32.    The $31,000,000 monetary fund created pursuant to the settlement will adequately compensate members of the Damages Class for any claimed losses.  It is smaller than the maximum possible exposure calculated by plaintiffs' statistical expert, but considerably greater than the maximum exposure calculated by defendants.  It appears to be one of the largest funds ever created in a gender discrimination case.

33.    The settlement does not provide any monetary relief to members of the Injunctive Class.  The state of defendants' records concerning the application process made negotiation of

classwide monetary relief impracticable. Recognizing this, the terms of the Consent Decree do not bar members of the Class from initiating suits seeking monetary relief.

34.     This relief obtained for members of both classes warrants approval of the settlement when measured against the likely outcome if this case were litigated.

35.     The plaintiffs and class members faced three substantial risk factors in this case in addition to the risks, expenses and delay normally associated with employment discrimination class actions. First, AEFA classified many of the proposed class members as independent contractors and not employees during much of the time involved in the class period. In early 2001, Judge James Rosenbaum of the United States District Court for the District of Minnesota, in a case brought on behalf of all AEFA financial advisors alleging violations of ERISA, expressed skepticism concerning the issue that the financial advisors were employees instead of independent contractors. The case, *Lambert v. American Express Financial Corp.*, Civ. File No. 99-CV-493 (JMR/SRN) (D. Minn.), settled shortly afterward, without Judge Rosenbaum having to decide the issue. If this issue had been resolved in AEFA's favor in this case, it could have dramatically reduced the size of the potential Damages Class and the amount of the potential recovery. Second, the proposed Damages Class encompasses over 4,000 financial advisors who have worked throughout the country at numerous locations under numerous managers, making class certification more problematic. Third, the plaintiffs intended to seek recovery of compensatory and punitive damages on behalf of all class members should litigation commence, again making certification more problematic.

36.     Regardless of the outcome, litigation would have been protracted and expensive, especially if the litigation proceeded through a full-scale liability trial and a large number of individual damages hearings.

9

### 3. The Stage of the Litigation Proceedings at the Time of Settlement

37. During the course of the mediation, Class Counsel obtained the information to assess the settlement by four means. First, they had contact with over 560 witnesses, conducted about 90 extensive interviews, and prepared 45 declarations summarizing the information obtained, in addition to regularly conferring with the named plaintiffs. Second, prior to and during the negotiation process, they obtained information about AEFA's policies and AEFA's computerized personnel information from the defendant, the same type of information that could have been obtained if the parties had proceeded to litigation only through a series of document production requests and depositions. Third, they engaged a recognized statistical expert who analyzed AEFA's data and prepared a series of analyses, provided the results of those analyses to AEFA, and received from AEFA a summary of the results of the analysis performed by the company's expert. Finally, many of the most difficult issues, such as whether the financial advisors were employees or independent contractors and whether Minnesota law would have extended beyond the state's borders, were largely legal in nature. Counsel analyzed each of them, often from several different perspectives.

38. Because of these efforts, the early stage of the litigation did not prevent counsel from adequately assessing the settlement.

### 4. Reaction of the Class to the Settlement

39. The Court's Preliminary Approval Order required that all opt-outs from and objections to the settlement from class members be postmarked by May 17, 2002. As of May 30, 2002, Class Counsel had received no objections to the settlement.

40. As of May 30, 2002, Class Counsel had received 22 opt-outs from the settlement, 21 postmarked on or before May 17, 2002 and one postmarked on May 23, 2002. Of the 22 opt-

outs, only four have offered reasons for why they desire to opt-out: two state they didn't feel

they suffered sex discrimination while employed by or affiliated with AEFA as financial

advisors, one indicates nothing about sex discrimination but appears to believe she has a

fraudulent misrepresentation claim, and one wishes to pursue her claims through an individual

action.

    41.    The lack of objections, the relatively small number of opt outs, and the substantial

number of claimants (see finding 25 above), show strong support for the settlement from class

members.

        **5.**    **The Opinion of Experienced Counsel**

    42.    Class Counsel has extensive experience in prosecuting employment

discrimination class actions.  Class Counsel and the class representatives believe that this

settlement is fair, reasonable and adequate.

    **B.**    **Allocation of the Benefits of the Settlement**

    43.    Both the injunctive and monetary benefits of the settlement will be shared by

plaintiffs and class members.  With one relatively minor exception, plaintiffs are not singled out

for any unique benefits.

    44.    The changes in policies and practices mandated by the injunctive provisions of

the Decree will be equally available to plaintiffs and all members of both settlement classes.  The

Decree does not contain any injunctive provisions, such as job relief, specifically benefiting

named plaintiffs.

    45.    The Decree provides that the Claims Portion of the Fund will be allocated to

members of the Damages Class who timely file claim forms based on a formula to be developed

by Class Counsel and approved by the Court that awards points for different forms of losses

covered by the settlement. The details of the formula, as well as the specific awards, must be submitted to the Court for approval before any disbursements are made.

46.    The Decree also provides that the Business Development Fund will be allocated among plaintiffs and other members of the Damages Class who are currently employed as financial advisors by AEFA based on a formula to be developed by Class Counsel and approved by the Court. Again, the details of the formula must be submitted to the Court for approval before any disbursements are made.

47.    The only benefit that named plaintiffs are receiving that class members are not is that the two plaintiffs who are members of the Injunctive Class but not the Damages Class will receive awards of $35,000 and $20,000. As stated above, Class Counsel lacked the information necessary to negotiate monetary relief for the members of the Injunctive Class. Class Counsel did have information concerning the circumstances of these two plaintiffs, however.

48.    Many of the injunctive provisions are designed to make AEFA's human resources policies and practices fairer for all financial advisors and potential financial advisors, not just for female advisors and applicants. The Decree does not provide for any class-wide preferential treatment via quotas or for the displacement of any incumbent from a job.

49.    The Decree fairly allocates the benefits of the settlements among plaintiffs and class members.

**C.    The Requested Award of Attorneys' Fees and Expenses**

50.    The settlement provides that Class Counsel will receive 35% of the total amount paid by defendants, or $10,850,000, plus allocable interest, to cover all fees and expenses already incurred and to be incurred in administering and monitoring the settlement. Thirty percent will be payable upon the Effective Date of the Decree (as set forth in §III.C. of the

Decree), 3% will be payable on December 15, 2002, and 2% will be payable on December 15, 2003.

### 1. Fees Allocable to Work Already Performed

51.     Based on experience in other cases, it is reasonable to believe that the fees at lodestar rates and expenses involved with claims administration and monitoring over the next four years will be in the range of $1.75 to $2.25 million.

52.     Lawyers who represent plaintiffs in class cases not brought under the civil rights laws, such as securities fraud and antitrust cases, generally do not incur any or incur only minimal attorneys' fees and costs post-settlement.

53.     Class Counsel's requested award also includes reimbursement for expenses already incurred, of more than $291,000.

54.     Subtracting the projected fees and expenses for administration and monitoring and the actual expenses already incurred of $291,000 from the $10,850,000 request brings the request for fees for work already performed down to approximately 27% of the settlement fund.

### 2. Reasonableness of Fee Request

#### a. The size of the fund created and the number of persons benefited

55.     As stated above, this is one of the largest gender discrimination settlements ever negotiated and also provides substantial injunctive relief. Negotiating and drafting the provisions concerning injunctive relief consumed more hours and energy than did the provisions concerning monetary relief.

#### b. The presence or absence of substantial objections by members of the class to the settlement and/or the requested fees

56.     Not only have no class members objected to the settlement, but also no class

members have objected to the provisions concerning attorneys' fees.

### c.     The skill and efficiency of the attorneys involved

57.     One of the firms comprising Class *Counsel,* Sprenger & Lang, specializes in class

action litigation on behalf of plaintiffs, generally employees, and has achieved many favorable

results in this District and elsewhere.  Among the highlights are settlement of age discrimination

collective action lawsuits against First Union Corporation and Ceridian Corporation for $58.5

million and $28.5 million respectively, settlement of race discrimination lawsuits against PEPCO

and Amtrak in this District for total amounts of over $62 million in cash plus sweeping

injunctive relief, certification of the first hostile environment class against women and then

achievement of the first liability finding to the class in a hostile environment case, earning what

Class Counsel believes is the largest settlement ever in a plant closing case, and settlement of a

landmark ERISA case for $26 million.

58.     The other firm, Miller-O'Brien, is one of the most respected plaintiffs' labor and

employment firms in the State of Minnesota.

59.     The attorneys of the two firms who primarily worked on this case have played

leading roles in their firms' employment cases, giving them a wealth of experience in class

action and employment discrimination litigation relevant to this case.

60.     Opposing counsel from Dorsey & Whitney is of equivalent skill and experience.

### d.     The complexity and duration of the litigation

61.     This case was factually complex.  Class Counsel had to identify the policies and

procedures that contributed to the alleged discrimination and develop evidence that those

policies and practices were administered centrally in a discriminatory manner and that AEFA

had a pattern or practice across offices scattered across the country of administering the policies and procedures in a discriminatory manner. This, as discussed below, necessitated numerous contacts with numerous class members and other witnesses.

62. This case also was legally complex. Among the unresolved issues were questions associated about AEFA's potential liability to plaintiffs and class members it classified as independent contractors, and issues associated with whether plaintiffs would have met the requirements for proceeding on behalf of a class.

63. The litigation lasted about three years from the commencement of investigation by Class Counsel, and about two years from the filing of the initial class charges of discrimination with the Equal Employment Opportunity Commission, until the parties agreed to a settlement. By litigation standards in the employment discrimination class action arena, the parties were remarkably efficient in reaching resolution so quickly. The pre-suit nature of this settlement was only made possible, however, by the parties' agreement, as a condition of conducting meaningful settlement negotiations, to the voluntary exchange of voluminous discovery, the sort of exchange that generally occurs only in cases that are hotly and comprehensively litigated. Class Counsel put in a extraordinary amount of work to assimilate the information and settle the case.

e. The risk of nonpayment

64. Employment discrimination class actions are very risky. The difference in risk between them and many other types of class actions, including antitrust, securities fraud, and consumer product class actions, is highlighted by the lack of competition among plaintiffs' lawyers to prosecute them. In *In re Vitamins Antitrust Litig.*, MDL No. 1285, at 2 n.3 (D.D.C. July 16, 2001) ("Vitamins") (Hogan, C.J.), for example, 57 law firms represented the plaintiffs.

*Vitamins at 2 n.3.* During the 13 years in which Sprenger & Lang has been in existence, on only

one occasion did another firm file a class action that overlapped with one filed by Sprenger &

Lang.

65.    Employment discrimination class action cases are risky for many reasons. There

generally is no government investigation to draw upon, as there frequently is in other types of

class action cases. Companies are able to keep figures concerning the impact of their

employment practices private, forcing plaintiffs' firms to perform expensive investigations prior

to filing suit, unlike, for example, in securities class actions. Many courts give great credence to

employers' business rationales for their policies and practices.

66.    Among employment discrimination class actions, this case was especially risky at

the time that Class Counsel agreed to represent the plaintiffs for two reasons, as described above:

the employee-independent contractor issue; and the attempt to certify a nationwide class of

women affected by decisions by hundreds of managers in scores of facilities.

      f.    **The amount of time devoted to the case**

67.    Although this case was settled early, Class Counsel has invested an extraordinay

amount of work into the matter over the past three years – over 10,243 hours of attorney and

legal assistant time – along with over $291,000 in expenses. They gathered substantial

quantities of information outside the discovery process, through contacts with over 560 class

members and other witnesses, extensive interviews with about 90 persons, preparation of 45

declarations, and regular conferences with the named plaintiffs. Prior to and during the

negotiation process, they obtained information about AEFA's policies and AEFA's

computerized personnel information from the defendant. They worked with a statistical expert

to analyze AEFA's data. They prepared a database summarizing the documents and information

they were obtaining. They performed the legal research for and prepared numerous memoranda analyzing the many legal issues in the case. They engaged in ten face-to-face negotiating sessions and spent a large amount of additional time on the phone with the mediator and opposing counsel. They worked with tax lawyers in addressing the issues raised by the fact that AEFA has treated many of the class members as independent contractors. Finally, they have been working with a consultant in connection with the issuance of notice to class members and the beginning of the claims administration process.

68.   Through April 30, 2002, Class Counsel had devoted $2,873,806.63 in fees at lodestar rates and $291,311.08 in expenses to prosecuting this action. Class Counsel sets their billing rates based on survey data about billing rates in Washington, D.C., and used billing judgment in eliminating several hundred hours of work on this case. Using Class Counsel's already incurred lodestar of $2,873,806 plus projected fees for settlement administration and monitoring of $1,250,000, the requested fee award amounts to an award of about 2.27 times the lodestar of about $4,370,000.

g.   **Awards in similar cases**

69.   Judge Emmet Sullivan of this District approved awards to cover attorneys' fees and expenses in 1999 and 2000 in two race discrimination class action cases against Amtrak that are very similar in procedural setting to this case. Those cases are *McLaurin v. National Railroad Passenger Corp.* and *Thornton v. National Railroad Passenger Corp.* Each case entered settlement discussions early, after the filing of the complaint in *McLaurin* and after a motion to dismiss and two depositions in *Thornton*. In those cases, like this one, the negotiations proceeded for many months. In those cases, like this one, the settlement provided for comprehensive injunctive relief in addition to damages. In those cases, like this one, the award

17

to Class Counsel encompassed both past and future work and past and future expenses. The period of the Decree in those cases, like this one, was four years. In light of all of these circumstances, Judge Sullivan awarded class counsel in each case fees and expenses in the amount of 37.5% of the settlements, 2.5% more than requested in this case.

## CONCLUSIONS OF LAW

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1331.

2.      The propriety of venue in this Court is not disputed.

**I.      NOTICE TO CLASS MEMBERS**

3.      Under Fed. R. Civ. P. 23(e), the Court is required to give class members notice and an opportunity to comment on, or object to, a proposed settlement of a class action. The form and method of notice must be adequate to inform the class members of the terms of the settlement.

4.      The form and method of notice were adequate in this case to inform the members of the settlement classes of the terms of the settlement.

**II.      THE SETTLEMENT CLASSES**

**A.      <u>The Rule 23 Classes</u>**

5.      A class that the parties seek to have certified in the context of a settlement must satisfy all of the requirements of Fed. R. Civ. P. 23, except that, if certification is sought pursuant to Rule 23(b)(3), the manageability of the proposed class action at trial is not in issue. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

18

6.     A class may be certified only if it satisfies the four requirements of Rule 23(a)

and at least one of the three alternatives of Rule 23(b).  Rule 23(a) requires:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there
> are questions of law or fact common to the class, (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the class, and (4) the
> representative parties will fairly and adequately protect the interests of the class.

7.     Each of the Classes satisfies the requirement of Rule 23(a)(1), because each has

too many members who are too widely scattered around the country for joinder to be practicable.

*See* 5 *Moore's Federal Practice* § 23.22[3][a] (Matthew Bender 3d ed. 1998); *Frazier v.*

*Consolidated Rail Corp.*, 851 F.2d 1447, 1456 n.10 (D.C. Cir. 1988).

8.     Each of the Classes satisfies the requirements of Rule 23(a)(2), because the

claims of the members of each Class raise numerous common issues of fact and law, even

though the proposed class members worked in many different locations across the country. *See*

*Martens v. Smith, Barney, Inc.,* 181 F.R.D. 243, 259 (S.D.N.Y. 1998) (holding that alleged

pattern of discriminatory treatment of women that is traced to centralized failure to address and

remedy widespread discrimination satisfies commonality and typicality requirements); *Thomas*

*v. Christopher*, 169 F.R.D. 224, 237 (D.D.C. 1996) (holding that commonality requirement is

satisfied when "key personnel procedures are centrally administered, highly subjective, and

applicable to all class members throughout their careers"), *aff'd in relevant part, rev'd in part*

139 F.3d 227 (D.C. Cir. 1998); *Wells v. General Elec. Co.*, 78 F.R.D. 433, 438 (E.D. Pa. 1978)

("[A] nationwide class action may be appropriately maintained where defendant formulates a

policy which is uniformly applied to all employees within the class.").

9.     Each of the Classes satisfies the requirements of Rule 23(a)(3).  The claims of the

15 plaintiffs who are members of the Damages Class arise out of the same policies and practices

and are typical of those of the other members of the Damages Class, and the claims of the two

19

plaintiffs who are members of the Injunctive Class arise out of the same policies and practices and are typical of those of the other members of the Injunctive Class. *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (holding that typicality requirement is satisfied if the named plaintiffs' claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members and ... are based on the same legal theory") (quotations omitted); *Thomas v. Christopher*, 169 F.R.D. 224 at 238 (holding that typicality requirement is satisfied when commonality requirement is satisfied and the plaintiffs have experienced the same types of adverse actions complained of for the class).

10.     Each of the Classes satisfies the requirements of Rule 23(a)(4), because they do not have any interests in conflict with those of the unnamed members of their respective Classes and they have together engaged experienced and adequate Class Counsel. *See Amchem*, 521 U.S. at 625-27.

11.     The Injunctive Class meets the requirements for certification under Rule 23(b)(2): AEFA adopted policies and practices in evaluating applicants for positions as financial advisors that have been generally applicable to such applicants and resulted in the rejection of all members of the Injunctive Class, making appropriate final injunctive relief for the Injunctive Class as a whole, and injunctive relief is the only form of relief being accorded to members of the Injunctive Class.

12.     The Damages Class shall be certified under both Rule 23(b)(2) and (b)(3). *See Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997) (permitting district court to "adopt a "hybrid" approach, certifying a (b)(2) class as to the claims for declaratory or injunctive relief, and a (b)(3) class as to the claims for monetary relief, effectively granting (b)(3) protections including the right to opt out to class members at the monetary relief stage"); *Thomas v.*

*Albright*, 139 F.3d 227 (D.C. Cir. 1998); *Taylor v. D.C. Water & Sewer Authority*, 205 F.R.D.

43, 48-49 (D.D.C. 2002) (Kennedy, J.) (refusing to dismiss class certification allegations

because D.C. Circuit law permits hybrid (b)(2)/(b)(3) certifications).

13.    The Damages Class meets the requirements for certification under Rule 23(b)(2)

insofar as it seeks injunctive relief.  AEFA adopted numerous personnel policies and practices

that have been generally applicable to financial advisors and that resulted in or did not rectify

harm to members of the Damages Class as a whole.  The adoption of these policies and practices

makes appropriate final injunctive relief for the class as a whole as to those issues underlying the

injunctive relief.

14.    The Damages Class meets the requirements for certification under Rule 23(b)(3)

insofar as it seeks monetary relief.  Common issues concerning the nature of AEFA's personnel

policies and practices and their impact on female employees would exceed in importance solely

individual issues in litigating the claims of Damages Class members, especially in the litigation

of liability issues.  However, the validity of and damages associated with each class member's

claim also would be influenced by purely individual facts.  Class members thus have an interest

in opting out of the settlement insofar as it provides monetary relief and controlling their own

litigation on that score.

    b.    **The Opt-In Collective Actions**

15.    Under 29 U.S.C. § 216(b), a person may opt in to an action under the EPA or the

ADEA if she is similarly situated to the named plaintiffs and gives her written consent to

participate.

16.    The factors to be considered in determining whether employees are similarly

situated  include similarity of positions, similarity of claim, and similarity of policies and

practices giving rise to the claims. *See Hyman v. First Union Corp.*, 982 F. Supp. 1 (D.D.C. 1997).

17.     The members of the Damages Class who assert that they were paid less than similarly-situated men are similarly situated to the plaintiffs for purposes of asserting claims under the EPA.

18.     The members of the Damages Class who were forty or older when affiliated as financial advisors with AEFA are similarly situated to the seven plaintiffs who were over the age of forty.

19.     All members of the Damages Class who fill out the sections of the Claim Form dealing with claims under the EPA and ADEA have given their written consent to participate.

### III.    EVALUATION OF THE SETTLEMENT

20.     Class actions may be approved only if they are fair, reasonable and adequate, based on three criteria:  is the quantum of relief provided by AEFA to the class fair, reasonable, and adequate; is the plan for distribution of that relief among plaintiffs and class members fair; and is the compensation to Class Counsel fair and reasonable. *In re Lorazepam & Clorazepate Antitrust Litig.* ("*Lorazepam*"), 205 F.R.D. 369 (D.D.C. 2002).

### A.    The Relief to be Provided by AEFA to the Class

21.     The Court is guided by the following factors in determining whether the relief to be provided by AEFA to the class is fair, reasonable and adequate:

(a) whether the settlement is the result of arms-length negotiations; (b) the terms of the settlement in relation to the strength of plaintiffs' case; (c) the stage of the litigation proceedings at the time of settlement; (d) the reaction of the class; and (e) the opinion of experienced counsel.

*Lorazepam*, 205 F.R.D. at 375 (citations omitted).  As set forth below, under these factors the Court concludes that the quantum of relief to the class is fair, reasonable, and adequate.

22

### 1.    The Nature of the Negotiations

22.    The settlement was a product of arms length negotiations between experienced attorneys.  Accordingly, a "presumption of fairness, adequacy and reasonableness attaches to [the] class settlement." *Lorazepam*, 205 F.R.D. at 376.

### 2.    The Amount of the Settlement Compared to the Strength of Plaintiffs' Case

23.    In assessing the terms of a settlement, "by far the most important factor is a comparison of the terms of the compromise or settlement with the likely recovery the plaintiffs would realize if the case went to trial." *Pigford v. Glickman*, 185 F.R.D. 82, 91 (D.D.C. 1999).

24.    This settlement provides substantial monetary and injunctive benefits to the class which justify the settlement in view of substantial risks that a class would not have been certified, that even if certified it would have been much smaller than the class defined in the settlement, and that even if certified the class would not have prevailed on liability and/or damages would have been substantially less than sought.

### 3.    The Stage of the Litigation Proceedings at the Time of Settlement

25.    Although "[e]arly settlement of [class action] cases is encouraged," when a case is settled early, a court must consider "whether counsel had sufficient information . . . to reasonably assess the risks of litigaton vis-à-vis the probability of success and range of recovery." *Lorazepam*, 205 F.R.D. at 377.

26.    Based on Class Counsel's research and the exchange of information with AEFA, Class Counsel had adequate information to reasonably assess the benefits and risks of litigation at the time of settlement.

**4.     Reaction of the Class to the Settlement**

27.     The lack of objections, the small number of opt outs, and the substantial number of claims already filed reflects strong approval for the proposed settlement, which strongly supports approval. *See Lorazepam*, 205 F.R.D. at 378; *In re: Newbridge Networks Securities Litig.*, 1998 U.S. Dist. LEXIS 23238, at *6-7 (D.D.C. October 23, 1998).

**5.     The Opinion of Experienced Counsel**

28.     Because they are experienced litigators, the Court gives substantial weight to Class Counsel's view that the settlement is fair, reasonable and adequate. *Lorazepam*, 205 F.R.D. at 380 (citations omitted); *see also In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 359, 379-80 (N.D. Ohio Aug. 29, 2001) (citing cases); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 580-81 (E.D. Pa. 2001).

**6.     Conclusion**

29.     For all of the above reasons, the Court concludes that the relief to the class provided by the settlement is fair, reasonable and adequate.

**B.     Allocation of the Benefits of the Settlement**

30.     The monetary relief to the members of the Damages Class will be distributed pursuant to formulas to be proposed by Class Counsel and approved by the Court.  An allocation plan such as the one at issue here that is subject to close court scrutiny at every stage is fair and reasonable even though the precise details of the formula are not spelled out in the decree itself. *In re Agent Orange Prod. Liability Litigation*, 818 F.2d 145, 170 (2d Cir. 1987) (where court assessed overall fairness of settlement prior to adoption of distribution scheme, distribution scheme need not be finalized prior to final approval of class settlement); *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 224 (5th Cir. 1981) (sustaining district court's

24

approval of settlement notice even though amounts each class member could expect to receive are not yet determined); *In re Drexel Burnham Lambert Group, Inc.*, 130 B.R. 910, 925 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285 (2d Cir. 1992) (settlement satisfactory even though "amounts to be distributed . . . will be subject to further allocation procedures").

31.    The settlement fairly and reasonably allocates the relief obtained from AEFA among plaintiffs and class members.

**C.    The Requested Award of Attorneys' Fees and Expenses**

32.    For purposes of evaluating the fee and expense provisions, this is a "common fund" case. In the D.C. Circuit, proposed fee awards in common fund cases should be evaluated based on the "percentage-of-the-fund method." *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993); *Lorazepam*, 205 F.R.D. at 383. "[T]he percentage of recovery method is meant to simulate awards that would otherwise prevail in the market." *In re Vitamins Antitrust Litig.*, MDL No. 1285, at 29 (D.D.C. July 16, 2001) ("*Vitamins*") (Hogan, C.J.).

**1.    Fees Allocable to Work Already Performed**

33.    Many of the decisions determining the percentage of the recovery to award as attorneys' fees have arisen in non-civil rights class actions in which there was little if any monitoring and claims administration work to be performed. To properly compare the fee request here to awards in other cases that involved little if any post-settlement work, it is necessary to subtract the projected fees and expenses for administration and monitoring and the actual expenses already incurred from the $10,850,000 request of Class Counsel. This brings the request for fees for work already performed down to between $8,700,000 and $9,200,000, or to between 28% and 29.7% of the settlement fund.

**2.    Reasonableness of Request for Work Already Performed**

34.    Fee awards in this District have ranged from 20% to 45% of the fund, while tending to center around 30%. *See Swedish Hospital*, 1 F.3d at 1272 (20%); *Vitamins* at 23 (about 34% plus expenses); *Thornton* (Schaefer Decl., ¶¶ 21-23) (37.5% for past and future fees and expenses); *McLaurin* (Schaefer Decl., ¶¶ 21-23) (37.5% for past and future fees and expenses); *In re Newbridge Networks Sec. Litig.*, 1998 U.S. Dist. LEXIS 23238, at *10-12 (30% plus expenses); *In re Ampicillin Antitrust Litig.*, 526 F. Supp. 494 (D.D.C. 1981) (45%, including expenses).  Awards around 30% are consistent with the trend in numerous other jurisdictions.

35.    The D.C. Circuit has not developed a list of factors to be considered in evaluating fee requests in common fund cases. *Lorazepam*, 205 F.R.D. at 383.  Based on two recent decisions issued by Judge Hogan, the Court considers seven factors that have been identified by the Third Circuit, as set forth below.

> **a.    The size of the fund created and the number of persons benefited**

36.    Higher percentages of recoveries generally should be awarded to attorneys who achieve settlements, such as this one, that produce "exceptional benefits." *See Vitamins* at 25-26.

37.    In judging the benefits provided by this settlement, the Court considers not only the monetary relief, but also the comprehensive injunctive relief contained in the Consent Decree.

> **b.    The presence or absence of substantial objections by members of the class to the settlement and/or the requested fees**

38.    The Court gives substantial weight to the fact that no class members have objected to the settlement, including to the requested fees and costs.

c.    **The skill and efficiency of the attorneys involved**

39.    The experience, skill and professionalism of Class Counsel and the performance

and quality of opposing counsel all support award of a fee in the range requested by Class

Counsel. See Vitamins at 26 (approving 34% fee award based in part on "[t]he experience, skill

and professionalism of counsel and the performance and quality of opposing counsel").

d.    **The complexity and duration of the litigation**

40.    This lawsuit raised a host of complex factual and legal issues.

41.    Counsel should not be penalized for achieving such an outstanding settlement in

about three years instead of the typically longer period between the start of investigation and the

conclusion of a class action lawsuit. *See Vitamins at 27;* Gunter v. Ridgewood Energy Corp.,

223 F.3d 190, 198 (3rd Cir. 2000) (recognizing purpose of percentage of recovery method is to

encourage early settlement); *Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358, 368

(S.D.N.Y. 2002) (awarding 33% in common fund securities case settled early in litigation); *In re

APAC Teleservices, Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS 17908, at *2 (S.D.N.Y. Dec. 10,

2001) (awarding 33% of a $21,000,000 settlement prior to start of depositions); *In re Safety

Components Int'l Inc. Sec. Litig.*, 166 F. Supp. 2d 72 (D.N.J. Sept. 27, 2001) (awarding 33% of

settlement fund when case settled early in litigation).

e.    **The risk of nonpayment**

42.    The riskiness of a case must be assessed as of the commencement of

representation, not sometime later when developments in the litigation made nonpayment more

or less risky. *See, e.g.,* In re Synthroid Marketing Litigation, 264 F.3d 712, 718-19 (7th Cir.

2001); *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 583 (3d Cir. 1984); *Emery v. Hunt*,

*132 F. Supp. 2d 803, 811 (D.S.D. 2001); Cook v. McCarron, 1997 U.S. Dist. LEXIS 1090, at \*58 (N.D. Ill. Jan. 30, 1997).*

43.    At the commencement of representation, this case posed a substantial risk of nonpayment to Class Counsel. This risk supports an award in the range requested by Class Counsel. *See Newbridge Network Sec. Litig.*, 1998 U.S. Dist. LEXIS 23238, at \*11 ("[U]nlike in *Swedish Hospital Corp.*, where an award of twenty percent was made because prior resolution of the underlying legal issue eliminated the risk of zero recovery, . . . here counsel did not 'piggyback' on the success of other plaintiffs and clearly faced the prospect of zero recovery.")

**f.    The amount of time devoted to the case by plaintiffs' counsel**

44.    The number of hours and type of work performed by Class Counsel fully supports the requested fee award. *See Vitamins* at 26.

45.    Although unnecessary to check under the law of this Circuit, the multiplier on Class Counsel's fees at their lodestar rates is consistent with that awarded in other cases, and is fair and reasonable.

**g.    The awards in similar cases**

46.    In the two most similar cases of which this Court is aware in this District, fees and expenses were awarded to cover both past and future work in the amount of 37.5% of the settlement fund, 2.5% more than is requested in this case.

**h.    Conclusion**

47.    For all these reasons, the proposed fee and expense award here is fair and

reasonable and should be approved.

An appropriate order and judgment accompanies this order.


Henry H. Kennedy, Jr
United States District Judge


Dated: June 16, 2002