

LIDDLE & ROBINSON, L.L.P.

800 THIRD AVENUE
NEW YORK, N.Y. 10022

(212) 687-8500
FACSIMILE: (212) 687-1505
www.liddlerobinson.com

EMAIL:  dmarek@liddlerobinson.com

RECEIVED

AUG 2 8 2007

FINRA DR
Western Region

MIRIAM M. ROBINSON (RETIRED)

JAMES A. BATSON
BLAINE H. BORTNICK
ETHAN A. BRECHER
DAVID I. GREENBERGER
MICHAEL E. GRENERT
JAMES R. HUBBARD
JEFFREY L. LIDDLE
DAVID M. MAREK
CHRISTINE A. PALMIERI
MARC A. SUSSWEIN

JEFFREY ZIMMERMAN
STEPHEN J. STEINLIGHT
ANDREA M. PAPARELLA
REBECCA A. SAENGER
LISA O. SIDMAN
DINA N. WEINBERG
DAVID H. FELDSTEIN
AMY L. STUTIUS*

*AWAITING ADMISSION TO THE BAR

August 27, 2007

**VIA OVERNIGHT MAIL**
Director of Arbitration
FINRA Dispute Resolution
One Liberty Plaza
165 Broadway
27th Floor
New York, NY 10006

Re:    Karen McCarthy v. Morgan Stanley DW, Inc.

Dear Director of Arbitration:

On behalf of Claimant Karen McCarthy, we submit this Statement of Claim pursuant to Rule 10314(a)[1] of the NASD Code of Arbitration Procedure against Morgan Stanley DW, Inc. ("Morgan Stanley"), McCarthy's former employer. McCarthy's claims stem from Morgan Stanley's conduct in connection with the wrongful termination of her employment and the damage it caused to her career and reputation. Specifically, Morgan Stanley retaliated against McCarthy for filing a formal complaint about the conduct of her Branch Manager; made false allegations that McCarthy violated firm policies; tried to force her to resign for no

---

[1] According to Rule 10314(a) of the NASD Code of Arbitration Procedure, "The Statement of Claim shall specify the relevant facts and the remedies sought."

LIDDLE & ROBINSON, L.L.P.

Director of Arbitration                    2                    August 27, 2007

legitimate reason; and – when she refused to resign – fabricated grounds to terminate her employment for cause. Morgan Stanley's conduct caused McCarthy damages in the amount of, not less than, $4.2 million, plus interest, punitive damages in an amount not less than $5 million, attorneys' fees, and costs.


## Statement of Facts

### McCarthy Joins Morgan Stanley

McCarthy worked at Morgan Stanley as a Financial Advisor for the firm's Durango, Colorado Branch Office from August 2000 through June 2005. In that time (and throughout her twenty-plus years in the securities industry), McCarthy's record in the securities industry was spotless. Furthermore, McCarthy was one of the largest producers in the Durango Branch Office.

Beginning in 2002, McCarthy reported to Max Scholfield (CRD # 2092692), the Branch Manager. Mr. Scholfield reported to David Reddoch (CRD # 800413), the Regional Manger, until Reddoch left Morgan Stanley in January 2005, at which time he was replaced as Regional Manager by Thomas Kovach (CRD # 712658).


### The Maureen McCarthy Incident

One of McCarthy's largest clients was Maureen McCarthy, her sister. In or around June 3, 2004, Maureen McCarthy called Scholfield because she felt that the Branch Office (not Claimant) had failed to provide her adequate service. Specifically, Maureen McCarthy wanted the Branch Office to be staffed for the half hour before the market opens.

LIDDLE & ROBINSON, L.L.P.

Director of Arbitration                    3                    August 27, 2007

On June 4, 2004, Scholfield returned Maureen McCarthy's call. When they spoke, Maureen McCarthy indicated (as she did in her June 3 voice mail) that she did not seek remuneration and had no complaints with Claimant. Rather, her sole purpose for calling was to request an administrative change, namely that Branch Office staff someone thirty minutes before the markets open. Scholfield did not attempt to address the problem. Instead, Scholfield attacked Maureen McCarthy in an unprofessional manner. Scholfield accused Maureen McCarthy of lying and being unreasonable, and raised his voice to her during this conversation. After the call, Maureen McCarthy informed Claimant what had occurred.

On June 7, 2004 – the following business day – Scholfield called Maureen McCarthy again – not to apologize, but rather to solicit her support in "calming" Claimant, who he claimed was "so emotional from this event that he was no longer sure whether she could any longer work in this profession." Scholfield then accused Maureen McCarthy of manipulating the situation so that she could remove her account from Morgan Stanley – a completely baseless allegation made without any evidence or semblance of truth – without offending Claimant.

Scholfield's conduct was so abhorrent that Maureen McCarthy felt compelled to write an email on June 8, 2004 to Reddoch, Tony Bennett, and Ben Tarantino, all of whom work for Morgan Stanley, to complain about Scholfield. (Attached as "Exhibit A" is a copy of Maureen McCarthy's June 8, 2004 email.)

Similarly, Claimant filed a formal complaint surrounding Scholfield's conduct with respect to this situation. On June 17, 2004, Karen McCarthy "agreed to allow Rosemary Johnson, Human Resources, to open a formal investigation [into] Max Scholfield's repeated acts of unprofessionalism toward [her and Maureen McCarthy]." (Attached as "Exhibit B" is a copy

LIDDLE & ROBINSON, L.L.P.

Director of Arbitration                    4                    August 27, 2007

of the "Written Complaint Transmittal Form.") According to Karen McCarthy's complaint, "To

both our client and me, Max inappropriately raised his voice, yelling and was hostile at times.

Max Scholfield's behavior is responsible for a very profitable client of Karen McCarthy to seek a

home for her assets elsewhere. After Karen McCarthy's client filed a Formal Written Complaint,

June 8, 2004, Max fiercely retaliated."

          Subsequently, Johnson scheduled a phone call with McCarthy and Joel Miller,

Johnson's manager in Human Resources. On this phone call, Miller told McCarthy that he

believed – without any evidence – that Maureen and Karen McCarthy were "attacking"

Scholfield. In essence, he told McCarthy that she and Maureen McCarthy were lying and that

Morgan Stanley condoned Scholfield's conduct. McCarthy believed that Morgan Stanley would

not help her deal with this situation, and would instead protect Scholfield.

          Accordingly, on July 1, 2004, McCarthy informed Miller and Johnson that she

"would like to drop the investigation [she] agreed to open June 17, 2004 [b]ecause Max

Scholfield had threatened my career and future in the securities business ...." (Attached as

"Exhibit C" is a copy of McCarthy's July 1, 2004 letter to Miller and Johnson.)

          In the aftermath of this incident, Claimant began looking for another job. In or

around September 2004, Scholfield – and others at Morgan Stanley – learned that Claimant was

on the verge of reaching an agreement to join Piper Jaffrey, a competing broker dealer, in San

Francisco. In addition to a higher commission payout, Piper Jaffrey offered McCarthy a signing

bonus equal to $300,000 of Piper Jaffrey stock. This stock has a present day value of

approximately $700,000. McCarthy planned on accepting Piper Jaffrey's offer until Morgan

Stanley interfered.

LIDDLE & ROBINSON, L.L.P.

Director of Arbitration                5                August 27, 2007

## Morgan Stanley Takes Steps To Destroy Claimant's Reputation and Career

Towards the end of 2004, McCarthy – along with all other Morgan Stanley financial advisors – participated in the firm's internal firm review. As part of this process, McCarthy checked "yes" to question 12b, which asked if she was aware of any incidents whereby Morgan Stanley violated the code of professional conduct. McCarthy believed that Morgan Stanley's conduct in connection with Maureen McCarthy's complaint to Scholfield and the firm's conduct afterwards constituted a violation of the code of professional conduct. Specifically, her branch manager accused one of her largest clients (and her sister) of fabricating a complaint about the way the branch was run to effectuate moving her account to a different broker. Scholfield accused Maureen McCarthy of lying and of being unreasonable, and spoke to her in such an unprofessional manner that it resulted in her writing a letter of complaint. Further, Scholfield retaliated against Claimant as a result of this incident. Neither Scholfield's manager, Reddoch, nor anyone else at Morgan Stanley took any action to address Scholfield's misconduct. Instead, the firm condoned this conduct and allowed Scholfield to retaliate against McCarthy for reporting it to Human Resources.

Shortly thereafter, Morgan Stanley took steps to destroy McCarthy's career and reputation. On October 20, 2004, Katherine Needam-Johnson, Morgan Stanley's District Compliance Officer, visited McCarthy at the Durango Branch Office. Needam-Johnson and McCarthy called Gloria Johnson, a Human Resources representative, and Helene Jepson, Esq., an in–house attorney. On this call, Needam-Johnson and Johnson identified five alleged issues with McCarthy's performance that must be addressed or could lead to her termination:

LIDDLE & ROBINSON, L.L.P.

Director of Arbitration                           6                      August 27, 2007

McCarthy (1) played her radio too loud in the office; (2) dressed inappropriately; (3) screamed

on the telephone to her ex-husband; (4) sang in the office; and (5) used profane language in the

office. The allegations have no merit. For instance, McCarthy did not even have a radio in the

office. Moreover, no one had ever raised any of these issues with McCarthy prior to this

meeting.

Then, Jepson told McCarthy that Morgan Stanley believed McCarthy had violated

the firm's sales practices. Specifically, Jepson referenced three incidents:

1.    Jepson accused McCarthy of taking "discretion" in the account of Troy

Nickerson based on a July 15, 2004 email. However, the record revealed that Nickerson had not

even made a trade in the account in 1.5 years – so certainly McCarthy had not made

discretionary trades in his account.

2.    Jepson accused McCarthy of making unauthorized trades in the account of

JoAnne Beardsley, McCarthy's ex-mother in law. In fact, Robert Beardsley, Ms. Beardsley's

son and McCarthy's ex-husband, who gave McCarthy the orders for certain transactions in Ms.

Beardsley's account, executed a written trading authorization form. McCarthy showed Morgan

Stanley the document, and Morgan Stanley confirmed (months later) that McCarthy did nothing

wrong with respect to this account.

3.    Jepson accused McCarthy of giving Mike and Randi Schweitz free

financial advice in exchange for a discount on granite tile. Morgan Stanley based this allegation

LIDDLE & ROBINSON, L.L.P.

Director of Arbitration                    7                    August 27, 2007

on one sentence from an email that Mr. Schweitz sent to McCarthy that stated in part, "With all the work you are doing for me, I will be forever indebted to you, literally. (Well, at least until you do your kitchen)." In fact, McCarthy paid Schweitz – who owned Durango Marble & Granite – $84 per square foot, which was full value. No evidence existed to suggest McCarthy's conduct was inappropriate in any way, and months later Morgan Stanley cleared McCarthy of any wrongdoing with respect to this account.

McCarthy provided Morgan Stanley with the evidence necessary to prove that each allegation was false at the October 20, 2004 meeting. Nevertheless, on this day, Morgan Stanley notified her that it had begun an investigation into her trading practices.

By doing this, Morgan Stanley prevented McCarthy from leaving Morgan Stanley and taking her book of business with her because – had she left while she was under investigation – she would have received a "yes" answer to question 7b on her Form U-5, which would have made her essentially unemployable in the securities industry and launched an NASD investigation into her trading practices. [2] Morgan Stanley knew what affect placing McCarthy on an internal investigation would have on her ability to accept Piper Jaffrey's offer – or go elsewhere.

---

[2] In <u>Rosensweig v. Morgan Stanley & Co., Inc.</u>, decided on August 9, 2007, the United States Court of Appeals for the Eleventh Circuit upheld an NASD Arbitration Panel's decision awarding Claimant – a former Morgan Stanley financial analyst – $1,649,860 as damages because Morgan Stanley "falsely reported to regulators that he was terminated for cause, which prevented him from working as a broker during the State's eight-month investigation ...." 2007 WL 2265515, *1 (11th Cir. 2007). (A copy of the case is attached as "Exhibit D.")

LIDDLE & ROBINSON, L.L.P.

Director of Arbitration                          8                          August 27, 2007

### Morgan Stanley Concludes Its Investigation On February 9, 2005, And Determines That McCarthy Did Not Violate Any Rules Or Regulations

On November 10, 2004, McCarthy sent a letter to Jepson informing her that Morgan Stanley had "threaten[ed] her career," and "asking [her] to thoroughly examine all of the evidence before you make a ruling that will affect the future of my committed, successful and compliantly clean career that began at age 21 in 1978." In this letter, McCarthy also told Jepson that Scholfield threatened her employment at Morgan Stanley and in the industry on June 7, 2004 – in the wake of the Maureen McCarthy incident. Jepson never investigated McCarthy's allegation that Scholfield threatened her employment at Morgan Stanley and in the industry as a result of the Maureen McCarthy incident. In fact, no one at Morgan Stanley ever investigated this allegation that McCarthy made on more than one occasion.

On January 26, 2005, McCarthy sent an email to Jepson, Needham-Johnson, Kovach, Tony Bennett, Ben Tarantino, Roberta Mailman, and Scholfield inquiring about the conclusion of Morgan Stanley's investigation into McCarthy's sales practices – which had been ongoing for several months and prevented McCarthy from being able to join another broker-dealer.

On February 9, 2005 Kovach delivered to McCarthy a so-called "Written Reprimand." (Attached as "Exhibit E" is a copy of the February 9, 2005 "Written Reprimand.") According to this memo, Morgan Stanley had decided to take no action against McCarthy as a result of the issues raised on the October 20, 2004 conference call. In fact, this memo makes clear that McCarthy had not violated any of the firm's or industry rules or regulations. Nevertheless, the last sentence of the memo indicates that "Any future violations may subject

LIDDLE & ROBINSON, L.L.P.

Director of Arbitration                    9                    August 27, 2007

you to further disciplinary action, up to and including immediate termination of your employment."

At this meeting, Kovach advised McCarthy to find a new job. McCarthy cried after Kovach finally delivered the news that Morgan Stanley had concluded its investigation and determined that she had not violated any firm or industry rules or regulations.

### Morgan Stanley Continues To Harass Claimant; And Ultimately Terminates Her Employment Without Cause

McCarthy stayed at Morgan Stanley. The firm's harassment continued. On April 12, 2005, Needam-Johnson accused McCarthy of sending an email to a client and crossing out the firm's boiler-plate disclaimer that appears at the bottom of every email. McCarthy explained – as she had once before – that she did not do this, but – for reasons she did not understand – a computer glitch must have caused it. Moreover, the email at issue included the boiler-plate disclaimer, making Needam-Johnson's accusation all the more transparent: Morgan Stanley was simply looking for *dirt* it could use to justify firing McCarthy and smear her reputation. At around this time, Kovach told McCarthy (again) that she should find a new job.

In May 2005, Jepson accused McCarthy of engaging in business activities outside of Morgan Stanley, without getting proper approval. This allegation was also completely without merit. According to Jepson, McCarthy served on the Board of Directors of the Durango Film Festival, a non-profit organization responsible for putting on the Durango Film Festival. In point of fact, McCarthy was not on this Board. McCarthy told Morgan Stanley that she was not on this Board. McCarthy even provided Morgan Stanley with a letter from the Board indicating

LIDDLE & ROBINSON, L.L.P.

Director of Arbitration                    10                    August 27, 2007

that she was not a member. (Attached as "Exhibit F" is a copy of an August 10, 2005 letter from Sofia van Sursum, the Executive Director of the Durango Film Festival, to Morgan Stanley.)

Nevertheless, on or around May 12, 2005, Morgan Stanley (through Kovach) told McCarthy that she must resign from her position at Morgan Stanley or the firm would fire her for cause and smear her reputation by putting something derogatory on her Form U-5. Morgan Stanley offered to pay Claimant $20,000 if she resigned and signed a Settlement Agreement and Release. (Attached as "Exhibit G" is a copy of the proposed Settlement Agreement and Release.) McCarthy refused to resign and did not sign the release.

Thus, on June 1, 2005, Morgan Stanley terminated McCarthy's employment, and alleged on her Form U-5 that the reason for termination was "Violations of Firm Policies: Failing to Get Approval For Outside Business Activities." (McCarthy's Form U-5 is attached as "Exhibit H.")    As discussed above, Morgan Stanley's claim that McCarthy engaged in unauthorized outside business interests by serving on the Board of Directors of the Durango Film Festival was false, and Morgan Stanley knew – or should have known – that it was false when it published this statement on her Form U-5. Morgan Stanley identified Erica Bunin as the "Person to contact for further information."

Accordingly, McCarthy contacted Bunin by email in June and July 2005 to request that Morgan Stanley identify "specifically for what actions I am being fired." Morgan Stanley failed to identify the actions at issue.

LIDDLE & ROBINSON, L.L.P.

Director of Arbitration                    11                    August 27, 2007

### Because of Morgan Stanley's Conduct, The NASD Launched
### An Investigation Into McCarthy, and She Could Not Find Another Job

As a result of the language put on McCarthy's Form U-5 (that she violated firm
policies), the NASD launched an inquiry into McCarthy's sales practices. On July 23, 2005,
McCarthy sent a report to the NASD setting forth the facts that surrounded her termination from
Morgan Stanley and the allegations made by the firm. On December 12, 2005, the NASD
decided not to take any action against McCarthy. However, the damage was already done.
McCarthy had been forced out of the industry. Morgan Stanley retained McCarthy's clients and
their assets and continued to profit from them.[3]

---

[3] In Rosensweig, the evidence showed that in the months after Morgan Stanley's termination of Claimant's
employment and the publication of the false statements on his Form U-5, "other brokers at Morgan Stanley were
soliciting business from his clients." 2007 WL 2265515, at *2.

LIDDLE & ROBINSON, L.L.P.

Director of Arbitration                    12                    August 27, 2007

## Remedies Sought

Morgan Stanley's conduct, as alleged herein,[4] has caused McCarthy substantial

financial damage in an amount not less than $9.2 million. McCarthy's damages include

- lost compensation from Morgan Stanley in the amount of $3.5 million, plus interest;

- lost opportunity costs in an amount to be determined by the Panel, but not less than $700,000 (or the present day value of the stock that Piper Jaffrey offered McCarthy as compensation if she joined the firm);

- career damage in an amount to be determined by the Panel;

- harm to her reputation in an amount to be determined by the Panel;

- punitive damages in the amount of $5 million; and

- attorneys' fees and costs

Respectfully submitted,

LIDDLE & ROBINSON, L.L.P.

By: _David Marek_

David Marek
Attorneys for Claimant
800 Third Avenue
New York, New York 10017
(212) 687-8500

---

[4] At the Panel's request, we will provide briefs on any relevant legal issues.

Exhibit A

From: "maureen mccarthy" <mosiemac@msn.com>
To: dave.reddoch@morganstanley.com
CC: tony.bennett@morganstanley.com, ben.tarantino@morganstanley.com
Subject: Max Scholfield
Date: Tue, 08 Jun 2004 22:00:31 -0700

June 8, 2004

Dear Mr. Reddoch and Others Concerned:

I am writing to express my concern and dismay over two recent conversations
that I have had with the manager of your Durango, CO. office, Max
Scholfield. In our first conversation, he essentially implied I was lying.
In the second conversation, he breached several levels of professionalism,
culminating in making an outright accusation that I had thoughtfully and
purposefully manufactured the events in order to effect a particular
outcome.

The facts are these:

I left Mr. Scholfield a voice message on June 3rd, 2004 simply to recount an
unfortunate event that had unfolded on June 2nd, 2004. My reason for
leaving the message was twofold. One, when I asked my account
representative how he had responded, she relayed that he conveyed disbelief
that the story was accurate or true. Two, since I represent $1.5 million in
assets and have referred another $8.5 million to that office due to my
belief in the expertise of my account representative, Karen McCarthy, I
thought that he might want to hear my thoughts on what I felt was, in that
situation, an inadequate level of service(at the office level, not at the
representative level). My conclusion was that I felt that the office ought
to be staffed for the half hour before the market opening at least by
someone to answer the telephones. Up until this juncture, there is nothing
that constitutes an unsolvable issue nor that warrants a complaint. It is
the aftermath of this event and the subsequent conversations with Mr.
Scholfield which I not only find appalling and inappropriate but am certain

of which you would want to be apprised.

It is important to know that not only in my voice message but also initially
in my first conversation with Mr. Scholfield, I made it clear that I was not
looking for remuneration but instead intended to recount unfortunate events.
Mr. Scholfield called me on June 4th, 2004 to address my voicemail. He
informed me that even if the events as I recounted them were the case, I
would not have been due what I thought I might(I did not have the proper
paperwork in place to pre-open or after-market trade). This was completely
acceptable and understandable. What was NOT acceptable nor understandable
was the rest of the conversation. He continually challenged my account of
the story, raised his voice over mine(which I in turn did too), and
repeatedly asserted the irrelevant fact to my story that the office was
populated by at least four people anywhere from eight minutes prior to the
opening. Not only did he imply that I was not wholly truthful, but
continually repeated his assertion that I was being unreasonable. He never
once offered a way for us to move forward from this situation, a way to make
the path different or smoother in the future. I was so unnerved by this
that I was shaking during and after our call. I was in fact so bewildered
that I speculated that your firm must teach managers to never take
reponsibility for anything(even non-remunerable situations) and to take the
offensive in order to mitigate any possiblity of liability. He in essence
turned a minor situation into an incendiary one; a tenable situation into a
possibly untenable one. I was so put off by his tact that I thought it wise
to consider putting some of my assets to work elsewhere. When I informed my
representative of how Mr. Scholfield handled my call, she was undertandably
befuddled and upset.

It is only now necessary to disclose to you that my representative is also
my sister.

The following business day, June 7th, 2004, Mr. Scholfield called me again.
I was certain he was going to make amends for the prior conversation.
Instead he said he was calling to solicit my support in helping to calm the
emotions of my sister. He said that she was so emotional from this incident
that he was no longer sure whether she could any longer work in this
profession! When I inquired as to what he was talking about, he pointed to
her divorce agreement which mandates that she must remain in Durango for X
amount of years. His implication was that if she didn't get his definition
of her runaway emotions under control, she would be fired, with no where
else to go in town. Then his real intent surfaced. He said that he felt
that I had created the situation in the first place so that I could remove
my assets from Morgan Stanley without creating a barrier between me and my
sister. He said that I had created the situation, and now I needed to help
end it! Can you imagine a manager of your esteemed firm calling me to
assert such paranoia after I had endured the humiliation of our first
conversation?? I explained to him why it was in fact he who created the
situation by not properly responding to my non-threatening first call. I
suggested that perhaps if we were going to walk down this paranoid path,
that it seems more likely then that he is looking for an avenue to fire her.
I explained how this originally minor situation could have had a wholly

different outcome were he to have handled the situation differently. I could not imagine that one of your managers might be unprofessional enough as to bring me into office politics, ask superficially for my help to manage a situation, and accuse me of manufacturing a situation for my own gain!! I am appalled by the requests and I resent the accusation. I have never experienced, let alone imagined, a more bizarre response to a customer complaint, warranted or not.

I know that Mr. Scholfield and Karen and I were all emotional on Friday when we were each having or discussing the conversation with him. If her conversations with Mr. Scholfield were anything like mine were(and she doesn't even have the benefit of being the customer in this situation), I can only imagine what she endured. When I asked Karen whether she had become emotional with Mr. Scholfield on Monday(as surely she must have if he were calling me to assert such strong implications for her career), she informed me that she had said only "hello" to him that day. She seemed to have moved on and seemed upbeat despite the situation. And I was left to wonder why I, as the customer, was being pulled into this situation.

I can assure you that my sister and I have the utmost repect for one another, and I do not need to create a "situation" to do what is best for me and my assets. I can assure you that wherever she goes, I will continue to refer business to her. I can assure you that I am still bewildered as to the accusations that were made. And I can assure you that I doubt I will ever find another situation where I am the customer that turns out as bizarre as this one. Morgan Stanley does not deserve the benefit of my assets or referrals if this is an accepted course of action for a customer complaint.

Maureen McCarthy
P.O. Box 685
Stinson Beach, CA. 94970
(415) 652- 8924

Karen McCarthy
3 Pine Tree Way
Durango, CO 81301
970-946-0662
km@karenmccarthy.net

8/7/2007

Exhibit B

✓ A·f

PRIVILEGED AND CONFIDENTIAL COMMUNICATION TO COMPANY COUNCIL

## Written COMPLAINT TRANSMITTAL FORM

**Date of Call:**    June 17, 2004, Registered Representative agreed to allow Rosemary Johnson, Human Resources, to open a formal investigation.

**Financial Advisor's Name:** Karen McCarthy

**Telephone Number:** 970-259-0937

**Office and Broker ID # and FA #:**    Durango, CO; Office # 246; PF0499; 007

**Operational Complaint:**  Complaint of Branch Manager, Max Scholfield

**Other Complaints Against Branch Manager:**  June 9, 2004 a Formal, Written, Complaint from FA's most important client, Maureen McCarthy. The client was insulted and dismayed by Max Scholfield's repeated acts of unprofessionalism towards her.

**Nature of Complaint:**    Three Interrelated Issues to be Investigated:

I.    To examine a formal written complaint submitted to David Reddoch, June 8, 2004, by the FA, Karen McCarthy's most important client, Maureen McCarthy. The complaint is regarding several levels of unprofessional conduct by my Branch Manager, Max Scholfield, towards a female client, which occurred during two phone conversations, June 4 and June 7, 2004. To date, June 23, 2004, Max Scholfield has neither apologized nor taken responsibility for insulting our client or for his aggressive behavior towards her.

II.    Registered Rep, Karen McCarthy would like to open an investigation into her Branch Manager, Max Scholfield's unacceptable conduct towards her, beginning June 3, 2004 when she initiated a conversation with her Branch Manager regarding a potential error, possibly her largest error to date, she thought possibly as much as $18,000. Karen was seeking her Branch Manager's guidance. Before hearing all the details of the situation, Max inappropriately lost his temper with the Registered Rep, accusing Karen of threatening him. To both our client and to me, Max inappropriately raised his voice, yelling and was hostile at times. Max Scholfield's behavior is responsible for a very profitable client of Karen McCarthy to seek a home for her assets elsewhere. After Karen McCarthy's client filed a Formal Written, Complaint, June 8, 2004, Max fiercely retaliated.

III.    There has been a lot of finger pointing, but in actuality, there has been a preponderance of biased and discrimination that began when Max Scholfield took over as Branch Manager. The Registered Rep now feels it necessary to open an investigation to look back at her Branch Manager's biased and discriminatory behavior that was either wholly unsupportive, destructive, or plainly not fair. The results have been detrimental to the development of her business. The results have led to an undesirable Risk / Reward for this Registered Rep.

Page 1 of

McCarthy, Karen

.om: McCarthy, Karen
ent: Friday, July 09, 2004 10:28 AM
To:  Purdy, Jeri; Guilfoyle, Keith
Cc:  Reddoch, Dave

Dear Ms. Purdy and Mr. Guifoyle,

RE:   Formal Written Complaint by client,  Maureen McCarthy against Branch Manager of Durango, Colorado, Max Scholfield
          Complaint Submitted 6/8/04 to David Reddoch

I am respectfully needing to understand Morgan Stanley's policy's regarding Formal, Written Customer Complaints. I no way am I trying to be combative or to push anyone's buttons.

Our client, Maureen McCarthy and I are wondering if it is Morgan Stanley's normal procedure for a client, who makes complaint, to not have received correspondence regarding the complaint.  The client did receive an email saying "here's what I am going to do"...however after a month, nothing has transpired.  The client complaint was not for purposes of remuneration, but for the purpose of being heard as well as thinking Morgan Stanley would want to know unprofessional behavior of a Branch Manager.

Our client and I are wondering why no one from our firm has called the client to just say, "I am sorry you had to encounter this unfortunate event...". From the beginning of this unfortunate experience, other than me, the Registere b, no one from Morgan Stanley has apologized.

at concerns the client and me, is instead of addressing a client complaint, what is being investigated is someone e. I, the Rep, is what got focused on, even though the complaint was not about me.  It does not seem compliant th when a client wants to voice a concern,  that the client or the Registered Rep need to worry that there will be retaliatic against someone else.

Again, in no way am I trying to be combative.  I am trying to understand Morgan Stanley's follow-up of client complaints.  All I know, is that I have been scrutinized.

I am hoping someone will be able to shed light on what I am apparently missing.

Respectfully,
Karen R, McCarthy


**Karen R McCarthy**
**Morgan Stanley**
940 Main Avenue
P O Box 4228
Durango, Colorado
970-259-0937
800-877-0937
karen_mccarthy@morganstanley.com

7/9/2004

Exhibit C

To: Joel Miller and Rosemary Johnson
Human Resources

CC: Dave Reddoch and Max Scholfield

Date:    July 1, 2004

Financial Advisor's Name:  Karen McCarthy

Telephone Number:  970-259-0937

Office and Broker ID # and FA #:   Durango, CO;  Office # 246;  PF0499;  007

Operational Complaint:  Complaint of Branch Manager, Max Scholfield

RE:    I would like to drop the investigation I agreed to open June 17, 2004. Because Max
Scholfield had threatened my career and my future in the securities business, I wanted
to have my version submitted, in writing. Secondly, I hoped for the firm's help in
maintaining my client relationship with Maureen McCarthy. I was mistaken. I thought the
purpose of opening this investigation was to have the firm's assistance with a situation
that occurred June 3 and 7, 2004.

Joel and Rosemary, thank you very much for your time and energy regarding this matter.
Going forward, I would prefer to focus my energy positively. If you have any more
questions regarding, please feel free to call.

Sincerely,

Karen McCarthy

Morgan Stanley
Karen McCarthy
P.O. Box 4228
Durango, Co 81301
C: 970-946-0662   H: 970-385-0440
800-877-937   Fax: 970-259-6655
karen.mccarthy@morganstanley.com

Exhibit D

Westlaw.

--- F.3d ----

--- F.3d ----, 2007 WL 2265515 (C.A.11 (Fla.))

(Cite as: --- F.3d ----)

Rosensweig v. Morgan Stanley & Co., Inc.
C.A.11 (Fla.),2007.
Only the Westlaw citation is currently available.
United States Court of Appeals,Eleventh Circuit.
Phil ROSENSWEIG, Plaintiff-Appellee,
v.
MORGAN STANLEY & CO., INC., f.k.a. Morgan
Stanley Dean Witter, Incorporated, Defendant-
Appellant.
No. 05-15325.

Aug. 9, 2007.

**Background:** Terminated securities broker brought action to confirm arbitration panel's award finding securities firm liable to him for breach of employment agreement, tortious interference, and conversion. The United States District Court for the Southern District of Florida, Shelby Highsmith, J., No. 04-20240-CV-SH, confirmed award and ordered firm to expunge broker's regulatory record. Firm appealed.

**Holdings:** The Court of Appeals, Gibson, Circuit Judge, held that:

(1) firm was not deprived of fair hearing when panel refused firm's request to introduce testimony about broker's computer disks containing client information, and

(2) order requiring firm to expunge record as recommended was not against public policy.

Affirmed.

[1] Alternative Dispute Resolution 25T ⬤➞ 374(7)

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(H) Review, Conclusiveness, and Enforcement of Award
            25Tk366 Appeal or Other Proceedings for Review
                25Tk374 Scope and Standards of Review
                    25Tk374(7) k. Questions of Law or Fact. Most Cited Cases
On appeal of a district court's confirmation of an

arbitration award, the Court of Appeals reviews its factual findings for clear error and its legal conclusions de novo.

[2] Alternative Dispute Resolution 25T ⬤➞ 358

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(H) Review, Conclusiveness, and Enforcement of Award
            25Tk353 Confirmation or Acceptance by Court
                25Tk358 k. Scope of Inquiry. Most Cited Cases
The Federal Arbitration Act (FAA) presumes that arbitration awards will be confirmed, and judicial review of an arbitration award is narrowly limited. 9 U.S.C.A. § 1 et seq.

[3] Alternative Dispute Resolution 25T ⬤➞ 265

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(F) Arbitration Proceedings
            25Tk264 Reception of Evidence
                25Tk265 k. In General. Most Cited Cases

Alternative Dispute Resolution 25T ⬤➞ 266

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(F) Arbitration Proceedings
            25Tk264 Reception of Evidence
                25Tk266 k. Application of Judicial Rules. Most Cited Cases
In making evidentiary determinations, arbitrators are not required to follow all the niceties observed by the federal courts, but they must give the parties a fundamentally fair hearing.

[4] Alternative Dispute Resolution 25T ⬤➞ 422

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk418 Employees of Exchanges or Dealer Associations

--- F.3d ----

--- F.3d ----, 2007 WL 2265515 (C.A.11 (Fla.))

(Cite as: --- F.3d ----)

25Tk422 k. Arbitrators and Proceedings. Most Cited Cases
Under Federal Arbitration Act (FAA), securities firm was not deprived of fair hearing in arbitration proceeding concerning termination of broker, when arbitration panel refused firm's request to introduce testimony about broker's computer disks containing client information, inasmuch as arbitrators reasonably could have concluded that additional testimony would have been cumulative and not determinative of claims on which broker prevailed. 9 U.S.C.A. § 10(a)(3).

[5] Alternative Dispute Resolution 25T ⚖️257

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(F) Arbitration Proceedings
            25Tk256 Hearing
                25Tk257 k. In General. Most Cited Cases
Arbitrators enjoy wide latitude in conducting an arbitration hearing, and they are not constrained by formal rules of procedure or evidence.

[6] Labor and Employment 231H ⚖️758

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk758 k. Wrongful Discharge in General. Most Cited Cases
Florida law provides no action for the common law tort of wrongful termination.

[7] Alternative Dispute Resolution 25T ⚖️424

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(f) Exchanges and Dealer Associations
            25Tk418 Employees of Exchanges or Dealer Associations
                25Tk424 k. Review, Conclusiveness, and Enforcement of Award. Most Cited Cases
District court's order requiring securities firm to expunge terminated securities broker's regulatory record as recommended by arbitration award was not against public policy, inasmuch as order was properly written to eliminate all adverse reports based on broker's discharge from firm, but nothing else.

Joseph Clay Coates, III, Bradford D. Kaufman, Greenberg, Traurig, P.A., West Palm Beach, FL,

Elliot H. Scherker, Julissa Rodriguez, Greenberg, Traurig, P.A., Miami, FL, for Defendant-Appellant.
Curtis Carlson, Carlson & Lewittes, P.A., Miami, FL, for Plaintiff-Appellee.

Appeal from the United States District Court for the Southern District of Florida.

Before EDMONDSON, Chief Judge, and TJOFLAT and GIBSON,[FN] Circuit Judges.
GIBSON, Circuit Judge:
*1 Morgan Stanley appeals from an order of the district court which confirmed the award of an arbitration panel in favor of one of Morgan Stanley's former employees, Philip E. Rosensweig, and ordered the expungement of Rosensweig's regulatory record. Rosensweig had instituted the arbitration proceedings to recover damages flowing from his termination as a securities broker at Morgan Stanley and Morgan Stanley's alleged retention of client records that Rosensweig claimed belonged to him. Morgan Stanley contends that the arbitrators committed misconduct by refusing to hear evidence about certain computer disks that contained the client data and that the expungement order is contrary to public policy. We affirm the order of the district court.

Rosensweig joined Dean Witter, which later merged with and became known as Morgan Stanley, as a retail broker in Miami, Florida, in 1992. At that time, he had been a licensed securities broker for ten years, and he brought with him a significant book of business. Rosensweig kept his client information, including names, addresses, phone numbers, portfolio information, and personal notes, in a computer program called *Broker's Ally*, which he had purchased before joining Morgan Stanley and continued to use during his seven years there. Rosensweig was known as a " top producer" at Morgan Stanley, with annual commissions and fees reaching as high as $900,000.

On May 28, 1999, Morgan Stanley terminated Rosensweig. When a firm terminates a registered securities broker, the firm must submit a form called a " Form U-5" setting forth the reasons for the termination to the " Central Registration Depository," where regulatory authorities can access the information. The Form U-5 Morgan Stanley submitted after Rosensweig's termination stated that he was terminated for " failure to follow instructions with respect to one account not prompted by a

--- F.3d ----

--- F.3d ----, 2007 WL 2265515 (C.A.11 (Fla.))

(Cite as: --- F.3d ----)

customer complaint, a difference in investment philosophy from the firm[,] and two customer complaints." The terms of Morgan Stanley's stock options, bonus, and deferred compensation plans allowed it to declare Rosensweig's benefits forfeited because his termination was for cause.

When a securities broker is terminated for cause in the State of Florida, the State investigates the matters set forth on that broker's Form U-5. In Rosensweig's case, the State held up the transfer of his securities license to a new firm until the investigation was complete, which took over eight months. Once his license finally cleared, Rosensweig was earning about $50,000 per year as an independent contractor with a small firm.

In October 2001, Rosensweig filed a complaint against Morgan Stanley with the Arbitration Division of the National Association of Securities Dealers, Inc. His statement of claim alleged that Morgan Stanley falsely reported to regulators that he was terminated for cause, which prevented him from working as a broker during the State's eight-month investigation; improperly treated his deferred compensation, stock options, and bonuses as forfeited based on the purported termination for cause; failed to return his personal property; failed to return his client information contained in the *Broker's Ally* computer program; and stole his clients. Rosensweig asserted claims against Morgan Stanley for breach of employment agreement, breach of equitable and just principles of trade, tortious interference, violation of the Florida Trade Secrets Act, and conversion. He sought damages for loss of future income between $1 million and $3 million and for loss of $500,000 in the deferred compensation, bonuses, and stock options that Morgan Stanley claimed were forfeited, as well as punitive damages and attorney's fees.

*2 During discovery, Morgan Stanley repeatedly requested material regarding Rosensweig's *Broker's Ally* files. Rosensweig indicated that Morgan Stanley had given him back-up disks of his *Broker's Ally* data some time after his termination but that the disks had viruses and that he could not find them. Morgan Stanley moved to strike Rosensweig's claim for damages, arguing that he should not be permitted to claim damages for lost customer relationships when he had failed to produce disks in his possession that contained all his customer data. The arbitrators denied the motion. On the Friday

evening before the arbitration was scheduled to begin the following Monday, Rosensweig notified Morgan Stanley that he had found the disks and delivered them to Morgan Stanley with a warning that they might contain viruses and should be opened at Morgan Stanley's own risk.

Arbitration began on Monday, September 15, 2003, and was scheduled to last three days. Morgan Stanley indicated that it planned to present evidence and testimony about the disks but first needed a computer expert to examine them for viruses. The panel stated that the evidence would have to be presented within the three days allotted for arbitration, and Morgan Stanley acquiesced.

Rosensweig was the primary witness at the arbitration, and he offered extensive testimony about his career as a broker and his work at Morgan Stanley. Rosensweig testified that his termination came as a shock, and he cast doubt on each of Morgan Stanley's asserted reasons for the termination. He explained that the alleged "failure to follow instructions" was based on his refusal to illegally restrict the trades of a client. He testified that he had not done anything wrong to provoke the purported "customer complaints," where one concerned his refusal to execute a client's trustee's suspect trading plans and the other was a letter from one of Rosensweig's former in-laws expressing concern about the performance of his investments. Third, he elicited testimony that the statement that he had a "difference in investment philosophy" from the firm was not meant to imply that he had done anything wrong and thus could not provide just cause for his termination. Rosensweig intimated that his branch manager did not understand the industry, particularly Rosensweig's 401(k) business, and feared that Rosensweig would defect to another firm and take other successful brokers with him. Rosensweig testified that this manager once had commented that, if Rosensweig were ever terminated from Morgan Stanley, he would never work at another major firm because the State investigation into the reasons for his discharge would hold up the transfer of his license to another firm. The investigation into Rosensweig's termination from Morgan Stanley indeed lasted over eight months. During that time, the national firm PaineWebber refused to hire him because he would be effectively unlicensed during the pendency of the investigation, and a regional firm that hired him let him go because it was taking too long for his license to transfer.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                        Page 4

_ --- F.3d ----, 2007 WL 2265515 (C.A.11 (Fla.))

(Cite as: --- F.3d ----)

Ultimately, Rosensweig took a position as an independent contractor with a small securities firm.

Rosensweig further testified that, in the months after his termination, he received telephone calls informing him that other brokers at Morgan Stanley were soliciting business from his clients. According to Rosensweig, Morgan Stanley refused to let him take his personal property home on the day he was terminated, giving Morgan Stanley the opportunity to print his client list from his computer and distribute copies of the list to its brokers. Although Morgan Stanley eventually gave him his computer, Rosensweig testified that the *Broker's Ally* program with all his client data had been deleted from it. He further testified that, upon his request, Morgan Stanley gave him a disk and a CD-Rom with a copy of the *Broker's Ally* program and the client data, but the disk had a virus and, while the CD-Rom contained his client contact information, his seventeen years' worth of client notes were missing. According to Rosensweig, he had an employment contract with Morgan Stanley that provided that the client list he brought with him when he joined the firm was his property.

*3 Morgan Stanley cross-examined Rosensweig on these issues, including his use of *Broker's Ally* after his termination. Rosensweig admitted that he had access to many of his clients' contact information from commission statements after the termination, but explained that he was unable to conduct business for them because the State had effectively suspended his license during its investigation of the reasons for termination that Morgan Stanley had stated on the Form U-5. Rosensweig acknowledged that his regulatory file contained several " Form U-4" customer complaints and an adverse arbitration award, but Morgan Stanley had not cited these as reasons for his termination. Moreover, there was evidence that Morgan Stanley disagreed with some of the complaints but settled them because it was most economical, and at least one was expunged by the complainant. Morgan Stanley did not produce other evidence of its reasons for terminating Rosensweig and did not call Rosensweig's former branch or regional managers to testify. Neither side was able to produce a copy of an employment agreement between Rosensweig and Morgan Stanley.

On September 17, 2003, the arbitration was adjourned until December to allow Morgan Stanley

time to verify that certain personnel records had been destroyed. During the adjournment, Morgan Stanley examined the back-up disks Rosensweig had produced and filed a motion to reopen the final hearing to allow it to present evidence about the disks. Morgan Stanley had discovered that the disks had no viruses, contained substantial customer information from *Broker's Ally*, and had been used shortly after Rosensweig's termination, and it argued, as it had in its earlier motion to strike, that these facts discredited Rosensweig's claims by showing he had access to his client data after his termination. Morgan Stanley sought to cross-examine Rosensweig about why he failed to produce the disks until the eve of arbitration and why he had claimed that Morgan Stanley had erased all his client data when the disks contained significant client information. The panel allowed Morgan Stanley to admit 21 binders containing a hard copy of the information extracted from the disks but did not permit Morgan Stanley to elicit testimony about the disks. At the close of the proceedings, Morgan Stanley stated that it did not feel that the proceedings had been fair because it was not allowed to conduct additional cross-examination on the disks.

The arbitration panel found Morgan Stanley liable to Rosensweig on the claims for breach of employment agreement, tortious interference, and conversion, and awarded him compensatory damages of $1,649,860.00. The panel also recommended that the Form U-5 be changed to state " broker was discharged without cause," and that other adverse documentation in the Central Registration Depository related to Rosensweig's discharge from Morgan Stanley be neutralized. It denied Rosensweig's other claims, including his request for punitive damages, attorney's fees, and relief under the Florida Trade Secrets Act.

*4 The district court confirmed the award and ordered the expungement of Rosensweig's record. In its motion to vacate, Morgan Stanley had argued that the panel was biased in favor of Rosensweig, that the award was arbitrary and capricious because it granted Rosensweig damages even though he had possession of his client information in the back-up disks, and that the arbitrators committed misconduct by refusing to allow Morgan Stanley to introduce testimony about the disks. The court rejected all these arguments, stating that a number of grounds supported the panel's decision and that the panel had the discretion to limit the evidence that would be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ---                                                                                                    Page 5

_ --- F.3d ----, 2007 WL 2265515 (C.A.11 (Fla.))

(Cite as: --- F.3d ----)

taken on the disks.

On appeal, Morgan Stanley has narrowed its complaints to two arguments: 1) the arbitrators committed misconduct by refusing to allow it to present pertinent and material evidence about the disks, and 2) the expungement of Rosensweig's regulatory record is contrary to public policy.

I.

[1] On appeal of a district court's confirmation of an arbitration award, we review its factual findings for clear error and its legal conclusions de novo. *Rintin Corp., S.A. v. Domar, Ltd.,* 476 F.3d 1254, 1258 (11th Cir.2007).

[2][3][4] The Federal Arbitration Act presumes that arbitration awards will be confirmed, and judicial review of an arbitration award is narrowly limited. *B.L. Harbert Int'l, LLC v. Hercules Steel Co.,* 441 F.3d 905, 909 (11th Cir.2006); *see also Davis v. Prudential Sec., Inc.,* 59 F.3d 1186, 1190 (11th Cir.1995). The Act sets forth four bases for vacating an award; Morgan Stanley challenges the arbitration panel's decision on the third statutory ground: " Where the arbitrators were guilty of misconduct in refusing ... to hear evidence pertinent and material to . the controversy." 9 U.S.C. § 10(a)(3). In making evidentiary determinations, arbitrators are not required to " follow all the niceties observed by the federal courts," but they must give the parties a fundamentally fair hearing. *See Tempo Shain Corp. v. Bertek, Inc.,* 120 F.3d 16, 20 (2d Cir.1997) (internal quotation marks and citation omitted). Morgan Stanley argues that it was deprived of a fair hearing when the arbitrators refused its request to introduce testimony about the *Broker's Ally* disks. Rosensweig contends that the arbitrators acted within their discretion because any further evidence about the disks would have been cumulative and immaterial.

[5] Arbitrators " enjoy wide latitude in conducting an arbitration hearing," and they " are not constrained by formal rules of procedure or evidence." *Robbins . v. Day,* 954 F.2d 679, 685 (11th Cir.1992), *overruled on other grounds, First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 948, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). " An arbitrator need not consider all the evidence the parties seek to introduce but may reject evidence that is cumulative or irrelevant." *Scott v. Prudential Sec., Inc.,* 141 F.3d 1007, 1017 (11th Cir.1998). In addition, " [a] federal court may

vacate an arbitrator's award only if the arbitrator's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings." *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901,* 763 F.2d 34, 40 (1st Cir.1985). In this case, the panel did not explain its reasons for limiting Morgan Stanley's ability to introduce testimony and cross-examine Rosensweig about the back-up disks, so we inquire whether there was any reasonable basis for its decision. *See Schmidt v. Finberg,* 942 F.2d 1571, 1574 (11th Cir.1991).

*5 We conclude that the arbitrators committed no misconduct because they had several reasonable bases for limiting evidence about the disks, none of which prejudiced Morgan Stanley. First, the arbitrators reasonably could have concluded that additional testimony would have been cumulative. Morgan Stanley's motion to reopen sought to introduce testimony that the disks contained significant amounts of Rosensweig's client information, had no viruses (contrary to Rosensweig's representations during discovery), and were used shortly after Rosensweig's termination. The panel granted the motion insofar as Morgan Stanley sought to introduce a hard copy of the contents of the disks, so additional testimony was not necessary to establish that the disks contained most of Rosensweig's client data. Moreover, the record shows that Morgan Stanley had already discredited Rosensweig's claim that it deprived him of all his client data during its cross-examination of Rosensweig at the initial hearing. Rosensweig admitted that he had access to contact information for many of his clients soon after his termination, that he eventually was able to retrieve all the data except for his client notes from the disks, and that some clients followed him to his new firm. The issue of why Rosensweig failed to produce the back-up disks until the eve of arbitration was not covered during Rosensweig's testimony, but Morgan Stanley has not explained how this discovery issue is substantively relevant to Rosensweig's claims. We do not see what a second cross-examination of Rosensweig would have added to the record.

Morgan Stanley insists that the testimony it sought to introduce would have defeated Rosensweig's claims and demonstrated that he suffered no damages by showing that Morgan Stanley provided him with all his client data shortly after his termination. We reject this argument. Even apart from the fact that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

_ ---F.3d ----, 2007 WL 2265515 (C.A.11 (Fla.))

(Cite as: --- F.3d ----)

evidence was cumulative, Rosensweig's possession of working disks was not necessarily inconsistent with his right to recover for breach of employment agreement, tortious interference, and conversion.

Morgan Stanley's improper retention of Rosensweig's *Broker's Ally* data was one theory advanced in support of each of his claims, and thus testimony that Rosensweig had access to that data soon after his termination arguably would have been relevant. Nonetheless, the panel's refusal to hear testimony about the disks did not deprive Morgan Stanley of a fair hearing in this case. *See Hoteles Condado Beach,* 763 F.2d at 40 (not every failure of an arbitrator to receive relevant evidence amounts to misconduct requiring vacatur of the award). The evidence Morgan Stanley sought to introduce would have shown that it provided Rosensweig with disks containing most of his *Broker's Ally* data soon after his termination, discrediting his allegations that it deprived him of his client records and prevented him from contacting his clients. Rosensweig's own testimony also had this effect. The evidence concerning the back-up disks does not address, however, a crucial part of Rosensweig's client data-related claims-that Morgan Stanley improperly copied his client lists and distributed them to Morgan Stanley brokers, who then solicited his clients. Thus, the panel reasonably could have concluded that, even if Morgan Stanley promptly provided Rosensweig with copies of his *Broker's Ally* data after his termination, Morgan Stanley nevertheless was liable for breach of employment agreement on the basis of Rosensweig's testimony that his employment agreement provided that his client information was his property, and he received many calls informing him that Morgan Stanley brokers were calling individuals in his client lists after his termination, using copies made by Morgan Stanley. Rosensweig's tortious interference and conversion claims were supported by the same testimony. The arbitrators reasonably could have concluded that tortious interference lay, not in Morgan Stanley depriving Rosensweig of his client data, but in Morgan Stanley brokers' use of Rosensweig's client lists to solicit his customers. Similarly, they could have concluded that conversion did not lie in Morgan Stanley deleting all of Rosensweig's client data, but in its retaining copies of his client lists, as well as failing to return the client notes component of his *Broker's Ally* data. Thus, to the extent that evidence that Morgan Stanley provided Rosensweig with back-up disks of his

*Broker's Ally* data was relevant to one of Rosensweig's theories for recovery, the arbitrators committed no misconduct by disallowing it in light of Rosensweig's unrefuted testimony that Morgan Stanley retained and used copies of his client lists and failed to return his client notes.

\*6 Moreover, Rosensweig's theory of wrongful termination provides a wholly independent basis from which the panel reasonably could have concluded that Rosensweig had established his claims, even if Rosensweig had complete access to his *Broker's Ally* data after his termination. On his breach of employment agreement claim, Rosensweig's evidence indicated that Morgan Stanley terminated him without just cause in violation of the terms of his employment,[FN1] an issue to which the disks are immaterial. Rosensweig's tortious interference claim is supported by evidence that Morgan Stanley reported false reasons for his termination on the Form U-5, knowing this would prompt an investigation that would effectively suspend his broker's license and thus preclude him from joining a new firm and conducting securities transactions for his clients for months. Finally, the disks are also immaterial to Rosensweig's alternate theory of conversion, on which the evidence showed that Morgan Stanley improperly treated his deferred compensation, stock options, and bonuses as forfeited by claiming that his termination was for cause.

Morgan Stanley disagrees that wrongful termination is a proper theory for sustaining Rosensweig's claims. Citing a footnote in the statement of claim in which Rosensweig stated, " The relief that Rosensweig seeks in this case does not depend on whether his termination was for cause or not for cause," Morgan Stanley argued before the arbitration panel and now argues on appeal that Rosensweig never asserted a claim for wrongful termination. It contends, rather, that the essence of Rosensweig's complaint was that Morgan Stanley stole his computerized client records, and that Rosensweig unfairly has attempted to recast his claims to fit the evidence as the arbitration progressed.

\*7 [6] After a thorough review of the record, we conclude that Morgan Stanley's reading of the statement of claim and the arbitration proceedings is not an accurate one. It is true that Rosensweig did not assert a claim entitled wrongful termination, but this is consistent with Florida law which provides no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 7

--- F.3d ----, 2007 WL 2265515 (C.A.11 (Fla.))

(Cite as: --- F.3d ----)

action for the common law tort of wrongful termination. See *Bass v. Metro Dade County Dep't of Corr. & Rehab.,* 798 So.2d 835, 836 (Fla.Dist.Ct.App.2001). The record as a whole is clear that Rosensweig advanced the legal theory of wrongful termination to support his claims, with Morgan Stanley's use and retention of his client data from *Broker's Ally* an alternative theory for relief. Morgan Stanley's own pleadings belie its present intimation that it did not receive fair notice that Rosensweig was advancing the theory of wrongful termination. In its answer to his statement of claim, it argued for the dismissal of Rosensweig's claim for ' wrongful termination' or ' breach of employment agreement' " on the grounds that he was an at-will employee. Thus, we reject Morgan Stanley's characterization of the case as turning on its handling of Rosensweig's client records; to the contrary, wrongful termination was a significant, independent issue, and one to which the back-up disks were immaterial.

In sum, the district court correctly denied Morgan Stanley's motion to vacate the arbitration award because the arbitrators reasonably could have concluded that the testimony Morgan Stanley sought to introduce was cumulative and not determinative of the claims on which Rosensweig prevailed, and thus Morgan Stanley was not deprived of a fair hearing. See *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 481 F.3d 813, 818-19 (D.C.Cir.2007) (arbitrators' refusal to hear cumulative or immaterial testimony does not deprive parties of a fair hearing).

II.

[7] Morgan Stanley also argues that the district court erred by ordering the expungement of Rosensweig's regulatory record as recommended by the arbitration award, contending the expungement is against public policy. See *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,* 861 F.2d 665, 670 (11th Cir.1988). According to Morgan Stanley's reading of the arbitration award, the expungement removes not only the false reasons for Rosensweig's termination but also all complaints that were filed against Rosensweig before his termination, sweeping his regulatory record clean in a way that will mislead the public.

The relevant portion of the award reads:
*8 [T]he Panel recommends that all documentation in [National Association of Securities Dealers Central

Registration Depository] referencing the Morgan Stanley, DW, Inc. discharge be changed such that 1) any " Yes" answers to Questions 14J1 and/or 22N1 submitted on subsequent Form U-4 filings be changed to " No" , 2) any Disclosure Reporting Pages be expunged and 3) any other documentation be expunged.

The expungement order based on this recommendation affects only those items in Rosensweig's regulatory record that refer to his termination from Morgan Stanley and thus is completely consistent with public policy. Morgan Stanley contends that the language " any other documentation" in the third enumerated item encompasses all customer complaints in Rosensweig's record, including those Form U-4s filed before his termination, but Morgan Stanley reads the recommendation too broadly. The three enumerated items for expungement all are qualified by the introductory phrase " all documentation in [National Association of Securities Dealers Central Registration Depository] referencing the Morgan Stanley, DW, Inc. discharge." The order is properly written to eliminate all adverse reports based on Rosensweig's discharge from Morgan Stanley, but nothing else.

We AFFIRM the district's order confirming the arbitration award and ordering a limited expungement of Rosensweig's regulatory record.

FN* Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

FN1. Before the arbitration hearing began, Morgan Stanley filed a motion to dismiss arguing that Rosensweig was an at-will employee and thus no just cause for termination was required. The panel denied this motion, and Morgan Stanley has not appealed. Thus, we assume that Morgan Stanley could not terminate Rosensweig without just cause.

C.A.11 (Fla.),2007.
Rosensweig v. Morgan Stanley & Co., Inc.
--- F.3d ----, 2007 WL 2265515 (C.A.11 (Fla.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit E

# Morgan Stanley

# Memorandum

| | | | |
|---|---|---|---|
| **To:** | Karen McCarthy | **Date:** | February 9, 2005 |
| **From:** | Thomas Kovach | **cc:** | Helene Jepson<br>Max Scholfield |

**Subject:**   Written Reprimand

This memo confirms your October 20, 2004 conference call with the law division, and, based upon that discussion, this will serve as a reprimand regarding your handling of your relationship with Mike and Randi Schweitz, as well as your handling of trades in the account of JoAnne Beardsley.

The following summarizes the key points discussed:

1. In the call you acknowledged that you are aware of the Firm's policy on Outside Activities. You further acknowledged that you are aware that, under the policy, an employee who wishes to participate in an outside activity must submit an Outside Activity Request Form and obtain the appropriate approval before engaging in outside activities. I have attached a copy of the Firm's policy on Outside Activities for your reference.

2. You acknowledged providing to Mike and Randi Schweitz a written statement detailing "Financial Consulting Hours," as well as assisting Mr. and Mrs. Schweitz in their dealings with third parties – e.g. loan refinancing and credit card applications. You further acknowledged that Mr. Schweitz sent you an e-mail message stating in part:  *"With all the work you are doing for me, I will be forever indebted to you, literally. (Well, at least until you do your kitchen)."*  You have stated that you did not receive compensation from Mr. and Mrs. Schweitz for assisting them, and that you paid Mr. Schweitz in full for services his firm Durango Marble & Granite provided to you. You have further stated that you did not believe your actions to be in violation of Firm's policy on Outside Activities. However, we believe that you, at a minimum, should have discussed with your manager whether or not your interactions with Mr. and Mrs. Schweitz conformed with Firm policy. We further believe that you should have abstained from interacting with a third-party financial institution on behalf of Mr. and Mrs. Schweitz regarding the re-financing of their mortgage. We further remind you that you must submit written correspondence to branch management for review before sending it to clients.

3. In addition, you were informed that the Firm's records department did not reflect that Robert Beardsley had trading authorization in JoAnne Beardsley's account, yet Mr. Beardsley had placed trades in Mrs. Beardsley's account. You subsequently provided the Firm with a trading authorization form, which appeared to have been executed by Mrs. Beardsley in November of 2003, but which had apparently not been submitted to our new accounts department. Please be advised that you are required to provide the Firm with any such documentation immediately after you receive it, in order to ensure that the Firm's records reflect accurate and complete client information.

4. Finally, you stated in the call that you have not exercised discretion in any client accounts.

In the future, please make a heightened effort to comply with all Morgan Stanley policies, as well as with other management instructions or restrictions. Any future violations may subject you to further disciplinary action, up to and including immediate termination of your employment.

Sincerely,

Thomas Kovach

RECEIVED:

_____          Date: _____
Karen McCarthy

Exhibit F



DURANGO
FILM FESTIVAL
A NEW VOICE FOR
THE FILM ARTS

August 10, 2005

Re: Durango Film Festival & Karen Mc Carthy

Dear Morgan Stanley and to Whom It May Concern,

Durango Film Festival is a Colorado non-profit corporation. Karen Mc Carthy was never formally elected to the Board of the Durango Film Festival. Nor has she not participated or attended any Durango Film Festival Board of Director meetings.

If you have any questions or I may be of further service I may be reached via email hq@durangofilmfestival.com or my cell 970-749-9620.

Sincerely,

Sofia van Surksum
Executive Director
Durango Film Festival


cc: DFF
    Karen Mc Carthy - Sent via fax 970-385-6873

a new voice for the film arts

P.O. Box 241  Durango, CO  81302
1-970-259-2291

Exhibit G

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release is made this _____ day of May, 2005, by Morgan Stanley DW, Inc. (hereinafter "Morgan Stanley") and Karen R. McCarthy (hereinafter "McCarthy"). Morgan Stanley and McCarthy are collectively referred to herein as the "parties".

### RECITALS

WHEREAS, McCarthy has indicated her intention to resign her employment with Morgan Stanley on or before May 12, 2005;

WHEREAS, McCarthy's last day in the Morgan Stanley Durango office will be May 5, 2005;

WHEREAS, McCarthy has made various complaints related to her employment with Morgan Stanley, which Morgan Stanley has denied;

WHEREAS, Morgan Stanley will pay McCarthy her normal draw, as well as all commissions pertaining to transactions in the accounts for which she is the Financial Advisor of record, up to the date of her resignation but in no event later than May 12, 2005;

NOW, THEREFORE, in consideration of the foregoing and the releases, promises, warranties and undertakings hereinafter contained, as well as other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

Morgan Stanley will pay to McCarthy the sum of $20,000.00, upon her execution of this Settlement Agreement and Release.

McCarthy, for herself, her heirs, administrators, executors and assigns, does hereby fully release, acquit and forever discharge Morgan Stanley, its parent, affiliates, subsidiaries, predecessors, successors, officers, directors, attorneys, employees, and past employees, from all claims, causes of action and liability, known or unknown, from the beginning of time until the execution of this Settlement Agreement and Release relating to or in any way connected with McCarthy's relationship with Morgan Stanley, or her termination of employment including, but not limited to, any claim arising under any federal, state or local law or ordinance, any tort, any employment contract express or implied, any public policy, any claims for whistleblowing under the Sarbanes-Oxley Act of 2002, or any claims arising under Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1966, as amended, the Age Discrimination in Employment Act, the Older Worker's Benefit Protection Act, as amended, the Equal Pay Act, as amended, the Americans with Disabilities Act, the Civil Rights Act of 1991, as amended, the Rehabilitation Act of 1973, the New York Human Rights Law, the Colorado Anti-Discrimination Act of 1957, the Colorado Equal Pay Law, the Colorado Discrimination by Labor Organization Law, and the Colorado Employee Family and Medical Leave Rules, all as amended, or any other claim for employment discrimination or any other employment or similar claim under any applicable federal, state, or local statutes, provisions, orders or regulations, and all claims for workers compensation, unpaid wages, salary or bonus, monetary or equitable relief, vacation, other employee fringe benefit plans, medical plans, indemnity, breach of contract, wrongful discharge, impairment of economic opportunity, reimbursement for fines paid, or attorneys' fees.

McCarthy further agrees, to the extent consistent with applicable laws, including but not limited to the Sarbanes-Oxley Act of 2002, not to initiate any legal action, claim, charge, complaint or action against Morgan Stanley, in any forum whatsoever, in connection with the claims released by her. In addition, to the extent any such claim, charge, complaint or action is pending or may be brought for her benefit or on her behalf, she expressly waives any claim to any form of monetary or other damages, or any other form of recovery or relief in connection with any such claim, charge, complaint or action, or in connection with any claim, charge, complaint or action brought by any third party, and thereby agrees to dismiss with prejudice any pending claim, charge, complaint or action covered by this Agreement.

IT IS UNDERSTOOD AND AGREED that this settlement is a compromise of disputed claims and is not to be construed as an admission of liability by McCarthy. It is further understood and agreed that this settlement does not constitute an admission of liability by Morgan Stanley or an admission that Morgan Stanley has violated any law or legal obligation with respect to any aspect of McCarthy's employment or termination from employment. In settling this matter, it is the desire of the parties to terminate any disputes and buy their peace. This Settlement Agreement and Release contains the entire agreement between the parties. The terms of this Settlement Agreement and Release are contractual and not mere recital. This Settlement Agreement and Release is executed without any reliance upon any representation by any person concerning the nature and extent of legal liabilities thereunder. Further, the parties acknowledge that they have read this Settlement Agreement and Release and know and understand the full contents and effects of it and sign the same as their own free act.

McCarthy hereby warrants, promises and covenants that she, her agents, representatives and attorneys with notice of this matter will keep the terms of this settlement and Settlement Agreement and Release strictly confidential and further warrants, promises and agrees that she and her agents, representatives and attorneys with notice of this matter will not communicate the terms of the settlement or this Settlement Agreement and Release orally or in writing to any third party except to her legal, financial or tax advisors, provided they agree to be bound by the terms of this confidentiality agreement or unless compelled to do so by a validly issued and served subpoena, court order, or other legal process or as may be necessary to enforce the terms of this Settlement Agreement and Release. However, notwithstanding anything contained herein to the contrary, this confidentiality clause does not prohibit or restrict McCarthy, her agents, representatives and attorneys with notice of this matter from responding to any inquiry about this settlement or its underlying facts and circumstances from the Securities and Exchange Commission (SEC), the NASD Regulation, Inc. (NASD), the New York Stock Exchange, Inc. (NYSE) or any other self-regulatory organization. This confidentiality clause is an important part of this settlement and without it, Morgan Stanley would not have settled this matter.

McCarthy acknowledges that this Agreement has been executed voluntarily by her. She is urged, and acknowledges that she has had the opportunity, to obtain the advice of an attorney or other representative of her choice, unrelated to Morgan Stanley, prior to executing this Agreement. Further, she acknowledges that she has a full understanding of the terms of this Agreement, which may not be changed except by a writing signed by both Morgan Stanley and McCarthy.

08/07/2007  14:18  9782472241          PETERSON OFFICE SUPP              PAGE  04/05

McCarthy acknowledges that she has been given at least twenty-one (21) days within which to consider executing this Agreement, and that she has seven (7) days from the date of her execution of this Agreement within which to revoke this Agreement. Any revocation must be in writing and be received by Thomas Kovach, at Morgan Stanley's Albuquerque, New Mexico, branch office, by 5:00 pm on or before the seventh day after this Agreement is executed by her. McCarthy further acknowledges that this Agreement will not become effective or enforceable until the revocation period has expired. If McCarthy executes this Agreement prior to the end of the twenty-one (21) day period that Morgan Stanley has provided for her to give it consideration, she agrees and acknowledges that the prior execution was a knowing and voluntary waiver of her right to consider this Agreement for the full twenty-one (21) days, and was due to her conclusion that she had sufficient time in which to consider and understand this Agreement, and in which to review this Agreement with her attorney or other representative of her choice.

BY SIGNING THIS AGREEMENT AND RELEASE, MCCARTHY ACKNOWLEDGES THAT SHE IS KNOWINGLY AND VOLUNTARILY WAIVING AND RELEASING ANY AND ALL RIGHTS SHE MAY HAVE AGAINST MORGAN STANLEY UP TO THE DATE OF HER EXECUTION OF THIS AGREEMENT UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT, THE OLDER WORKERS BENEFIT PROTECTION ACT, AND ANY OTSHER APPLICABLE AGE DISCRIMINATION LAWS, STATUTES, ORDINANCES OR REGULATIONS.

If any provision herein is, for any reason, adjudged to be void, invalid or unenforceable by an arbitrator or arbitration panel, a regulatory body or a court of law, the remainder of this Settlement Agreement and Release will continue and remain in full force and effect.

This Settlement Agreement and Release shall be construed under the laws of the State of New York.

IN WITNESS WHEREOF the parties have executed this Settlement Agreement and Release as of the date(s) indicated below.

Name: _____    Date: _____
        Karen R. McCarthy

Morgan Stanley DW Inc.

Name: _____    Date: _____
        Thomas Kovach
        Branch Manager

5/5/05

Thomas A. Kovach
Executive Director
Rio Grande Area

6701 Uptown Blvd NE
Albuquerque, NM 87110

toll-free  800 776 5973
direct  505 889 2898
fax  505 889 2858

Karen,

As promised.

Sincerely,

Jim

Morgan Stanley

Exhibit H

FORM U5
UNIFORM TERMINATION NOTICE FOR SECURITIES INDUSTRY REGISTRATION

U5 - FULL
06/03/2005

Rev. Form U5 (06/2003)

## NOTICE TO THE INDIVIDUAL WHO IS THE SUBJECT OF THIS FILING

Even if you are no longer registered you continue to be subject to the jurisdiction of regulators for at least two years after your registration is terminated. You may have to provide information about your activities while associated with this firm. Therefore, you must forward any residential address changes for years following your termination date or last Form U5 amendment to: CRD Address Changes, P.O. Box 9495 , Gaithersburg , MD 20898-9495 .

### 1. GENERAL INFORMATION

| | | | |
|---|---|---|---|
| First Name:<br>KAREN | Middle Name:<br>RUTH | Last Name:<br>MCCARTHY | Suffix: |
| Firm CRD #:<br>7556 | Firm Name:<br>MORGAN STANLEY DW INC. | CRD Branch #: | Firm NFA #: |
| Firm Billing Code: | Individual CRD #:<br>860218 | Individual SSN:<br>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 | Individual NFA #: |
| Office of Employment Address Street 1:<br>940 MAIN AVENUE | | Office of Employment Address Street 2: | |
| City:<br>DURANGO | State:<br>Colorado | Country:<br>USA | Postal Code:<br>81301 |

Private Residence Check Box:
If the Office of Employment address is a private residence, check this box. ☐

Rev. Form U5 (06/2003)

### 2. CURRENT RESIDENTIAL ADDRESS

## NOTICE TO THE FIRM

This is the last reported residential address. If this is not current, please enter the current residential address.

| From | To | Street | City | State | Country | Postal Code |
|---|---|---|---|---|---|---|
| 05/2005 | PRESENT | 3 PINE TREE WAY | DURANGO | CO | USA | 81301 |
| 04/1998 | 04/2005 | 174 NORTH ELK RUN | DURANGO | CO | USA | 81303 |

Form U5 (06/2003)

### 3. FULL TERMINATION

Case 1:06-cv-01142-RWR    Document 45-4    Filed 11/15/2007    Page 42 of 57

Yahoo! Mail - flomonroevenus@yahor ~om                                    Page 2 of 5

Is this a *FULL TERMINATION*? ⊙ Yes ○ No
Note: A "Yes" response will terminate ALL registrations with all *SROs* and all *jurisdictions*.

Reason for Termination: * Discharge  * Provide an explanation below

OLATIONS OF FIRM POLICIES.

Rev. Form U5 (06/2003)

4. DATE OF TERMINATION

Date Terminated (MM/DD/YYYY): 06/01/2005
A complete date of termination is required for full or partial termination. This date represents the actual date that the termination of registration is ef

Rev. Form U5 (06/2003)

6. AFFILIATED FIRM TERMINATION

No Information Filed

Rev. Form U5 (06/2003)

7. DISCLOSURE QUESTIONS

IF THE ANSWER TO ANY OF THE FOLLOWING QUESTIONS IN SECTION 7 IS 'YES', COMPLETE DETAILS OF ALL EVENTS OR PR(
ON APPROPRIATE DRP(S). IF THE INFORMATION IN SECTION 7 HAS ALREADY BEEN REPORTED ON FORM U4 OR FORM U5.
RESUBMIT DRPs FOR THESE ITEMS. REFER TO THE EXPLANATION OF TERMS SECTION OF FORM U5 INSTRUCTIONS FOR EXPL.
ITALICIZED WORDS.

Investigation Disclosure

| 7A. | Currently is, or at termination was, the individual the subject of an *investigation* or *proceeding* by a domestic or foreign governmental body *self-regulatory organization* with jurisdiction over *investment-related* businesses? (Note: Provide details of an *investigation* on an Investigat Disclosure Reporting Page and details regarding a *proceeding* on a Regulatory Action Disclosure Reporting Page.) |

Internal Review Disclosure

| 7. | Currently is, or at termination was, the individual under internal review for fraud or wrongful taking of property, or violating *investment-rela* statutes, regulations, rules or industry standards of conduct? |

Criminal Disclosure

| 7C. | While employed by or associated with your *firm*, or in connection with events that occurred while the individual was employed by or associ with your *firm*, was the individual: |
| | 1. | convicted of or did the individual plead guilty or nolo contendere ("no contest") in a domestic, foreign or military court to any *felon* |
| | 2. | *charged* with any *felony*? |
| | 3. | convicted of or did the individual plead guilty or nolo contendere ("no contest") in a domestic, foreign or military court to a *misdemeanor involving*: investments or an *investment-related* business, or any fraud, false statements or omissions, wrongful takin; property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? |
| | 4. | *charged* with a *misdemeanor* specified in 7(C)(3)? |

Regulatory Action Disclosure

| 7D. | While employed by or associated with your *firm*, or in connection with events that occurred while the individual was employed by or associ with your *firm*, was the individual *involved* in any *disciplinary action* by a domestic or foreign governmental body or *self-regulatory organi* (other than those designated as a "*minor rule violation*" under a plan approved by the U.S. Securities and Exchange Commission) with jurisdiction over the *investment-related* businesses? |

Customer Complaint/Arbitration/Civil Litigation Disclosure

| 7E. | 1. | In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual name a respondent/defendant in an *investment-related*, consumer-initiated arbitration or civil litigation which alleged that the individual w *involved* in one or more *sales practice violations* and which: |
| | | (a) | is still pending, or; |
| | | (b) | resulted in an arbitration award or civil judgment against the individual, regardless of amount, or; |
| | | (c) | was settled for an amount of $10,000 or more. |
| | 2. | In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual the s of an *investment-related*, consumer-initiated complaint, not otherwise reported under question 7(E)(1) above, which alleged that the |

Yahoo! Mail - flomonroevenus@yaho. ɔm                                              Page 3 of 5

3.  individual was *involved* in one or more *sales practice violations*, and which complaint was settled for an amount of $10,000 or more
In connection with events that occurred while the individual was employed or associated with your *firm*, was the individual the subj-
an *investment-related*, consumer-initiated, written complaint, not otherwise reported under questions 7(E)(1) or 7(E)(2) above, whic

(a)  would be reportable under question 14I(3)(a) on Form U4, if the individual were still employed by your *firm*, but which has
previously been reported on the individual's Form U4 by your *firm*; or

(b)  would be reportable under question 14I(3)(b) on Form U4, if the individual were still employed by your *firm*, but which has
previously been reported on the individual's Form U4 by your *firm*.

**Termination Disclosure**

7F.  Did the individual voluntarily *resign* from your firm, or was the individual discharged or permitted to *resign* from your firm, after allegation
were made that accused the individual of:

1.  violating *investment-related* statutes, regulations, rules or industry standards of conduct?

2.  fraud or the wrongful taking of property?

3.  failure to supervise in connection with *investment-related* statutes, regulations, rules or industry standards of conduct?

---

Rev. Form U5 (06/2003)

**8. SIGNATURE**

Please Read Carefully

All signatures required on this Form U5 filing must be made in this section.

A "Signature" includes a manual signature or an electronically transmitted equivalent. For purposes of an electronic form filing, a signature is effecti
the designated signature field. By typing a name in this field, the signatory acknowledges and represents that the entry constitutes in every way, use,
legally binding signature.

8A.  FIRM ACKNOWLEDGMENT
This section must be completed on all U5 form filings submitted by the *firm*.

INDIVIDUAL ACKNOWLEDGMENT AND CONSENT

8B.  This section must be completed on amendment U5 form filings where the individual is submitting changes to Part II of the INTERNAL REVII
Section 2 (CURRENT RESIDENTIAL ADDRESS).

**FIRM ACKNOWLEDGMENT**

I VERIFY THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN AND WITH THIS FORM.

| Person to contact for further information | Telephone # of person to contact |
|---|---|
| ERICA BUNIN | 914-225-5563 |

| Signature of *Appropriate Signatory* | Date (MM/DD/YYYY) |
|---|---|
| HELEN DACHTLER | 06/03/2005 |

Type or Print Name of Appropriate Signatory _____

---

Rev. Form U5 (06/2003)

**INVESTIGATION DRP**

                                            No Information Filed

Rev. Form U5 (06/2003)

**INTERNAL REVIEW DRP**

                                            No Information Filed

Rev. Form U5 (06/2003)

**CRIMINAL DRP**

                                            No Information Filed

Rev. Form U5 (06/2003)

**TERMINATION DRP**

                                            No Information Filed

. Form U5 (06/2003)

ɔULATORY ACTION DRP

                                            No Information Filed

Rev. Form U5 (06/2003)

CUSTOMER COMPLAINT/ARBITRATION/CIVIL LITIGATION DRP

No Information Filed

| Individual Name: MCCARTHY, KAREN RUTH | SSN: 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 |
|---|---|
| Individual CRD#: 860218 | Firm CRD#: 137670 |

**U4 - INITIAL**
10/18/2005

Rev. Form U4 (06/2003)

CRIMINAL DRP

No Information Filed

Rev. Form U4 (06/2003)

REGULATORY ACTION DRP

No Information Filed

Rev. Form U4 (06/2003)

CIVIL JUDICIAL DRP

No Information Filed

Rev. Form U4 (06/2003)

CUSTOMER COMPLAINT/ARBITRATION/CIVIL LITIGATION DRP

No Information Filed

Rev. Form U4 (06/2003)

TERMINATION DRP

 's Disclosure Reporting Page is an ⊙ INITIAL OR ○ AMENDED response to report details for affirmative response to *Question 14J* on Form

.eck question(s) you are responding to:

| Termination | | |
|---|---|---|
| ☑ 14J(1) | ○ 14J(2) | ○ 14J(3) |

One event may result in more than one affirmative answer to the above items. Use only one DRP to report details related to the same termination. Us
separate DRP for each termination reported.

1.  Firm Name:
    MORGAN STANLEY

2.  Termination Type:
    Discharged

3.  Termination Date (MM/DD/YYYY):
    06/03/2005  ⊙ Exact  ○ **Explanation**
    If not exact, provide explanation:

4.  Allegation(s):
    VIOLATIONS OF FIRM POLICIES: FAILING TO GET APPROVAL FOR OUTSIDE BUSINESS ACTIVITIES.

5.  Principal Product Type:
    No Product
    Other Product Types:

6.  Comment (Optional). You may use this field to provide a brief summary of the circumstances leading to the termination. Your information mus
    within the space provided.
    MY NAME WAS ERRONEOUSLY PRINTED ON A NOT FOR PROFIT BROCHURE AS BEING ON THE BOARD OF DIRECTORS. EX
    DIR. OF ABOVE ADMITTED IN A LETTER SHE MADE MISTAKE IN PRINTING MY NAME(LETTER AND DETAILS ON FILE W/N.
    I DID NOT PARTICIPATE IN OUTSIDE BUSINESS ACTIVITIES WITH THIS NOT FOR PROFIT.

Rev. Form U4 (06/2003)

INVESTIGATION DRP

No information Filed

Yahoo! Mail - flomonroevenus@yahoo.com

| Rev. Form U4 (06/2003) |
| BANKRUPTCY/SIPC/COMPROMISE WITH CREDITORS DRP |
| No Information Filed |

| Rev. Form U4 (06/2003) |
| BOND DRP |
| No Information Filed |

| Rev. Form U4 (06/2003) |
| JUDGMENT LIEN DRP |
| No Information Filed |

Brian Dennen





## OCTOBER IS FINRA MEDIATION SETTLEMENT MONTH

**FINRA Dispute Resolution**

**Boca Raton Region**
Leon de Leon
(561) 447-4917
leon.deleon@finra.org
(Southeast, Southwest and California)

**Chicago Region**
Rosari Domenick
(312) 899-4442
rosari.domenick@finra.org
(Midwest, Northwest and Texas)

**New York Region**
Ed Sihaga
(212) 858-4359
edward.sihaga@finra.org
(Northeast, Mid-Atlantic and Ohio)

## FINRA's mediation program results in settlements more than 80 percent of the time.

Choose FINRA mediation for:

- Time and cost savings — Settlement is generally swift, and fees and expenses are modest.

- Control — Parties control the outcome.

- Successful resolution — FINRA mediators settle four out of every five cases.

- Quality — Parties choose the mediator from a select roster of skilled and experienced FINRA mediators.

Save on FINRA mediation during October:

- Cases with an amount in controversy up to $25,000 are only $100/party for a four-hour mediation.

- Cases with an amount in controversy from $25,000.01 to $100,000 are only $200/party for a four-hour mediation.

- Cases with an amount in controversy over $100,000 are only $500/party for a eight-hour mediation.

- FINRA administrative filing fees also apply, but are reduced by 50 percent during Settlement Month.

FINRA Mediation Settlement Month is coming soon, so reserve your date early. Visit our Web site at *www.finra.org/ArbitrationMediation*.



© 2007. FINRA. All rights reserved.

## DISCOVERY GUIDE

This Discovery Guide and Document Production Lists supplement the discovery rules contained in NASD Code of Arbitration Procedure for Customer Disputes ("NASD Customer Code.") (See Rules 12505-12511.)

No requirement under the Discovery Guide supersedes any record retention requirement of any federal or state law or regulation or any rule of a self-regulatory organization.

The Discovery Guide, including the Document Production Lists serves as a guide for the parties and the arbitrators; it is not intended to remove flexibility from arbitrators or parties in a given case. Arbitrators can order the production of documents not provided for by the Document Production Lists or alter the production schedule described in the Discovery Guide. Nothing in the Discovery Guide precludes the parties from voluntarily agreeing to an exchange of documents in a manner different from that set forth in the Discovery Guide. NASD encourages the parties to agree to the voluntary exchange of documents and information and to stipulate to various matters. The fact that an item appears on a Document Production List does not shift the burden of establishing or defending any aspect of a claim.

The arbitrators and the parties should consider the documents described in Document Production Lists 1 and 2 presumptively discoverable. Absent a written objection, documents on Document Production Lists 1 and 2 shall be exchanged by the parties within the time frames set forth in the NASD Customer Code. The arbitrators and parties also should consider the additional documents identified in Document Production Lists 3 through 14, respectively, discoverable, as indicated, for cases alleging the following causes of action: churning, failure to supervise, misrepresentation/omission, negligence/breach of fiduciary duty, unauthorized trading, and unsuitability. For the general document production and for each of these causes of action, there are separate Document Production Lists for firms/Associated Person(s) and for customers.

### Confidentiality

If a party objects to document production on grounds of privacy or confidentiality, the arbitrator(s) or one of the parties may suggest a stipulation between the parties that the document(s) in question will not be disclosed or used in any manner outside of the arbitration of the particular case, or the arbitrator(s) may issue a confidentiality order. The arbitrator(s) shall not issue an order or use a confidentiality agreement to require parties to produce documents otherwise subject to an established privilege. Objections to the production of documents, based on an established privilege, should be raised in accordance with the time frame for objections set forth in the NASD Customer Code.

### Affirmation In The Event That There Are No Responsive Documents or Information

If a party responds that no responsive information or documents exist, the customer or the appropriate person in the brokerage firm who has personal knowledge (i.e., the person who has conducted a physical search), upon the request of the requesting party, must: 1) state in writing that he/she conducted a good faith search for the requested information or documents; 2) describe the extent of the search; and 3) state that, based on the search, no such information or documents exist.

### Admissibility

Production of documents in discovery does not create a presumption that the documents are admissible at the hearing. A party may state objections to the introduction of any document as evidence at the hearing to the same extent that any other objection may be raised in arbitration.

• • •

### DOCUMENT PRODUCTION LISTS

• • •

**LIST 1**

## DOCUMENTS TO BE PRODUCED IN ALL CUSTOMER CASES[1]

FIRM/ASSOCIATED PERSON(S):

1) All agreements with the customer, including, but not limited to, account opening documents, cash, margin, and option agreements, trading authorizations, powers of attorney, or discretionary authorization agreements, and new account forms.

2) All account statements for the customer's account(s) during the time period and/or relating to the transaction(s) at issue.

3) All confirmations for the customer's transaction(s) at issue. As an alternative, the firm/Associated Person(s) should ascertain from the claimant and produce those confirmations that are at issue and are not within claimant's possession, custody, or control.

4) All "holding (posting) pages" for the customer's account(s) at issue or, if not available, any electronic equivalent.

5) All correspondence between the customer and the firm/Associated Person(s) relating to the transaction(s) at issue.

6) All notes by the firm/Associated Person(s) or on his/her behalf, including entries in any diary or calendar, relating to the customer's account(s) at issue.

7) All recordings and notes of telephone calls or conversations about the customer's account(s) at issue that occurred between the Associated Person(s) and the customer (and any person purporting to act on behalf of the customer), and/or between the firm and the Associated Person(s).

8) All Forms RE-3, U-4, and U-5, including all amendments, all customer complaints identified in such forms, and all customer complaints of a similar nature against the Associated Person(s) handling the account(s) at issue.

9) All sections of the firm's Compliance Manual(s) related to the claims alleged in the statement of claim, including any separate or supplemental manuals governing the duties and responsibilities of the Associated Person(s) and supervisors, any bulletins (or similar notices) issued by the compliance department, and the entire table of contents and index to each such Manual.

10) All analyses and reconciliations of the customer's account(s) during the time period and/or relating to the transaction(s) at issue.

11) All records of the firm/Associated Person(s) relating to the customer's account(s) at issue, such as, but not limited to, internal reviews and exception and activity reports which reference the customer's account(s) at issue.

---

[1]     Only named parties must produce documents pursuant to the guidelines set forth herein. However, non-parties may be required to produce documents pursuant to a subpoena or an arbitration panel order to direct the production of documents (see Rule 12513). In addition, the arbitration chairperson may use the Document Production Lists as guidance for discovery issues involving non-parties.

12) Records of disciplinary action taken against the Associated Person(s) by any regulator or employer for all sales practices or conduct similar to the conduct alleged to be at issue.

•  •  •

LIST 2

## DOCUMENTS TO BE PRODUCED IN ALL CUSTOMER CASES

CUSTOMER:

1) All customer and customer-owned business (including partnership or corporate) federal income tax returns, limited to pages 1 and 2 of Form 1040, Schedules B, D, and E, or the equivalent for any other type of return, for the three years prior to the first transaction at issue in the statement of claim through the date the statement of claim was filed.

2) Financial statements or similar statements of the customer's assets, liabilities and/or net worth for the period(s) covering the three years prior to the first transaction at issue in the statement of claim through the date the statement of claim was filed.

3) Copies of all documents the customer received from the firm/Associated Person(s) and from any entities in which the customer invested through the firm/Associated Person(s), including monthly statements, opening account forms, confirmations, prospectuses, annual and periodic reports, and correspondence.

4) Account statements and confirmations for accounts maintained at securities firms other than the respondent firm for the three years prior to the first transaction at issue in the statement of claim through the date the statement of claim was filed.

5) All agreements, forms, information, or documents relating to the account(s) at issue signed by or provided by the customer to the firm/Associated Person(s).

6) All account analyses and reconciliations prepared by or for the customer relating to the account(s) at issue.

7) All notes, including entries in diaries or calendars, relating to the account(s) at issue.

8) All recordings and notes of telephone calls or conversations about the customer's account(s) at issue that occurred between the Associated Person(s) and the customer (and any person purporting to act on behalf of the customer).

9) All correspondence between the customer (and any person acting on behalf of the customer) and the firm/Associated Person(s) relating to the account(s) at issue.

10) Previously prepared written statements by persons with knowledge of the facts and circumstances related to the account(s) at issue, including those by accountants, tax advisors, financial planners, other Associated Person(s), and any other third party.

11) All prior complaints by or on behalf of the customer involving securities matters and the firm's/Associated Person(s') response(s).

12) Complaints/Statements of Claim and Answers filed in all civil actions involving securities matters and securities arbitration proceedings in which the customer has been a party, and all final decisions and awards entered in these matters.

13) All documents showing action taken by the customer to limit losses in the transaction(s) at issue.

. . .

LIST 3

## CHURNING

FIRM/ASSOCIATED PERSON(S)

1) All commission runs relating to the customer's account(s) at issue or, in the alternative, a consolidated commission report relating to the customer's account(s) at issue.

2) All documents reflecting compensation of any kind, including commissions, from all sources generated by the Associated Person(s) assigned to the customer's account(s) for the two months preceding through the two months following the transaction(s) at issue, or up to 12 months, whichever is longer. The firm may redact all information identifying customers who are not parties to the action, except that the firm/Associated Person(s) shall provide at least the last four digits of the non-party customer account number for each transaction.

3) Documents sufficient to describe or set forth the basis upon which the Associated Person(s) was compensated during the years in which the transaction(s) or occurrence(s) in question occurred, including: a) any bonus or incentive program; and b) all compensation and commission schedules showing compensation received or to be received based upon volume, type of product sold, nature of trade (e.g., agency v. principal), etc.

. . .

LIST 4

## CHURNING

CUSTOMER

No additional documents identified.

. . .

LIST 5

## FAILURE TO SUPERVISE

FIRM/ASSOCIATED PERSON(S):

1) All commission runs and other reports showing compensation of any kind relating to the customer's account(s) at issue or, in the alternative, a consolidated commission report relating to the customer's account(s) at issue.

2)    All exception reports and supervisory activity reviews relating to the Associated Person(s) and/or the customer's account(s) that were generated not earlier than one year before or not later than one year after the transaction(s) at issue, and all other documents reflecting supervision of the Associated Person(s) and the customer's account(s) at issue.

3)    Those portions of internal audit reports at the branch in which the customer maintained his/her account(s) that:  (a) focused on the Associated Person(s) or the transaction(s) at issue; and (b) were generated not earlier than one year before or not later than one year after the transaction(s) at issue and discussed alleged improper behavior in the branch against other individuals similar to the improper conduct alleged in the statement of claim.

4)    Those portions of examination reports or similar reports following an examination or an inspection conducted by a state or federal agency or a self-regulatory organization that focused on the Associated Person(s) or the transaction(s) at issue or that discussed alleged improper behavior in the branch against other individuals similar to the improper conduct alleged in the statement of claim.

· · ·

**LIST 6**

## FAILURE TO SUPERVISE

CUSTOMER

No additional documents identified.    · · ·

**LIST 7**

## MISREPRESENTATION/OMISSIONS

FIRM/ASSOCIATED PERSON(S)

Copies of all materials prepared or used by the firm/Associated Person(s) relating to the transactions or products at issue, including research reports, prospectuses, and other offering documents, including documents intended or identified as being "for internal use only," and worksheets or notes indicating the Associated Person(s) reviewed or read such documents.  As an alternative, the firm/Associated Person(s) may produce a list of such documents that contains sufficient detail for the claimant to identify each document listed.  Upon further request by a party, the firm/Associated Person(s) must provide any documents identified on the list.

· · ·

LIST 8

## MISREPRESENTATION/OMISSIONS

CUSTOMER

1)    Documents sufficient to show the customer's ownership in or control over any business entity, including general and limited partnerships and closely held corporations.

2)    Copy of the customer's resume.

3)    Documents sufficient to show the customer's complete educational and employment background or, in the alternative, a description of the customer's educational and employment background if not set forth in a resume produced under item 2.

* * *

LIST 9

## NEGLIGENCE/BREACH OF FIDUCIARY DUTY

FIRM/ASSOCIATED PERSON(S)

Copies of all materials prepared or used by the firm/Associated Person(s) relating to the transactions or products at issue, including research reports, prospectuses, and other offering documents, including documents intended or identified as being "for internal use only," and worksheets or notes indicating the Associated Person(s) reviewed or read such documents. As an alternative, the firm/Associated Person(s) may produce a list of such documents that contains sufficient detail for the claimant to identify each document listed. Upon further request by a party, the firm/Associated Person(s) must provide any documents identified on the list.

LIST 10

## NEGLIGENCE/BREACH OF FIDUCIARY DUTY

CUSTOMER

1)    Documents sufficient to show the customer's ownership in or control over any business entity, including general and limited partnerships and closely held corporations.

2)    Copy of the customer's resume.

3)    Documents sufficient to show the customer's complete educational and employment background or, in the alternative, a description of the customer's educational and employment background if not set forth in a resume produced under item 2.

* * *

LIST 11

## UNAUTHORIZED TRADING

FIRM/ASSOCIATED PERSON(S)

    1)  Order tickets for the customer's transaction(s) at issue.

    2)  Copies of all telephone records, including telephone logs, evidencing telephone contact between the customer and the firm/Associated Person(s).

    3)  All documents relied upon by the firm/Associated Person(s) to establish that the customer authorized the transaction(s) at issue.

LIST 12

## UNAUTHORIZED TRADING

CUSTOMER

    1.  Copies of all telephone records, including telephone logs, evidencing telephone contact between the customer and the firm/Associated Person(s).

    2.  All documents relied upon by the customer to show that the transaction(s) at issue was made without his/her knowledge or consent.

* * *

LIST 13

UNSUITABILITY

FIRM/ASSOCIATED PERSON(S)

    1)  Copies of all materials prepared, used, or reviewed by the firm/Associated Person(s) related to the transactions or products at issue, including but not limited to research reports, prospectuses, other offering documents, including documents intended or identified as being "for internal use only," and worksheets or notes indicating the Associated Person(s) reviewed or read such documents. As an alternative, the firm/Associated Person(s) may produce a list of such documents. Upon further request by a party, the firm/Associated Person(s) must provide any documents identified on the list.

    2)  Documents sufficient to describe or set forth the basis upon which the Associated Person(s) was compensated in any manner during the years in which the transaction(s) or occurrence(s) in question occurred, including, but not limited to: a) any bonus or incentive program; and b) all compensation and commission schedules showing compensation received or to be received based upon volume, type of product sold, nature of trade (e.g., agency v. principal), etc.

**LIST 14**

## UNSUITABILITY

CUSTOMER

     1) Documents sufficient to show the customer's ownership in or control over any business entity, including general and limited partnerships and closely held corporations.

     2) Written documents relied upon by the customer in making the investment decision(s) at issue.

     3) Copy of the customer's resume.

     4) Documents sufficient to show the customer's complete educational and employment background or, in the alternative, a description of the customer's educational and employment background if not set forth in a resume produced under item 3.

# Use Other

| DELIVER TO | DEPARTMENT |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

# Side First

| SENT BY | DEPARTMENT |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |

RECEIVED
SEP 13 2007

Rcvd Law
Sep 13 2007



ATE: 5/30/2007    TIME: 18:05
ECE ID: BNQ0P0651444V

K#: BNQ0P065144X1
S : 1    USER: ADIXON
2: BALACEK DANA
    M036BN
T#: 8219
NE: +1 212-537-1339

(E)BALACEK DANA
FLR:< 25
SITE: NYC-2000W
BLDG: NY-1633

DATE: 9/12/2007    TIME: 16:48
PIECE ID: BQN0206044534



TRK#: BQN0206044534
PCS: 1    USER: SHAUNY
ADD2: KLUSKY MEL
ID:    MJ8201
COST#: 850001
PHONE: +1 914 225-5629

(E)KLUSKY MEL
FLR: 01
SITE: NYC-1633
BLDG: NY-2000W

# ORIGINAL

FINRA Arbitration
UNIFORM SUBMISSION AGREEMENT  07-02370

Claimant(s)

In the Matter of the Arbitration Between

Name(s) of Claimant(s)

Karen  McCarthy

and

Name(s) of Respondent(s)

Morgan  Stanley  DW , Inc.

1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, cross claims and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or *Code of Arbitration Procedure* of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or *Code of Arbitration Procedure* of the sponsoring organization.

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

Karen R. McCarthy
Claimant Name (please print)

Claimant's Signature                                        8/8/2007
                                                            Date

Claimant Name (please print)

Claimant's Signature                                        Date

If needed, copy this page.

21